UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JUDGE SCHEINDLIN

----------------------------------------------------------------x

SAWABEH INFORMATION SERVICES
COMPANY and EDCOMM, INC.,

                Plaintiffs,

      v.

CLIFFORD BRODY, LINDA EAGLE and
DAVID SHAPP,

                Defendants.

----------------------------------------------------------------x

Case No.

11 CIV 4164

COMPLAINT

**JURY TRIAL DEMANDED**

RECEIVED
JUN 17 2011
U.S.D.C. S.D. N.Y.
CASHIERS

Plaintiffs Sawabeh Information Services Company ("SISCOM") and Edcomm, Inc.

("Edcomm"), by and through their undersigned attorneys, Buchanan Ingersoll & Rooney PC, and

for their Complaint against the above-named Defendants, respectfully allege as follows:

## INTRODUCTION

1.      This action arises out of Defendants' deceptive schemes, material

misrepresentations and fraudulent omissions, all with the intent to induce SISCOM to purchase

all of Edcomm's outstanding shares or otherwise extort funds from or harm SISCOM.  Through

this action Plaintiffs seek damages for securities fraud under Section 10(b) of the Securities

Exchange Act of 1934 and SEC Rule 10b-5, fraud in the inducement of a contract for the sale of

stock, fraudulent misrepresentation and breach of contract, and declarations of Plaintiffs' rights

and other relief as against Defendants

2.      As set out in detail below, Defendants either:  (1) at the time of the stock

purchase, failed to disclose substantial liabilities of Edcomm, including approximately $12

million of liabilities purportedly owed by Edcomm to Defendant Brody, a selling shareholder

and corporate insider, and affirmatively misrepresented to Plaintiffs that it owned valuable assets

that Defendants now claim belong to Brody, or (2) months after the stock purchase, have brought forward alleged agreements of dubious authenticity with the goal of extorting money from SISCOM and Edcomm.

3.      On or about October 7, 2010, SISCOM, Edcomm and the Defendants reached an understanding whereby SISCOM would acquire from the Defendants all of the outstanding shares in Edcomm for $727,895.  That understanding was memorialized in the "Sawabeh Information Services Company Acquisition of All Outstanding Common Shares of Edcomm, Inc. – Term Sheet" (the "Stock Purchase Agreement"), executed on October 7, 2010.  A true and correct copy of the Stock Purchase Agreement is annexed hereto as Exhibit A.

4.      In or about March 2011, five months after the stock transaction by which SISCOM purchased all of the outstanding shares of Edcomm from the Defendants (the "Stock Purchase Transaction"), Plaintiffs received from Defendants two documents purporting to be years-old agreements between Edcomm and one of the Defendants.  These agreements are of questionable authenticity.  Assuming *arguendo* they are genuine, these agreements represent previously undisclosed liabilities totaling nearly $12 million.  In that case, then Defendants defrauded SISCOM in connection with the purchase of all of Edcomm's stock, among other violations of law.  If they are not genuine, then Defendants are attempting to extort money from Plaintiffs by lying about the validity of the agreements.  In either case, SISCOM and Edcomm are entitled to relief from Defendants' bad conduct and to place liability where it belongs – with Defendants.

5.      SISCOM was induced to enter into the Stock Purchase Agreement based on misrepresentations and omissions by Defendants about Edcomm, including misrepresentations about Edcomm's ownership of all intellectual property relevant to its business ("IP") and the

value of that business, while at the same time concealing the purported transfer of Edcomm's IP and more than $12 million of liabilities, which, if genuine, would substantially eliminate all value of the company.

6.      Despite the clear requirement in the Stock Purchase Agreement that Defendants disclose these liabilities before the completion of the Stock Purchase Transaction, Defendants waited until five months after SISCOM purchased all of Edcomm's stock to present Plaintiffs with two previously concealed purported liabilities of Edcomm.  These asserted liabilities arose from:  an alleged employment contract between Edcomm and Defendant Brody (the "Alleged Employment Agreement") and an alleged IP agreement between Edcomm and Defendant Brody (the "Alleged IP Agreement" and, together with the Alleged Employment Agreement, the "Alleged Agreements").  These Alleged Agreements, if authentic, which circumstances detailed below strongly suggest they are not, represent approximately $12 million of total liabilities of Edcomm to Defendant Brody.

7.      According to the Alleged Employment Agreement, which is dated 1995, Defendant Brody would purportedly be entitled to severance payments totaling millions of dollars upon the termination of his employment for any reason other than his resignation. Defendant Eagle executed the Alleged Employment Agreement on behalf of Edcomm.  A true and correct copy of the Alleged Employment Agreement is annexed hereto as Exhibit B.

8.      According to the Alleged IP Agreement dated September 17, 2008, Edcomm purportedly transferred all of its IP to Defendant Brody and gave Defendant Brody the right to demand payment of $8 million from Edcomm for the continued use of the Edcomm developed IP.  Inexplicably, notwithstanding that the Alleged IP Agreement made clear that Edcomm developed and owned the IP, the Alleged IP Agreement omitted any obligation for Brody to pay

Edcomm for the IP. Defendant Eagle executed the Alleged IP Agreement on behalf of Edcomm in her capacity as President, and Defendants Shapp and Brody also executed that Alleged IP Agreement on behalf of Edcomm. A true and correct copy of the Alleged IP Agreement is annexed hereto as Exhibit C.

9.     Each of the Defendants knew of the Alleged IP Agreement, and each of them knew or should have known of the Alleged Employment Agreement.

10.    Despite the requirement in the Stock Purchase Agreement to disclose all such liabilities or potential liabilities, none of the Defendants disclosed the asserted liabilities of the Alleged Agreements to SISCOM before the Stock Purchase Agreement was executed and SISCOM paid the agreed purchase price. Defendants also failed to disclose other then-existing liabilities, including certain related-party transactions.

11.    Assuming, *arguendo,* that the Alleged Agreements are not sham documents, Defendants deceived SISCOM to induce the Stock Purchase Agreement by, *inter alia,* fraudulently concealing the purported $12 million of liabilities under the Alleged Agreements, among other liabilities, which had the effect of greatly inflating Defendants' valuation of Edcomm that they provided to SISCOM.

12.    In addition, to the extent the Alleged IP Agreement is genuine, Defendants affirmatively misrepresented that Edcomm owned 100% of its IP in a scheme to defraud SISCOM. The IP is Edcomm's principal asset, and the prime motivation for Plaintiff SISCOM to purchase the shares of Edcomm from Defendants.

13.    If, however, as the circumstances strongly suggest, the Alleged Agreements are after-the-fact concoctions intended solely to extort approximately $12 million from Plaintiffs, Defendants' bad faith attempt to enforce them is manifestly unlawful.

14.    By their Complaint, SISCOM and Edcomm seek (a) damages due to Defendants' fraud, including damages associated with all undisclosed liabilities, and (b) a declaration that (i) the Alleged Agreements are unenforceable, regardless of whether they are genuine, or (ii) any undisclosed liabilities of Edcomm, including any liabilities to Defendant Brody under the Alleged Agreements, are the personal responsibility of the Defendants pursuant to the indemnification terms of the Stock Purchase Agreement.  SISCOM and Edcomm also seek compensatory and punitive damages resulting from Defendants' misconduct against SISCOM and Edcomm.

## JURISDICTION AND VENUE

15.    This court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331 in that this Complaint asserts causes of action arising under the laws of the United States. The court also has supplemental jurisdiction pursuant to § 1367 over claims not arising under the laws of the United States.

16.    Venue is proper pursuant to 28 U.S.C. § 1391(b) in that a substantial part of the events or omissions giving rise to the claims occurred in this district.

## PARTIES

17.    Plaintiff SISCOM is a Saudi Arabian company and a regional technology services firm that defines, designs and delivers information technology-enabled business solutions to its clients.

18.    Plaintiff Edcomm is a New York Corporation with corporate offices at 21 Penn Plaza, New York, New York and with facilities in Fort Washington, Pennsylvania.  Edcomm is a multimedia company that specializes in providing consulting and training to the banking industry.  Through such services as The Banker's Academy, Edcomm has cultivated a significant

client base in the banking industry, and provides over 1,400 courses on issues relevant to the industry, including compliance, protection against money laundering and information security. As a result of the Stock Purchase Transaction, whereby SISCOM purchased all of the outstanding Shares of Edcomm in October 2010, Edcomm is currently a wholly-owned subsidiary of SISCOM.

19.     Upon information and belief, Defendant Clifford Brody ("Brody") is a Pennsylvania citizen residing at 840 Merrill Road, Ambler, Pennsylvania.  Brody is a former chief executive officer ("CEO") and director of Edcomm and one of Edcomm's three former shareholders.

20.     Upon information and belief, Defendant Linda Eagle ("Eagle") is a New York citizen residing at 225 West 71st Street, Apt. 83, New York, New York.  Eagle is a former director and the former president of Edcomm and, along with Brody, one of Edcomm's three former shareholders.

21.     Upon information and belief, Defendant David Shapp ("Shapp", and collectively with Brody and Eagle, the "Defendants") is a Pennsylvania citizen residing at 4540 York Road, New Hope, Pennsylvania.  Shapp is a former director and the former chief financial officer ("CFO") of Edcomm and, along with Brody and Eagle, one of the three former shareholders of Edcomm.

## FACTS

22.     Edcomm is a multimedia company that specializes in providing consulting and training to the banking industry.  Through such services as The Banker's Academy, Edcomm has cultivated a significant client base in the banking industry and provides over 1,400 courses on

issues relevant to the industry, including compliance, protections against money laundering and information security.

23.    The value of Edcomm rests upon its intellectual property ("IP"), including copyrighted software and "eLearning courseware." Three of Edcomm's key products are "Moose Trax," a lead generation and sales and project tracking system; "Learning Link," Edcomm's Learning Management System; and IDEAS, the Integrated Documentation and Education Access System, a document management system.

24.    For the development of its IP, Edcomm has been granted specialized tax treatment by the state of Pennsylvania.

25.    Despite the successes Edcomm had in developing its IP, the company experienced a downturn in revenues coincident with the global economic recession in 2008 through 2010.

26.    By September 2010, Edcomm's receivables and available assets on hand had dwindled.

## EDCOMM'S LINE OF CREDIT AND DEFENDANTS' GUARANTEES

27.    In 2002, Edcomm entered into a financing agreement ("Financing Agreement") with Summa Capital Corp. ("Summa") for a line of credit up to $150,000. The Financing Agreement was deemed to be made in New York. In exchange for the extension of the line of credit, among other obligations, Edcomm provided Summa with a security interest in all of Edcomm's Receivables, as defined in the Financing Agreement. That security interest was provided to Summa in the form of a UCC-1 statement.

28.    By the terms of the Financing Agreement, Summa held a security interest in Edcomm's IP.

29.     Over time, Edcomm requested, and Summa granted, further expansions of the line of credit covered by the Financing Agreement.  By May 2008, Summa had expanded the line of credit available to Edcomm to $650,000.  Upon information and belief, in response to Summa's demands, the Defendants gave personal guarantees of payment of the outstanding balance of the Financing Agreement.

30.     In 2009, the Financing Agreement, and all of its benefits and its obligations, were assumed by SmartPros, Ltd. ("SmartPros"), a competitor of Edcomm, through a Line of Credit Amendment, dated as of June 10, 2010.

31.     By the Line of Credit Amendment, Defendants confirmed that SmartPros received the benefit of the Summa security interest.

32.     On June 11, 2010, SmartPros expanded and extended Edcomm's available line of credit to $900,000 for 120 days from June 11, 2010 to October 9, 2010.

33.     Under the Line of Credit Amendment, Edcomm was obligated either to keep $300,000 in domestic receivables aged less than 90 days or to make immediate payment representing the difference between the value of the receivables and $300,000.

34.     The Line of Credit Amendment was executed by Defendant Eagle in her capacity as president of Edcomm and by each of the Defendants individually as guarantors of Edcomm's obligations.

## EDCOMM'S UNCERTAIN FINANCES AND DEFENDANTS' DESPERATE PURSUIT OF FINANCIAL ASSISTANCE FROM SISCOM

35.     Upon information and belief, by September 2010, Defendants Brody, Eagle and Shapp recognized that Edcomm's financial situation had worsened and that a serious cash flow problem would prevent Edcomm from maintaining the minimum required $300,000 of receivables under the Line of Credit Amendment and the Financing Agreement.

36.     Upon information and belief, Defendants understood that SmartPros was entitled to and, in fact, would exercise its rights and seize Edcomm's security if Edcomm failed to maintain the necessary receivables.  In addition, Defendants understood that SmartPros could choose to discontinue Edcomm's line of credit and demand full repayment of Edcomm's line of credit from Edcomm's assets, including Edcomm's IP, and, if there was a shortfall in those assets, from the Defendants under their personal guarantees.

37.     Upon information and belief, Defendants knew of and feared that SmartPros would call the loan and require immediate repayment as a means of wresting control of its competitor.

38.     By the end of September, 2010, the balance of Edcomm's line of credit from SmartPros was over $720,000.  Upon information and belief, Defendants knew that they were personally liable for any liability unsatisfied by Edcomm's assets.

### THE DEFENDANTS' FRAUD BEGINS

39.     Upon information and belief, recognizing that Edcomm had insufficient current receivables to meet the requirements of the SmartPros line of credit, Defendants Brody, Eagle and Shapp developed their scheme to defraud SISCOM in order to avoid their personal liability and to prevent SmartPros from taking over Edcomm.

40.     On or about September 28, 2010, Eagle telephoned Haitham Saead, Executive Vice President of SISCOM and business acquaintance of Eagle, and requested a loan from SISCOM.  That call began a series of communications among SISCOM representatives and the Defendants leading to the sale of all outstanding shares of Edcomm to SISCOM on October 7, 2010.

41.     Through the oral and written communications between Defendants and SISCOM representatives, Defendants repeatedly conveyed the need to act quickly to reach a deal.

42.     Over the course of two weeks, the Defendants negotiated with SISCOM to avoid the closing of the SmartPros line of credit and SmartPros' calling of all amounts due thereunder, which would have occurred on October 9, 2010.

43.     On or about October 7, 2010, SISCOM, Edcomm and Defendants, as the sole shareholders of Edcomm, entered into the Stock Purchase Agreement.

44.     Under the terms of the Stock Purchase Agreement, SISCOM agreed to purchase all 200 outstanding shares of Edcomm from the Defendants in exchange for repayment of the outstanding balance of the SmartPros' Financing Agreement and Line of Credit Amendment. Defendants Brody and Shapp each owned 24% of the outstanding shares, equaling 48 shares of Edcomm stock, and Defendant Eagle owned the remaining 52% or 104 shares, all of which would be purchased by SISCOM.

45.     At the time of the Stock Purchase Agreement, based on representations of Defendant Eagle, SISCOM believed the balance of the line of credit to be $727,895.

46.     The Stock Purchase Agreement provided that "Closing" on the sale of the stock would occur upon the occurrence of the Stock Purchase Transaction. Thus, simultaneous with the payment of the outstanding SmartPros balance, ownership of all outstanding shares of Edcomm, all of which were held by Defendants, would pass to SISCOM.

47.     On October 11, 2010, SISCOM transferred $730,000 to Edcomm. SISCOM then authorized Edcomm to transfer the balance to SmartPros subject to: (a) an acknowledgment by Edcomm and its shareholders that the October 7, 2010 Stock Purchase Agreement among and between the parties was in full effect and is binding upon the parties until replaced by a formal

contract; (b) the signing of all outstanding stock certificates by the shareholders, leaving all other transfer information blank and placing the signed and dated certificates in escrow until such time they were requested by SISCOM; and (c) an acknowledgment that Edcomm was deemed to be sold to SISCOM as of October 11, 2010.

48.    By its terms, the Stock Purchase Agreement Closing occurred on October 11, 2010, and all of Defendants' shares of Edcomm passed to SISCOM's name and control.

49.    The Stock Purchase Agreement provided for a period of 90 to 120 days for reorganization of Edcomm, defined as the Reorganization Period.  During that period, SISCOM had the right to transition Edcomm's management and replace the Defendants as officers and directors of Edcomm.

50.    The Stock Purchase Agreement required Defendants to remain employed by Edcomm during the Reorganization Period and to cooperate in the transition of Edcomm to new management.  (Ex. A, ¶10)

51.    In addition, Defendants and Edcomm agreed, pursuant to the Stock Purchase Agreement, that Defendant Shapp "shall certify the Company's outstanding liabilities, and forecast any liabilities that might reasonably occur within six (6) months of the stock acquisition by SISCOM." (*Id.*)

52.    Paragraph 10 of the Stock Purchase Agreement further provides SISCOM with an indemnification such that "[i]f the actual or forecasted liabilities are exceeded, the current directors and officers shall be personally liable, jointly and severally, for the amount the actual liabilities exceed those in the Shapp certification." (*Id.*)

53.    At the time of the Stock Purchase Agreement, the then-current directors and officers of Edcomm were Defendants.

54.     On October 8, 2010, Defendant Shapp, with the knowledge of Defendants Eagle and Brody, provided a certification of liabilities pursuant to paragraph 10 of the Stock Purchase Agreement (the "Certification") signed by all of the Defendants.

55.     The Certification did not disclose either the Alleged Employment Agreement, the Alleged IP Agreement, or any other significant then-existing liabilities of Edcomm, including rents, equipment leases and other amounts owed by Edcomm.

56.     Because Defendant Brody could demand payment of $8 million at any time under the Alleged IP Agreement, if the Alleged IP Agreement is genuine, then the $8 million in liability thereunder was outstanding at the time of the Certification.

57.     The approximately $4 million in liability under the Alleged Employment Agreement might have reasonably occurred within six months of the Stock Purchase Transaction. The Stock Purchase Agreement clearly contemplated that the Defendants' employment could terminate at the end of the Reorganization Period. Specifically, the Stock Purchase Agreement required Defendants to remain employed to assist in transitioning the business of Edcomm to new management. It also required Defendants to "sign a non-compete agreement with the Company for a term of three (3) years, effective upon leaving the employ of the Company." (Ex. A, ¶7)

58.     In addition, upon information and belief, the financial statements and other accounting records that Defendants provided to SISCOM prior to the Closing were fraught with errors, materially misstated both accounts receivables and liabilities, concealed Edcomm's transactions with Defendants, and did not comply with GAAP.

## THE FRAUDULENT MISREPRESENTATIONS

59.     Assuming, *arguendo,* the authenticity of the Alleged Agreements, through a series of oral and written fraudulent misrepresentations and material omissions, the Defendants induced SISCOM to enter into a transaction for the purchase of all outstanding shares of Edcomm.

60.     In the communications leading to the Stock Purchase Agreement, despite her knowledge of the Alleged IP Agreement, Defendant Eagle, with the knowledge of Defendants Brody and Shapp, made material misrepresentations regarding the ownership of Edcomm's IP.

61.     Defendants, knowing of the existence of the Alleged IP Agreement and the purported transfer of all IP to Defendant Brody, misrepresented that Edcomm owned all of its IP and that its assets had significant value.

62.     In an email dated October 1, 2010, Defendant Shapp, with the knowledge of Defendants Brody and Eagle, represented to SISCOM that the value of its coursework, only a part of its IP, exceeded $20 million.  That representation failed to account for the Alleged IP Agreement, assuming, *arguendo,* that it is genuine, in that it included the value of the IP, even though Defendants now assert that Edcomm no longer owned its IP at the time.

63.     Because the Alleged IP Agreement had purportedly transferred all of Edcomm's IP to Defendant Brody, Defendants' representation in the October 1 email from Defendant Shapp was false when made.  Moreover, because the IP was the cornerstone of Edcomm's business, its value was material to SISCOM's decision to enter into the Stock Purchase Agreement and consummate the Stock Purchase Transaction.

64.     In a reply email on October 1, 2010, written in her capacity as Founder and President of Edcomm, Defendant Eagle further represented to SISCOM that the Edcomm IP

"represents great value and also it will become important to our discussions down the road of strategic plans for the future."

65.     In that same email, Defendant Eagle, represented that:

> **All of our IP is 100% owned by us.** We have not used outside organizations to create our IP and we have not given any client ownership of any courses we have created for them.

(emphasis added).

66.     After further detailing some of Edcomm's IP, Defendant Eagle then represented that she "wanted to be sure" that SISCOM "knew the extent of our IP and that our IP is 100% ours."

67.     As is true for Defendant Shapp's October 1 email, Defendants intended for Defendant Eagle's October 1 email to deceive SISCOM into believing that Edcomm alone owned the IP that formed the foundation of its business.  SISCOM had no reason to doubt the veracity of Defendant Eagle's written representation.

68.     In an October 2, 2010 email at 8:30 am to SISCOM representatives, Defendant Eagle, as Founder and President of Edcomm, represented Edcomm IP as follows:

> As promised, I am sending you some additional information on Intellectual Property.  There is a ppt presentation that provides descriptions and screen shots of our Curriculum (Classroom and eLearning), System (Moose Trax; IDEAS; and Learning Link) & Web Presence (www.bankersacademy.com), and Methodology. **These areas comprise our IP.**
>
> **As I explained earlier, our IP is 100% owned by us.** We have not used outside organizations to create our IP and we have not given any client ownership of any courses we have created for them.  I fact, over the past 8 years we have applied for and the state of Pennsylvania (where the IP work is performed) has granted Edcomm research & Development Tax credits based on over $6,000,000 in IP investment.

(emphasis added). This email was later copied to Defendants Brody and Shapp, neither of whom refuted the representations made by Defendant Eagle.

69.     Assuming the Alleged IP Agreement was not a post-Stock Purchase Transaction fabrication, Defendants affirmatively misrepresented to SISCOM that Edcomm owned 100% of its IP, despite their knowledge of the Alleged IP Agreement. Because the IP was at the core of Edcomm's business, Edcomm's ownership of the IP was a material and essential predicate to SISCOM's decision to enter into the Stock Purchase Agreement. Because of the repeated representations that Edcomm owned "100%" of its IP, SISCOM had no reason to suspect the falsity of thereof.

70.     Before completing the Stock Purchase Transaction, SISCOM required Defendants to provide SISCOM with the Certification of its liabilities.

71.     On October 8 at 9:47 a.m., SISCOM's counsel requested by email that Defendants send the Certification required by Paragraph 10 of the Stock Purchase Agreement signed by each of the Defendants.

72.     In her reply email on behalf of Defendants, Defendant Eagle informed SISCOM that the Certification documents would be sent with "our signatures as soon as Cliff [Brody] is back in the office to sign (later today)."

73.     By reply email dated October 8 at 6:22 p.m., Defendant Eagle sent copies of the signed Certification with the signatures of each of the Defendants.

74.     The Certification documents do not disclose the Alleged IP Agreement.

75.     The Certification documents do not disclose the Alleged Employment Agreement.

76.     Other liabilities that were either outstanding or reasonably foreseeable to occur within six months of the Stock Purchase Transaction were also omitted from the Certification.

77.     By the same email, dated October 8 at 9:47 a.m., SISCOM's counsel sought assurances that Edcomm had not sold any of its IP content in the past.

78.     By reply email at 3:32 p.m. the same day, Defendant Eagle assured SISCOM's representatives that "Edcomm has never sold its content."  By "content," Defendant Eagle was referring to Edcomm's IP.

79.     Because Defendants now assert that the 2008 Alleged IP Agreement is valid and enforceable, the representation made by Defendant Eagle, and known to Defendants Brody and Shapp, was false when made, and was made for the purpose of inducing SISCOM to complete the Stock Purchase Transaction.

80.     On October 11, 2010, after receiving the Certification from Defendants and one last assurance that Edcomm owned the IP, SISCOM completed the Closing by transferring to Edcomm funds sufficient to pay off the liability to SmartPros.

81.     To complete the Closing, SISCOM wired $730,000 to Edcomm for it to pay the entire outstanding line of credit to SmartPros.

82.     After the Closing, both Defendants Brody and Eagle profusely thanked SISCOM for entering into the Stock Purchase Transaction and preventing a takeover from SmartPros.

83.     At that time, Defendants' ownership of the Edcomm shares ceased and was transferred to SISCOM.

84.     Since that time, SISCOM has been the sole shareholder of Edcomm.

**DEFENDANTS' UNTIMELY DISCLOSURE OF THE ALLEGED AGREEMENTS**

85.     After the Closing SISCOM began the Reorganization Period set forth in the Stock Purchase Agreement.

86.     Since the Closing, Defendants wrongfully have attempted to thwart and undercut their sale of Edcomm to SISCOM by hindering and disrupting the Reorganization Period,

16

necessitating the extension thereof by several months, threatening to take all of Edcomm's

business, even though they each agreed to sign a non-compete, and threatening to publicly

disparage Edcomm in the event they left its employ.

87.     Significantly, approximately 5 months after the Closing, in March 2011,

Defendant Eagle disclosed the Alleged Agreements to SISCOM for the first time.  Under the

Alleged Agreements, Edcomm purportedly had previously-concealed liabilities to Defendant

Brody in the amount of approximately $12 million and had divested the company of the only

assets capable of generating a return on SISCOM's purchase of all Edcomm's stock – its

intellectual property.

88.     At no time previously had any of the Defendants disclosed the existence of the

Alleged Agreements, even though such disclosures would have been necessary to correct their

prior misleading statements concerning the ownership and value of the IP and the value of

Edcomm.

89.     Since that time, Defendants have threatened to seek enforcement of both the

Alleged IP Agreement and the Alleged Employment Agreement.

## THE SHAM ALLEGED AGREEMENTS

90.     As noted above, the authenticity of the Alleged Agreements is dubious, at the

very least, if not utterly implausible.

91.     The circumstances of their presentation to SISCOM and the terms of the Alleged

Agreements evidence that they are purely fabrications made up following Plaintiff's purchase of

Defendants' Edcomm stock.

92.     Notwithstanding that Defendants were required to disclose all liabilities in the

Certification, Defendants failed to identify those liabilities arising under the Alleged

Agreements. That is so even though the $12 million in liabilities far surpasses the almost

$730,000 Edcomm purchase price. Not until five months after the Stock Purchase Transaction

was consummated were these Alleged Agreements mentioned to SISCOM. No reasonable

explanation was provided for the delay.

93.    Moreover, no original of either Alleged Agreement was ever provided to

SISCOM. When SISCOM requested originals, Defendants told SISCOM that they did not have

the originals. That neither Defendant Brody, Edcomm nor the other Defendants retained

originals, given the staggering $12 million at stake, is wholly incredible.

94.    Examination of the terms of the Alleged Agreements casts further doubt on their

genuineness. Neither of the Alleged Agreements provides any tangible benefit to Edcomm;

rather they just provide for substantial liabilities to Defendant Brody.

95.    The lack of any benefit to Edcomm is particularly glaring in the Alleged IP

Agreement, whereby Edcomm is purported to have transferred all its IP to Defendant Brody for

no consideration, even though it acknowledged that the value of the IP was "great." In contrast,

the Alleged IP Agreement gave Brody the right to demand $8 million in payment for use of the

IP, without providing any reasoned formula or justification for that payment. These omissions

strongly suggest that the Alleged IP Agreement is a sham.

## SISCOM SEEKS RELIEF

96.    Regardless of whether either of the Alleged Agreements are a sham, Plaintiffs are

entitled to relief. If either of the Alleged Agreements is genuine, Defendants fraudulently

induced SISCOM into purchasing the stock, among other breaches of their duties to Plaintiffs.

If either Alleged Agreement is a sham, then Defendants are lying to Plaintiffs in an unlawful

attempt to extort additional funds from, or otherwise harm, them. In neither case is Defendants'

conduct lawful.

97.     Assuming, *arguendo,* the Alleged Agreements are valid, SISCOM purchased Edcomm based on the Defendants' representations, required under the Stock Purchase Agreement, concerning the value of Edcomm's assets, including the IP, and the amount of Edcomm's liabilities outstanding at the time of the Stock Purchase Agreement or reasonably foreseeable within 6 months of the Stock Purchase Agreement.

98.     Defendants knew of and deceptively failed to disclose the Alleged IP Agreement and the Alleged Employment Agreement, knowing that such disclosure would end the discussions with SISCOM over the Stock Purchase Agreement, which would have resulted in both a default on the SmartPros line of credit and SmartPros' attempt to collect on its security interest in Edcomm's assets.

99.     In the alternative, Defendants know that the Alleged IP Agreement and the Alleged Employment Agreement are fabrications and not liabilities of Edcomm or SISCOM, but are persisting in their deception to extort money from Plaintiffs.

100.    By this Complaint, SISCOM and Edcomm seek, *inter alia,* a declaration that the Alleged Agreements are invalid or, in the alternative, that any liability to SISCOM and Edcomm under the Alleged Agreements be indemnified by Defendants pursuant to the Stock Purchase Agreement.

101.    SISCOM and Edcomm have been, and continue to be, irreparably harmed by the assertion of these undisclosed liabilities.

102.    SISCOM and Edcomm are entitled to compensatory and punitive damages and attorneys' fees and costs as a result of Defendants' fraudulent conduct.

## FIRST CAUSE OF ACTION
## (SECURITIES FRAUD)
## (ON BEHALF OF PLAINTIFF SISCOM)

103.    Plaintiffs hereby incorporate by reference and reallege each and every prior allegation as if fully set forth herein.

104.    If the Alleged Agreements are genuine, then, in circumstances evidencing an obvious intent to deceive SISCOM, the Defendants made numerous material oral and written affirmative misrepresentations in connection with the Stock Purchase Transaction, including but not limited to:

- misrepresentations that Edcomm owned all the IP relating to its business, when in fact Edcomm purportedly divested all of its IP to corporate insider Brody;

- misrepresentations that they would and had certified all of Edcomm's liabilities, when, in fact, the Defendants failed to disclose the asserted $12 million liabilities arising from the Alleged Agreements;

- misrepresentations concerning Edcomm's value, as all valuations, including the Certification, provided by Defendants to SISCOM failed to account for the Alleged Agreements; and

- providing financial statements and accounting records that, upon information and belief, materially misstated Edcomm's receivables, payables and other liabilities.

105.    Each Defendant was clearly aware of the Alleged IP Agreement as they all had purportedly executed it in 2008, a mere three years prior to the Stock Purchase Transaction.

106.    Assuming that the Alleged IP agreement is valid, the Defendants repeatedly misrepresented to SISCOM that Edcomm owned all the IP, notwithstanding their knowledge of the Alleged IP Agreement, which renders those repeated representations utterly false.  The Defendants furthered this deception by falsely inflating the value of Edcomm by including the IP therein, even though Edcomm purportedly no longer owned it.

107.    Ownership of Edcomm's IP was a material fact.  The IP was the only Edcomm asset through which the company could profit in the future, and, therefore, the only asset capable of generating a return on any third party's purchase of Edcomm stock.  Accordingly, the knowingly-false statements that Edcomm owned *all* of its IP were unquestionably material.

108.    SISCOM had no reason to doubt, and reasonably relied on, Defendants' veracity.  Reliance thereon was particularly reasonable in light of (a) the Defendants' reiteration of these misrepresentations, both orally and in writing, (b) the disclosure obligations under the Stock Purchase Agreement, and (c) Defendants' indemnification obligations under the Stock Purchase Agreement.

109.    In the Stock Purchase Agreement, the Defendants agreed that Defendant Shapp would certify all of Edcomm's "outstanding liabilities and forecast any liabilities that might reasonably occur within six (6) months of the" Stock Purchase Transaction.

110.    Defendant Shapp provided the requisite Certification, countersigned by all of the Defendants, which omitted the purported $12 million in liabilities to Brody, among other liabilities, even though they were either outstanding or might reasonably occur within 6 months, assuming that the Alleged Agreements are genuine.

111.    The Alleged IP Agreement gave Brody the right to demand payment at any time, making the liability outstanding at the time of the Certification.

112.   The Stock Purchase Agreement clearly contemplated that the Defendants' employment could be – and might very well be – terminated at the conclusion of the 90 to 120-day Reorganization Period.  Brody's termination would, therefore, trigger the $4 million liability under his Alleged Employment Agreement at the conclusion of a four-month Reorganization Period, well within the six-month forecast period required to be reported in the Certification.

113.   Contrary to the disclosure requirements of the Stock Purchase Agreement, the Certification omitted the staggering $12 million in liabilities allegedly due under the Alleged Agreements.

114.   By omitting the purported liabilities due under the Alleged IP and Employment Agreements, the Certification materially misrepresented Edcomm's now-asserted financial status – that it is a shell corporation with no valuable assets and massive liabilities to an insider.

115.   These material misrepresentations were intended to defraud SISCOM into completing the Stock Purchase Agreement.  That intent is clear from: (a) the Defendants' knowledge of the Alleged Agreements; and (b) the circumstances of the Stock Purchase Transaction.

116.   The Defendants needed to close the Stock Purchase Agreement to avoid default on Edcomm's line of credit from SmartPros and SmartPros' foreclosure on its interest in Edcomm's assets and attempt to collect on the personal guarantees by Defendants.  The fact that the Defendants were on the verge of losing their company and incurring substantial personal liability gave them an obvious motive to deceive SISCOM and misrepresent Edcomm's shell-corporation status and staggering debt.  SISCOM's repeated requests for confirmation that Edcomm owned its IP and requiring a Certification of all liabilities made it obvious that

SISCOM would not have proceeded to Closing had Defendants misrepresented the ownership of the IP, the value of Edcomm and the amount of Edcomm's liabilities.

117.    Neither SISCOM nor any reasonable potential purchaser of Defendants' stock would proceed with a transaction knowing that Edcomm had no assets capable of generating a return on investment and millions of dollars in liabilities to Defendant Brody.  The Defendants, therefore, had a strong incentive to lie to SISCOM to obtain the funds necessary to pay SmartPros and avoid the loss of their company and employment.

118.    By virtue of Defendants' affirmative misrepresentations in violation of Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C.A. § 78j(b), and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5, assuming the Alleged Agreements are genuine, SISCOM is entitled to compensatory damages in amounts to be proven at trial.

**SECOND CAUSE OF ACTION**
**(SECURITIES FRAUD - FAILURE TO DISCLOSE)**
**(ON BEHALF OF PLAINTIFF SISCOM)**

119.    Plaintiffs hereby incorporate by reference and reallege each and every prior allegation as if fully set forth herein.

120.    If the Alleged Agreements are genuine, then the Defendants fraudulently failed to disclose the fact that Edcomm was essentially a shell corporation and that the Defendants had previously caused Edcomm to divest substantially all of its assets of value to Defendant Brody.

121.    Defendants thus knew that, rather than being a valuable company, Edcomm had approximately $12 million in undisclosed liabilities under the Alleged Agreements, no ownership of the IP, and substantially limited other assets.

122.    By virtue of their insider status at a closely held corporation, the Defendants had the duty to disclose all material information before trading in Edcomm securities.

123.    Any reasonable potential purchaser of Edcomm stock would deem it material before purchasing its securities that Edcomm had transferred its only asset that was capable of generating any income – its IP – to a corporate insider, and had incurred $12 million in liabilities to that same insider.

124.    The Defendants knew these material facts due to their insider status but failed to disclose them before selling their Edcomm stock to SISCOM.

125.    As detailed above, the Certification was materially misleadingly in that it failed to disclose the purported liabilities under the Alleged Agreements.  Having presented a misleading affirmative representation concerning Edcomm's financial status, the Defendants had a duty to disclose prior to the Closing the liabilities necessary to make their representations in the Certification not misleading.

126.    The Defendants knew that SISCOM was laboring under the misrepresentation that Edcomm owned 100% of its IP, because they were all copied on emails containing that misrepresentation to SISCOM from Defendant Eagle.  That knowledge gave the Defendants a duty to disclose the fact that Edcomm purportedly divested the IP to Defendant Brody, but they failed to do so.

127.    Upon information and belief, the Defendants' nondisclosure of the Alleged IP and Employment Agreements, and resulting liabilities, could only have been intentional or reckless. The basis of this belief is the circumstances of the nondisclosures.

128.    First, all of the Defendants were aware of: (1) the prior misrepresentations that Defendant Eagle made to SISCOM concerning Edcomm's ownership of 100% of its IP, (2) misleading representations of the value of Edcomm that included its IP and excluded the purported $12 million in liabilities to Defendant Brody due under the Alleged Agreements, and

24

(3) the misleading information contained in the Certification. Yet, none of the Defendants took any action to correct these prior misstatements of material fact even though they knew SISCOM was relying on them in closing the Stock Purchase Transaction.

129.   Second, the Defendants knew that, if they disclosed these liabilities to SISCOM, SISCOM would never close the Stock Purchase Agreement or do any other kind of transaction with Edcomm. No reasonable investor would purchase stock of a corporation that essentially has no assets and massive liabilities.

130.   SISCOM made the necessary inquiries concerning liabilities and Edcomm's ownership of its IP when considering whether to purchase Edcomm's stock. SISCOM's inquiries made clear to Defendants that full disclosure of the Alleged Agreements would have killed the deal, and Edcomm would have defaulted on its loan from SmartPros within days.

131.   Alternatively, the Defendants knew of the purported liabilities to Defendant Brody under the Alleged Agreements. The Defendants were also aware of their contractual obligation to disclose them under the Stock Purchase Agreement. Notwithstanding that obligation, the Defendants failed to disclose the liabilities arising under the Alleged Agreements. If such non-disclosure was not intentional, it had to have been reckless in light of the Defendants' knowledge of the Certification and their obligation to disclose all liabilities therein.

132.   By virtue of Defendants' affirmative misrepresentations in violation of Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C.A. § 78j(b), and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5, assuming the Alleged Agreements are genuine, SISCOM is entitled to compensatory damages in amounts to be proven at trial.

**THIRD CAUSE OF ACTION**
**(FRAUDULENT INDUCEMENT)**
**(ON BEHALF OF PLAINTIFF SISCOM)**

133.    Plaintiffs hereby incorporate by reference and reallege each and every prior allegation as if fully set forth herein.

134.    As detailed above, if the Alleged Agreements are genuine, the Defendants fraudulently induced SISCOM into entering the Stock Purchase Agreement by (a) lying about Edcomm's ownership of its IP, (b) misrepresenting the value of Edcomm, and (c) fraudulently concealing the purported liabilities to Defendant Brody and other liabilities.

135.    In light of the Defendants' duties to disclose, SISCOM reasonably relied on the accuracy of the Defendants' representations concerning its ownership of 100% of its IP and that the Certification did and would fully reveal all outstanding liabilities and those that were reasonably likely to come due within six months.

136.    Had the Defendants not made such misrepresentations and fraudulent nondisclosures, but had instead revealed the Alleged Agreements and resulting and other liabilities, SISCOM never would have entered into the Stock Purchase Agreement.  Neither SISCOM nor any reasonable investor would buy a company that had divested all valuable assets to an insider but had retained only massive liabilities.

137.    The Defendants' fraudulent conduct was wanton and malicious and was quasi-criminal in that the Stock Purchase Transaction essentially resulted in their acceptance of money from SISCOM while knowingly giving nothing to SISCOM in return.

138.    By virtue of the Defendants' fraud, assuming that the Alleged Agreements are authentic, SISCOM is entitled to compensatory and punitive damages in amounts to be proven at trial.

26

## FOURTH CAUSE OF ACTION
### (COMMON LAW FRAUD)
### (ON BEHALF OF PLAINTIFF SISCOM)

139.   Plaintiffs hereby incorporate by reference and reallege each and every prior allegation as if fully set forth herein.

140.   As set forth above, if the Alleged Agreements are valid, Edcomm was essentially a shell corporation at the time of the Stock Purchase Transaction, having divested substantially all of its valuable assets to Defendant Brody, while retaining massive liabilities to that same insider.

141.   Also set forth above, through affirmative misrepresentations and fraudulent non-disclosures of material facts, the Defendants concealed Edcomm's shell-corporation status.

142.   The Defendants' fraudulent misrepresentations and nondisclosures of material facts induced SISCOM's reasonable reliance and caused SISCOM to purchase all of the stock of Edcomm.

143.   The Defendants' fraudulent conduct was wanton and malicious and was quasi-criminal in that the Stock Purchase Transaction essentially resulted in their acceptance of money from SISCOM while knowingly giving nothing to SISCOM in return.

144.   By virtue of the Defendants' fraud, SISCOM is entitled to compensatory and punitive damages in amounts to be proven at trial.

## FIFTH CAUSE OF ACTION
### (BREACH OF CONTRACT)
### (ON BEHALF OF PLAINTIFF SISCOM)

145.   Plaintiffs hereby incorporate by reference and reallege each and every prior allegation as if fully set forth herein.

146.    The Stock Purchase Agreement clearly and expressly required the Defendants to certify all "outstanding liabilities and forecast any liabilities that might reasonably occur within six (6) months of the" Stock Purchase Transaction.  The Defendants were thereby obligated to include all such liabilities in that Certification.

147.    The Defendants breached that obligation by failing to include the purported liabilities under the Alleged IP and Alleged Employment Agreements in the Certification.  As set forth above, these purported liabilities to Brody were either outstanding or reasonably likely to occur within six months of the Stock Purchase Transaction.

148.    The Stock Purchase Agreement also required each of the Defendants to "cooperate with SISCOM in transitioning management" of Edcomm.  (Ex. A, ¶6.b)  Defendants have utterly flouted that obligation by continually obstructing SISCOM's transition efforts.

149.    By virtue of the Defendants' breach of the Stock Purchase Agreement, SISCOM has been damaged in an amount to be proven at trial.

## SIXTH CAUSE OF ACTION
### (BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING)
### (ON BEHALF OF PLAINTIFF SISCOM)

150.    Plaintiffs hereby incorporate by reference and reallege each and every prior allegation as if fully set forth herein.

151.    As set forth above, the Defendants, by concealing the asserted liabilities due to Brody under the Alleged IP and Employment Agreements, deprived SISCOM of all benefits of the Stock Purchase Agreement.

152.    The Defendants' bad faith conduct, thereby, violated the covenant of good faith and fair dealing implicit in every contract, including the Stock Purchase Agreement.

153.    By virtue of the Defendants' breach of covenant of good faith and fair dealing implicit in the Stock Purchase Agreement, SISCOM has been damaged in an amount to be proven at trial.

## SEVENTH CAUSE OF ACTION
### (DECLARATORY JUDGMENT - INDEMNIFICATION)
### (ON BEHALF OF PLAINTIFF SISCOM)

154.    Plaintiffs hereby incorporate by reference and reallege each and every prior allegation as if fully set forth herein.

155.    The Stock Purchase Agreement expressly requires the Defendants to indemnify SISCOM for any liability that was omitted from the Certification.

156.    The liabilities reflected in the Alleged IP and Alleged Employment Agreements, assuming, *arguendo,* that they are genuine, were either outstanding or reasonably likely to occur within six months of the Stock Purchase Transaction, but were excluded from the Certification.

157.    To the extent that the liabilities to Defendant Brody are valid and enforceable liabilities of Edcomm, the Defendants agreed in the Stock Purchase Agreement to indemnify SISCOM for these obligations.  The Stock Purchase Agreement, therefore, required Defendants to indemnify SISCOM from and against these liabilities due to their omission from the Certification.

158.    In addition, the Defendants failed to disclose other liabilities in the Certification, including those relating to leases, related party transactions and other sources.

159.    Moreover, the Defendants' bad faith conduct concerning these liabilities made clear that Edcomm would incur substantial attorneys' fees and costs as a result thereof.

160.   Therefore, as a result of the Defendants' aforementioned conduct, an actual and justiciable controversy exists as to the Defendants' duties and obligations to indemnify SISCOM for any liability omitted from the Certification.

161.   By virtue of the foregoing, SISCOM is entitled to a declaration that Defendants must indemnify it for all costs resulting from any liability omitted from the Certification, including those to Defendant Brody and any costs and fees incurred in connection with this action.

## EIGHTH CAUSE OF ACTION
### (RESCISSION - ALLEGED IP AGREEMENT)

162.   Plaintiffs hereby incorporate by reference and reallege each and every prior allegation as if fully set forth herein.

163.   Upon information and belief, to the extent the Alleged IP Agreement is genuine, the Alleged IP Agreement was a sham transaction to protect Edcomm's IP at the expense of would-be creditors and purchasers, including SISCOM.   The basis of this belief is the timing of the purported execution of the Alleged IP Agreement and the provisions thereof.

164.   Edcomm purportedly transferred all of its IP to Defendant Brody shortly before the expansion of its line of credit up to $650,000, for which Edcomm's assets served as collateral.

165.   There was no apparent reason for the Defendant-owners of Edcomm to cause the company to divest its IP to Brody other then to prevent Summa, and subsequently SmartPros, from obtaining Edcomm's most valuable assets in the event it defaulted on the loan.

166.   This is particularly clear because the Alleged IP Agreement had no benefit to Edcomm and was not an arms-length transaction.   For example, the Alleged IP Agreement made no provision for any specific payment from Brody to Edcomm for the IP, even though it recognized that the value of the IP was "great."   Similarly, the Alleged IP Agreement omitted

any definitive formula for compensating Brody for Edcomm's use thereof.  The absence of such

terms is wholly inconsistent with a legitimate arm's-length agreement governing the sale of IP.

167.    In addition, such an Alleged IP Agreement would be wholly inconsistent with the

security interest provided to Summa and SmartPros.  To the extent the Alleged IP Agreement

transferred an Edcomm asset, the transfer would have had to have been recorded.

168.    Upon information and belief, the Defendants determined to perpetuate the sham

Alleged IP Agreement after approaching SISCOM about a potential transaction to similarly

deprive SISCOM of Edcomm's only asset of value.  As set forth above, the Defendants so

perpetuated the sham through bad faith and malicious falsehoods and fraudulent non-disclosures

in the course of negotiations with SISCOM.

169.    In these circumstances, equity and fair dealing require rescission of the Alleged IP

Agreement.

170.    By virtue of the foregoing, Plaintiffs are entitled to rescission of the Alleged IP

Agreement.

## NINTH CAUSE OF ACTION
### (INJUNCTION - ALLEGED IP AGREEMENT)

171.    Plaintiffs hereby incorporate by reference and reallege each and every prior

allegation as if fully set forth herein.

172.    As detailed above, the Alleged IP Agreement, to the extent it was actually

executed in 2008, was a sham, intended only to defraud creditors and would-be purchasers of

stock, including SISCOM; as such, it breached the Defendants' fiduciary obligations to Edcomm

in their capacity as officers and directors of Edcomm.

173.    In addition, at the time of the Alleged IP Agreement, Summa held a valid lien on

all of Edcomm's assets under the UCC financing statement.  Edcomm, therefore, was precluded

from transferring the IP under the Alleged IP Agreement, at the very least without recording it.

Edcomm failed to record the Alleged IP Agreement, thereby preventing SISCOM from

discovering its existence.

174.   If, however, the IP Agreement is a sham, then any attempt to enforce the IP

Agreement is manifestly improper.

175.   SISCOM would be irreparably harmed by Defendants' enforcement of the

Alleged IP Agreement in that it would have no ability to profit from its ownership of Edcomm.

176.   Any notion of equity and fair dealing precludes enforcement of the Alleged IP

Agreement, whether it is genuine or bogus.

177.   By virtue of the foregoing, Plaintiffs are entitled to a permanent injunction against

Defendants' enforcement of the Alleged IP Agreement.

### TENTH CAUSE OF ACTION
### (DECLARATORY JUDGMENT - IP)

178.   Plaintiffs hereby incorporate by reference and reallege each and every prior

allegation as if fully set forth herein.

179.   As detailed above, the Alleged IP Agreement was either (a) entered into in 2008

as a sham, intended only to defraud creditors and would-be purchasers of stock, including

SISCOM, or (b) a post-Stock Purchase Transaction fabrication intended to extort additional

funds from Plaintiffs and deprive SISCOM of the benefits of its rightful ownership of Edcomm.

180.   Therefore, an actual and justiciable controversy exists as to the validity,

enforceability, and genuineness of the IP Agreement.

181.   By virtue of the foregoing, Plaintiffs are entitled to a declaratory judgment that

Edcomm is the owner of the IP.

## ELEVENTH CAUSE OF ACTION
## (DECLARATORY JUDGMENT - ALLEGED EMPLOYMENT AGREEMENT)
## (ON BEHALF OF PLAINTIFF EDCOMM)

182.    Plaintiffs hereby incorporate by reference and reallege each and every prior allegation as if fully set forth herein.

183.    Implicit in any employment agreement is the employee's obligation to honor all fiduciary obligations to the employer.  Should an employee breach his or her fiduciary duties to an employer, the employer will be relieved of any future obligations to the employee under the employment agreement.

184.    Here, Defendant Brody may unquestionably be terminated for cause based on (1) his breach of fiduciary duty by entering into the Alleged IP Agreement, which gave Edcomm's only assets of value to him at no cost, or (2) by representing the Alleged IP Agreement as genuine when it is not and (3) his bad faith and fraudulent conduct towards SISCOM, Edcomm's current owner.

185.    Defendant Brody's misconduct nullifies any future obligation of Edcomm to Brody, including those set forth in the Alleged Employment Agreement, to the extent it is valid and genuine.

186.    Therefore, an actual and justiciable controversy exists as to the duties and obligations of Edcomm to Brody, including those set forth under the alleged Employment Agreement.

187.    By virtue of the foregoing, Plaintiffs are entitled to a declaratory judgment that it has no obligation to pay Brody any money as a result of his termination for cause, including without limitation those amounts specified in the Alleged Employment Agreement.

## TWELFTH CAUSE OF ACTION
## (INJUNCTION - ALLEGED EMPLOYMENT AGREEMENT)

188.   Plaintiffs hereby incorporate by reference and reallege each and every prior allegation as if fully set forth herein.

189.   As detailed above, Defendant Brody may be terminated for cause due to his bad faith and malicious deception of SISCOM in connection with the Stock Purchase Transaction and breach of his fiduciary duties to Edcomm.  Such bad conduct nullifies any entitlement to severance or any other payment from Edcomm to the extent the Alleged Employment Agreement is valid.

190.   If, however, the Alleged Employment Agreement is a sham, then any attempt to enforce it is manifestly improper.

191.   Any notion of equity and fair dealing precludes enforcement of the Alleged Employment Agreement, regardless of whether it is genuine.

192.   By virtue of the foregoing, Plaintiffs are entitled to a permanent injunction against Defendants' enforcement of the Alleged Employment Agreement.

## THIRTEENTH CAUSE OF ACTION
## (BREACH OF FIDUCIARY DUTY)

193.   Plaintiffs hereby incorporate by reference and reallege each and every prior allegation as if fully set forth herein.

194.   Upon information and belief, the Alleged IP and Employment Agreements are completely sham devices intended only to extort additional funds from SISCOM in connection with the Stock Purchase Transaction.

195.   The basis of that belief includes the following:

- Defendants' failure to disclose the Alleged IP or Employment Agreements to SISCOM for an incredible five months after the consummation of the Stock Purchase Transaction, even though (a) Defendants were obligated to disclose all liabilities to SISCOM in the Certification prior to the Closing and (b) Defendants and SISCOM were in the midst of the Reorganization Period and working together daily to transition control of Edcomm.

- Defendants purport not to have originals of either Alleged IP or Employment Agreements, when, given the amounts purportedly due and owing thereunder, both Edcomm and Defendant Brody would reasonably be expected to have their *own* copy of the Alleged Agreements.

- The Alleged IP Agreement has none of the hallmarks of a legitimate transfer of IP, including (a) any provision of payment by Brody to Edcomm for the IP, even though the acknowledged value was "great," and (b) any formula for Edcomm's payment to Brody for the use of the IP. Instead, the Alleged IP Agreement simply allows Defendant Brody to demand payment of $8 million at any time, even though he purportedly bought the IP from Edcomm.

196.    Edcomm is Defendants' employer, and SISCOM owns Edcomm as a result of the Stock Purchase Transaction.   Defendants, therefore, have fiduciary duties to Plaintiffs.

197.    Defendants wholly flouted their fiduciary obligations to Plaintiffs by lying about the validity of the Alleged IP and Employment Agreements and by knowingly attempting to extort money based on phony transactions.

198.    Defendants are also breaching their fiduciary obligations to Plaintiffs by disrupting and hindering SISCOM's efforts to transition management and repeatedly threatening to take all of Edcomm's business and disparage it publicly.

199.    These breaches are wanton, malicious and quasi-criminal.

200.    By virtue of the Defendants' egregious breaches of their fiduciary duties, Plaintiffs are entitled to compensatory damages, including their costs and attorneys' fees in bringing this action, and punitive damage in amounts to be determined at trial.

## FOURTEENTH CAUSE OF ACTION
## (BREACH OF FIDUCIARY DUTY)

201.    Plaintiffs hereby incorporate by reference and reallege each and every prior allegation as if fully set forth herein.

202.    The Defendants owed Plaintiffs a fiduciary duty arising from their existing employment at Edcomm and the expectation that they would remain employed by Edcomm after SISCOM bought all their shares, at least for the duration of the Reorganization Period.

203.    The Defendants breached their fiduciary obligation to Edcomm by transferring its only valuable assets to Defendant Brody for no apparent value.  They did so notwithstanding the acknowledged facts that:  (a) Edcomm owned the IP and (b) Edcomm paid for the development of the IP.  Such a transfer violated the Defendants' fiduciary obligations to Edcomm, as Edcomm derived no benefit from the transaction and the Alleged IP Agreement was not in Edcomm's best interests.

204.    The Defendants also breached their fiduciary obligations to SISCOM by failing to disclose to their future employers the Alleged IP and Employment Agreements.  The failures to disclose were wanton and malicious and evinced the utmost in bad faith in dealing with Edcomm's future owners and their ultimate parent entity.

36

205.    By virtue of the Defendants' egregious breaches of their fiduciary duties,

Plaintiffs are entitled to compensatory and punitive damages in amounts to be determined at trial.

**FIFTEENTH CAUSE OF ACTION**
**(NEGLIGENT MISREPRESENTATION)**
**(ON BEHALF OF PLAINTIFF SISCOM)**

206.    Plaintiffs hereby incorporate by reference and reallege each and every prior

allegation as if fully set forth herein.

207.    To the extent that the Defendants' misrepresentations were not intentional or

reckless, which the circumstances strongly infer that they were, the misrepresentations were

grossly negligent.

208.    All the Defendants were aware of the Alleged IP and Employments Agreements

but failed to disclose the liabilities due thereunder.

209.    All of the Defendants had a duty to disclose these liabilities arising from:  (a) their

prior misstatements concerning Edcomm's ownership of its IP; (b) the prior valuations of

Edcomm that did not account for the Alleged IP and Employment Agreements; (c) the

misleading information concerning Edcomm's financial status set forth in the Certification; (d)

their knowledge that SISCOM was laboring under the misconception that the Certification

identified all liabilities; and (e) their superior knowledge as corporate insiders.

210.    In the unlikely event that the Defendants' failure to disclose the Alleged IP and

Employment Agreement was not made with scienter, the nondisclosures were grossly negligent.

211.    By virtue of the Defendants' negligent misrepresentations with respect to the

Alleged Agreements and other liabilites, SISCOM has been damaged in an amount to be proven

at trial.

WHEREFORE, Plaintiffs respectfully demand judgment as follows:

i.      compensatory damages in an amount to be determined at trial;

ii.     punitive damages in an amount to be determined at trial;

iii.    all of the costs of suit (including attorneys' fees and costs);

iv.     rescission of the Alleged IP Agreement;

v.      rescission of the Alleged Employment Agreement;

vi.     a permanent injunction preventing Defendants from enforcing the Alleged IP and Employment Agreements;

vii.    a declaration that Edcomm is the owner of the IP;

viii    a declaration that Edcomm has no obligations under the Alleged IP and Employment Agreements;

ix      to the extent that the Alleged IP and Employment Agreements are valid liabilities of Edcomm, a declaration that SISCOM is entitled to indemnification from Defendants for any liability due thereunder;

x.      to the extent Defendants failed to disclose any other liabilities, a declaration that SISCOM is entitled to indemnification for any such liabilities; and

    xi.     granting such other and further relief as this Court deems just and proper.

Dated:       June 17, 2011
              New York, New York

                      BUCHANAN INGERSOLL & ROONEY PC


By: _____
           Philip L. Hirschhorn
           Leslie J. Harris
           Tanya D. Bosi
           Buchanan Ingersoll & Rooney PC
           1290 Avenue of the Americas
           30th Floor
           New York, New York  10104
           Tel:  (212) 440-4400
           Fax:  (212) 440-4401
           **philip.hirschhorn@bipc.com**

           *Attorneys for Plaintiffs*

# EXHIBIT A

SAWABEH INFORMATION SERVICES COMPANY
ACQUISITION OF ALL ISSUED AND OUTSTANDING COMMON SHARES OF
EDCOMM, INC.

## TERM SHEET

**SAWABEH INFORMATION SERVICES COMPANY** ("SISCOM"), a Saudi Arabian company with commercial registration # 1010187407, represented by Waleed Abalkhail, its president, hereby offers to purchase all of the issued and outstanding common shares of **EDCOMM, Inc.**, a corporation incorporated in the State of New York, dba Bankers Academy ("EDCOMM" or the "Company"), represented by Linda Eagle, its president, on the following terms and conditions.

1.    SISCOM will purchase all of the issued and outstanding common shares of EDCOMM, totaling 200 shares, in consideration for paying of EDCOMM's total outstanding debt to SmartPros, Ltd., which is currently represented by the Company to be $727,895.00 ("Purchase Price").

   a.  SISCOM shall deposit funds in a designated Company bank account ("SISCOM Deposit").

   b.  Current EDCOMM management will promptly transfer the Purchase Price to SmartPros.

   c.  Any difference between the SISCOM Deposit and the Purchase Price shall remain on deposit in the designated Company bank account and will not be accessible for any purpose except with the express written approval of SISCOM or its representatives.

2.    Simultaneous with the payment of EDCOMM's debt to SmartPros, ownership of the current issued and outstanding shares shall pass to SISCOM. All outstanding stock certificates of the Company shall be deemed cancelled and SISCOM shall be entered on the Company's stock ledger as the owner of all outstanding shares. The date of the payment to SmartPros and the transfer of the outstanding common stock and control of the Company to SISCOM shall be deemed the "Closing Date" and the time of transfer shall be deemed the "Closing."

3.    Prior to the Closing Date, the Company will identify all bank and investment accounts which the Company owns and which Company employees have signature authority on these accounts. SISCOM reserves the right to remove current signators from accounts, and new signators or substitute signators in its sole discretion. After the Closing, no withdrawals will be made from any Company account with out the prior approval of SISCOM or its representatives.

4.    Prior to the Closing Date, the Company will identify all corporate credit card accounts and employees who have use of corporate credit cards. After the Closing, no charges

will be made on any corporate credit card with out the prior approval of SISCOM or its representatives.

5.      A period of ninety (90) to one hundred twenty (120) days of reorganization ("Reorganization Period") shall follow the Closing Date.

6.      During the Reorganization Period:

   a. SISCOM will amend the Company's certificate of incorporation and its By-Laws as deemed necessary by SISCOM.

   b. The current officers and directors will remain in the employ of the Company and cooperate with SISCOM in transitioning the management of the Company.

7.      All current directors and officers of the Company, and those identified as key employees shall sign a non-compete agreement with the Company for a term of three (3) years, effective upon leaving the Company's employ.

8.      At the conclusion of the Reorganization Period, the Company will set aside a specific number of shares from the then authorized common shares of the Company for distribution to designated Company managers and  employees within the discretion of the Company's board of directors.

9.      Shares allocated to a Company employee, pursuant to Paragraph 8 above will be conditioned upon the employee entering into an employment agreement with the Company. One of the provisions of such an agreement will be that the shares allocated to the employee will be awarded in the amount of one-third (⅓) of the allocated total on the annual anniversary of the employment contract over a minimum period of three (3) years completed service.  If the employee fails to complete three (3) years service to the company, then the shares issued to the employee will be considered without consideration and will be stricken from the Company's stock ledger as void.

10.     The current Company CFO, David Shapp, shall certify the Company's outstanding liabilities, and forecast any liabilities that might reasonably occur within six (6) months of the stock acquisition by SISCOM. If the actual or forecasted liabilities are exceeded, the current directors and officers shall be personally liable, jointly and severally, for the amount the actual liabilities exceed those in the Shapp certification. Additionally, Shapp shall prepare a declaration of all Company assets sold within a 90 day period prior to the Closing Date.

11.     This term sheet shall be replaced by a formal contract.

[SIGNATURES NEXT PAGE]

OFFERED this 7th day of October, 2010

SAWABEH INFORMATION SERVICES COMPANY

By: _____
    Waleed S. Abalkhail, President

ACCEPTED this 7 day of October, 2010

EDCOMM, INC.

By: _____        _____
    Linda Eagle, President                     Linda Eagle

    _____        _____
    Clifford Brody                             David Shapp

# EXHIBIT B

**From:**  Dr. Linda Eagle, President
**To:**  Clifford Brody
**Date:**  August 2, 1995

**Subject: Memo to the Files - Employment Contract**

Attached is the Employment Agreement with the terms that we have agreed to. We both recognize that this is in place as I have been made the majority shareholder of our company. This Contract and Agreement will remain in place regardless of any change in titles or division of shares, except as amended in writing.

## Employment Contract and Agreement between
## Clifford Brody and Edcomm, Inc.

The parties Clifford Brody and Edcomm, Inc. a New York Corporation represented by Dr. Linda Eagle its President agree as follows:

Clifford Brody is and will remain a paid working officer of Edcomm, Inc. expected to work full time (40 hours per week).

Should Clifford Brody cease working as a paid full time officer of Edcomm, Inc. for any reason other than his voluntary departure from Edcomm, Inc. he will be entitled to the following.

1) Untaken vacation accrued at four weeks per year paid at the rate of annual salary of $400,000 calculated from February 14, 1988 and through the day he is asked to leave Edcomm Inc.'s employ.
2) Severance pay accrued at two month's salary per year of service calculated from February 14, 1988 paid at the rate of annual salary of $400,000 through the day he is asked to leave Edcomm Inc.'s employ.
3) Two year's salary paid at the rate of annual salary of $400,000.
4) A bonus of $1,000,000 in recognition of the value Clifford Brody has contributed to Edcomm, Inc. unless the total amounts of items 1, 2 and 3 in the aggregate equal more than $5,000,000 in which case said bonus may be given at Edcomm, Inc.'s option only but in which case said bonus is not a legal obligation.

Payment schedule will be as following:
- $500,000 will be paid by wire transfer to an account as directed by Clifford Brody within two working days of separation.
- The balance of the monies will be paid by wire transfer to an account as directed by Clifford Brody within sixty days of separation.

These rights are irrevocable except by written agreement of both parties.

Agreed and Accepted:

_____ 2 August 1995
Edcomm, Inc.
Dr. Linda Eagle / President / Date

_____ 8/2/95
Clifford G. Brody / Date

# EXHIBIT C

AGREEMENT BETWEEN
CLIFFORD G. BRODY and EDCOMM, INC.

This Agreement is made this 17th day of September 2008 by and between Edcomm, Inc. (Edcomm), a New York Corporation (Edcomm), and Clifford G. Brody (Brody), an individual.

WHEREAS

A.    Edcomm has significant Intellectual Property.

B.    Brody has been the thought leader for the creation of all Intellectual Property developed at Edcomm by himself and employees of Edcomm.

C.    The Intellectual Property includes software, courseware, eLearning, company methodology, internal systems, and company web sites.

D.    All Intellectual Property developed by Edcomm is owned by Edcomm.

E.    The Intellectual Property has a Market Value that Edcomm and Brody agree is great.

F.    Brody has worked and plans to continue to work with Edcomm with salary and benefits that are paid out at rates that do not reflect his fair market value because of Edcomm's lack of available liquid funds / cash.

G.    Brody has in the past and is expected in the future to make loans to Edcomm.

In consideration of the mutual covenants contained herein, the parties agree as follows:

1.    Definitions. Intellectual Property (IP) includes Edcomm developed software, courseware, course content, eLearning, company methodology, internal systems including but not limited to IDEAS and LEARNING LINK, and the company web sites www.edcomm.com and www.bankersacademy.com , including all IP completed, in Development, and to be developed in the future.

2.    Ownership.  Upon the signing of this Agreement the Ownership of all IP is transferred to Brody.

3.    Right to Use.  Upon the signing of this Agreement Brody grants Edcomm the right to use the IP with his permission at no cost until such time as he demands payment for same. Such demand may not exceed $8,000,000. Such demand once demanded shall be paid within thirty days.

4.    Consequences of Wrongful Use, Remedy. Should Edcomm use the IP in any way following demand for payment and such demand has not yet been met, an additional penalty shall be imposed with Edcomm paying a monthly sum on the last day of the month equal to 50 percent of all collected revenue from all projects during said month regardless of whether such IP is actually used in the conduct of the project.

5.    Option to Pay Brody. At Edcomm's option, Edcomm may at any time pay to Brody an amount of $8,000,000 at which time any and all amounts up to $8,000,000 owed to Brody shall be deemed paid and any and all amounts above and exceeding $8,000,000 shall remain owed.

6.  <u>Right of First Refusal.</u>  It is not contemplated that Brody will sell the IP however Brody grants Edcomm a right of first refusal in any sale of the IP.

7.  <u>Confidentiality.</u>  The terms of this Agreement shall remain Confidential as the term confidential is normally construed in business.

8.  <u>Remedies, No Waiver, Indemnity.</u>  Either party may be entitled to equitable relief by way of injunction if there is a material breach of this Agreement. Each party agrees to indemnify the other for any costs and expenses, including legal expenses, the aggrieved party may incur in connection with the enforcement of or arising out of a material breach of the provisions of this Agreement. All legal fees and costs that may arise under this Agreement shall be "reasonable and necessary" and copies of all invoices for said legal fees and costs shall be provided to the other party required to pay for same.

9.  <u>Term.</u>  This Agreement shall become effective as and from the date first written above and shall remain in effect until cancelled or renewed by the written consent of the parties.

10.  <u>Binding Effect.</u>  This Agreement shall be binding upon and inure to the benefit of the successors and assigns of the parties hereto.  Neither party may assign its rights or delegate its duties hereunder without the prior written consent of the other party.

11.  <u>Severability.</u>  If any part of this Agreement is held by a court of competent jurisdiction to be invalid, the remainder of this Agreement will remain in full force and effect.

12.  <u>Independent Parties.</u>  No provision of this Agreement shall create a partnership between the parties or make a party the agent of the other party for any purpose.  A party has no authority or power to bind, to contract in the name of, or to create a liability of the other party in any way or for any purpose.

13.  <u>Construction: Governing Law, consent to Jurisdiction, Etc.</u>  This Agreement shall be governed by and construed in accordance with the laws of the state of Pennsylvania.

IN WITNESS WHEREOF, Brody and Edcomm have duly executed this Agreement as of the day and year first written above.

Clifford Brody                           Edcomm, Inc.

By: _Clifford Brody_  9/17/2008    By: _____ 17 SEPTEMBER 2008
Clifford Brody                           Dr. Linda Eagle, President
                                         By: _Clifford Brody_ 9/17/2008
                                         Clifford Brody
                                         By: _____ 9/17/08
                                         David Shapp
                                         By: _____ 17 SEPTEMBER 2008
                                         Dr. Linda Eagle