UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------- X

SAWABEH INFORMATION
SERVICES CO. and EDCOMM, INC.,

              **Plaintiffs,**

   - against -

CLIFFORD BRODY, LINDA EAGLE
and DAVID SHAPP,

             **Defendants.**

------------------------------------------------- X

**OPINION AND ORDER**

**11 Civ. 4164 (SAS)**

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 12/16/11
```

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

## I.     INTRODUCTION

       Sawabeh Information Services Company ("Siscom") and its wholly

owned subsidiary Edcomm, Inc. ("Edcomm") (collectively "plaintiffs") bring this

action against former Edcomm officers and shareholders, Clifford Brody, Linda

Eagle and David Shapp ("defendants") arising out of the October 11, 2011 sale of

all of the outstanding shares of Edcomm from defendants to Siscom (the

"transaction") pursuant to the parties' stock purchase Term Sheet (the "Term

Sheet"). Five months after the transaction, defendants identified — for the first

time — two documents imposing significant potential liabilities on Edcomm: (1) a

1

2008 agreement transferring all of Edcomm's intellectual property ("IP") to Brody (the "IP Agreement"); and (2) a 1995 employment agreement between Edcomm and Brody entitling Brody to substantial severance pay (the "Employment Agreement") (collectively the "Brody Agreements").  Plaintiffs question the authenticity of the Brody Agreements, and allege that if they are authentic, they raise serious concerns regarding the integrity of the transaction.

Plaintiffs allege the following causes of action arising out of the transaction and subsequently-disclosed Brody Agreements:  (1) securities fraud based on defendants' misrepresentation of certain material facts concerning the transaction; (2) securities fraud based on defendants' failure to disclose certain material information concerning the transaction; (3) fraudulent inducement based on defendants' misrepresentations and omissions concerning the transaction; (4) common law fraud based on defendants' misrepresentations and omissions concerning the transaction; (5) breach of contract based on defendants' failure to inform Siscom of certain Edcomm liabilities under the Term Sheet; (6) breach of the covenant of good faith based on defendant's failure to inform Siscom of certain Edcomm liabilities; (7) a declaration that defendants be held personally liable for any of Edcomm's liabilities of which defendants failed to inform Siscom; (8) rescission of the IP Agreement inasmuch as it was a sham transaction intended to

turn Edcomm into a shell company; (9) a permanent injunction against defendants' enforcement of the IP Agreement; (10) a declaration that Edcomm is the owner of all the IP identified in the IP Agreement; (11) a declaration that Siscom has no further obligations under the Employment Agreement based on Brody's conduct; (12) a permanent injunction against defendants' enforcement of the Employment Agreement; (13) breach of fiduciary duty based on defendants' creation of inauthentic documents and their interference with Siscom's management of Edcomm; (14) breach of fiduciary duty based on defendants entering into the IP Agreement and failure to disclose the Employment Agreement; (15) negligent misrepresentation based on defendants' negligence in failing to discover and/or disclose the Brody Agreements; and (16) unfair competition based on defendants' misappropriation of Edcomm's IP through inauthentic or otherwise unenforceable documents.

Defendants now move to dismiss the Complaint on the following grounds: *first*, the Court should dismiss counts (1), (2), (3), (4) and (15) — the fraud counts — because (a) defendants made no false representations; (b) plaintiffs have failed to plead facts giving rise to a strong inference that defendants acted with scienter; (c) plaintiffs could not have reasonably relied on the alleged misrepresentations; (d) the alleged misrepresentations caused no losses; and (e) the

alleged misrepresentations occurred after the execution of the Term Sheet; *second*, the Court should dismiss counts (13), (14) and (15) — the state securities law claims — because they are preempted by the Martin Act;[1] *third*, the Court should dismiss counts (5) and (6) — the contract claims — because (a) the Term Sheet was not a binding contract, and (b) count (6) is duplicative of count (5); *fourth*, the Court should dismiss any of the fraud counts to the extent that they arise out of the same facts as plaintiffs' breach of contract claims; *fifth*, the Court should dismiss count (13) because plaintiffs fail to allege any damages caused by the alleged breach of fiduciary duty; and, *sixth*, the Court should dismiss the remaining counts ((7), (8), (9), (10), (11), (12) and (16)) because the Court should decline to exercise supplemental jurisdiction over these state law claims after dismissing the federal securities claims under counts (1) and (2).  For the following reasons, defendants' motion is denied in part and granted in part.

## II.   BACKGROUND

### A.   The Parties

Siscom is a Saudi Arabian company and a regional technology services firm that defines, designs and delivers information technology-enabled

---

[1]      N.Y. Gen. Bus. Law § 352-c.

business solutions to clients.[2]  Edcomm is a New York corporation that specializes in providing consulting and training to the banking industry.[3]  Specifically, Edcomm provides over 1400 online and in-person standard courses to banking professionals on issues including compliance, protection against money laundering and information security.[4]  Edcomm also personalizes its courses for individual clients and, as a result, has thousands of variations of its standard courses.[5] Edcomm's value lies primarily in its IP — its copyrighted software and "eLearning courseware."[6]  Edcomm's three lead products are "Moose Trax," a lead generation and sales and project tracking system, "Learning Link," a learning management system, and "IDEAS," an integrated documentation and education access system.[7] Edcomm has been granted special tax treatment by Pennsylvania for development of its IP.[8]

       Brody is a Pennsylvania resident and a former chief executive officer,

---

[2]     *See* First Amended Complaint ("Compl.") ¶ 19.

[3]     *See id.* ¶ 20.

[4]     *See id.*

[5]     *See id.*

[6]     *Id.* ¶ 25.

[7]     *Id.*

[8]     *See id.* ¶ 26.

director and shareholder of Edcomm.[9]  Eagle is a New York resident and a former

president, director and shareholder of Edcomm.[10]  Shapp is a Pennsylvania resident

and a former chief financial officer, director and shareholder of Edcomm.[11]  Prior

to October 11, 2010, Brody, Eagle and Shapp were the only three shareholders of

Edcomm.[12]

### B.    The Line of Credit

In 2002, Edcomm entered into a financing agreement with Summa

Capital Corporation ("Summa") for a line of credit up to $150,000.[13]  In exchange

for the loan, Edcomm provided Summa with a security interest in all of its

receivables including a security interest in Edcomm's IP.[14]  By May 2008, Summa

had expanded the line of credit available to Edcomm to $650,000.[15]  The

defendants also gave Summa personal guarantees that they would repay the

---

[9]     *See id.* ¶ 21.

[10]    *See id.* ¶ 22.

[11]    *See id.* ¶ 23.

[12]    *See id.*

[13]    *See id.* ¶ 29.

[14]    *See id.* ¶¶ 29-30.

[15]    *See id.* ¶ 31.

outstanding balance.[16]

Between September 2008 and September 2010, Edcomm experienced a decline in revenues coincident with the economic recession.[17]  In 2009, SmartPros, Limited ("SmartPros"), a competitor of Edcomm, assumed all the benefits and obligations of the line of credit from Summa including the security interests.[18]  At the time of this line of credit amendment, defendants personally guaranteed Edcomm's obligations to SmartPros.[19]  By June 11, 2010, SmartPros expanded Edcomm's line of credit to $900,000.[20]  In return, Edcomm was required to maintain $300,000 in domestic receivables aged less than ninety days or make immediate payment to SmartPros of the difference between such amounts receivable and $300,000.[21]

### C.     The Transaction

Because of cash flow problems, defendants realized that by September 20, 2010, Edcomm would not be able to meet the minimum requirement of

---

[16]     *See id.*

[17]     *See id.* ¶ 27.

[18]     *See id.* ¶ 32.

[19]     *See id.* ¶ 36.

[20]     *See id.* ¶ 34.

[21]     *See id.* ¶ 35.

$300,000 of receivables under the line of credit amendment with SmartPros.[22]

Defendants understood that if Edcomm failed to maintain the necessary

receivables, SmartPros was entitled to seize Edcomm's securities as well as

demand payment from the defendants based on their personal guarantees.[23]  When

September arrived, the balance of the line of credit was $720,000, and defendants

still feared they would not meet their receivables requirement.[24]

Knowing this, on September 28, 2010, Eagle called a business

acquaintance, Haitham Saead, executive vice president of Siscom, and requested a

loan from Siscom.[25]  This led to a series of communications between defendants

and Siscom resulting in a proposal that defendants would sell all of their shares in

Edcomm to Siscom in return for Siscom paying off all of Edcomm's outstanding

debt under the line of credit.[26]  Over the next two weeks, the parties negotiated the

substance of the transaction, which was set to occur on October 9, 2010.[27]

In furtherance of their agreement, the parties entered into the Term

---

[22]    *See id.* ¶ 37.

[23]    *See id.* ¶ 38.

[24]    *See id.* ¶ 40.

[25]    *See id.* ¶ 41.

[26]    *See id.* ¶ 42.

[27]    *See id.* ¶ 44.

Sheet on October 7, 2010.[28]  Under the Term Sheet, Siscom was required to pay off the $727,895 balance of Edcomm's line of credit, and in return, would receive all outstanding shares of Edcomm.[29]  The parties agreed that these transfers would occur simultaneously on the unidentified "Closing Date."[30]  The Term Sheet further provided that after the Closing Date, there would be a ninety day period of "Reorganization" during which Siscom could transition into management of Edcomm, and the "current officers and directors will remain in the employ" of Edcomm.[31]  Moreover, Edcomm's officers and directors agreed to sign non-compete clauses with Edcomm for a three year term.[32]  Finally, the Term Sheet required Shapp to prepare a certification identifying all the "outstanding liabilities, and forecast[ing] any liabilities that might reasonably occur within six (6) months of the stock acquisition" (the "certification").[33]  This certification clause also provided that if any of Edcomm's liabilities were not properly identified, then

---

[28]    *See id.* ¶ 45; *see also* Term Sheet, Ex. A to Compl.

[29]    *See* Term Sheet ¶¶ 1-2.

[30]    *Id.* ¶ 2.

[31]    *Id.* ¶¶ 5-6.

[32]    *See id.* ¶ 7.

[33]    *Id.* ¶ 10.

defendants would be personally liable for them.[34]  By its terms, however, the Term

Sheet provided for its replacement by a formal contract in the future.[35]

At the time of the transaction, there were a total of 200 outstanding

Edcomm shares; Brody and Shapp each owned 48 shares and Eagle owned 104.[36]

The closing occurred on October 11, 2010 when Siscom transferred the money to

Edcomm and (1) Edcomm and defendants acknowledged that the Term Sheet was

binding on the parties, (2) defendants signed stock certificates, and (3) the parties

acknowledged that Edcomm was deemed to be sold as of October 11, 2010.[37]

Earlier, on October 8, 2010, Shapp provided the certification pursuant to the Term

Sheet.[38]  The certification did not include any liabilities that could arise under the

Brody Agreements.[39]  The Brody Agreements were never revealed to plaintiffs at

any time prior to the transaction.[40]

### D.    Defendants' Representations

---

[34]    *See id.*

[35]    *See id.* ¶ 11.

[36]    *See* Compl. ¶ 46.

[37]    *See id.* ¶¶ 49, 82.

[38]    *See id.* ¶ 56.

[39]    *See id.* ¶ 57.

[40]    *See id.* ¶¶ 61-62.

The parties' discussions concerning the status and value of Edcomm's IP occurred over a series of e-mails exchanged around the time of the transaction.[41] In an e-mail on October 1, 2010, Shapp informed Siscom that the value of Edcomm's IP "exceeded $20 million."[42]  In a further e-mail on October 1, Eagle represented to Siscom that Edcomm's IP "represents great value and also it will become important to our discussions down the road of strategic plans for the future."[43]  In the same e-mail, Eagle stated that "[a]ll of our IP is 100% owned by us. We have not used outside organizations to create our IP and we have not given any client ownership."[44]  Later in the e-mail Eagle stressed that she "wanted to be sure" that Siscom "knew the extent of our IP and that our IP is 100% ours."[45]  On October 2, Eagle sent another e-mail to Siscom representatives reviewing Edcomm's IP and stating that "our IP is 100% owned by us.  We have not used outside client organizations to create our IP and we have not given any client ownership."[46]

---

[41]     *See id.* ¶¶ 64-66.

[42]     *Id.* ¶ 64.

[43]     *Id.* ¶ 66.

[44]     *Id.* ¶ 67.

[45]     *Id.* ¶ 68.

[46]     *Id.* ¶ 70.

11

On October 8, Siscom's counsel requested the certification pursuant to the Term Sheet.[47]  That same day, defendants sent copies of the certification, signed by all three defendants.[48]  This certification did not disclose either of the Brody Agreements.[49]  In another e-mail exchange on October 8, defendants reassured Siscom representatives that "Edcomm has never sold its contents" — an understood reference to Edcomm's IP.[50]

### E.     The Brody Agreements

After the October 11 closing, defendants interfered with the reorganization period by threatening to take Edcomm's business, and by publicly disparaging the company.[51]  In March 2011 — five months after the closing — defendants revealed the existence of the Brody Agreements for the first time, representing potential liabilities for Edcomm of twelve million dollars as well as the potential loss of Edcomm's IP.[52]  The Employment Agreement was signed on August 2, 1995, and purports to govern the employment relationship between

---

[47]     *See id.* ¶ 73.

[48]     *See id.* ¶ 75.

[49]     *See id.* ¶¶ 76-77.

[50]     *Id.* ¶ 80.

[51]     *See id.* ¶ 88.

[52]     *See id.* ¶ 89.

Edcomm and Brody.[53]  The Employment Agreement provides that Brody will work full time as an officer of Edcomm.[54]  The Employment Agreement further provides for severance pay in the event that Brody ceases to work at Edcomm "for any reason other than his voluntary departure."[55]  Such severance pay includes (1) untaken vacation accrued at four weeks per year at the rate of an annual salary of $400,000 from February 14, 1988 until Brody's departure, (2) severance pay at two month's salary per year of service at the rate of an annual salary of $400,000 from February 14, 1988 until Brody's departure; (3) two years salary at the annual rate of $400,000, and (4) a one million dollar bonus unless the payments under items (1), (2), and (3) exceed five millions dollars.[56]

The IP Agreement was signed on September 17, 2008, and concerns a purported transfer of all of Edcomm's IP from Edcomm to Brody.[57]  Under the IP Agreement, Edcomm acknowledged that it had IP of great market value, and that Brody had worked hard on developing such IP despite being compensated at rates

---

[53]    *See id.* ¶ 7; *see also* 8/2/1995 Employment Agreement, Ex. B to Compl.

[54]    *See* Employment Agreement.

[55]    *Id.*

[56]    *See id.*

[57]    *See* Compl. ¶ 8; *see also* 9/17/08 IP Agreement, Ex. C to Compl.

that "do not reflect his fair market value."[58]  The IP Agreement further provided that Edcomm transferred all of its IP to Brody and that Brody granted Edcomm a license to use his IP with his permission at no cost.[59]  However, under the IP Agreement, Brody could terminate this free license at any time and demand up to eight million dollars in payment for Edcomm's continued use of his IP.[60] Moreover, if Brody made a demand and Edcomm failed to pay, Edcomm would have to make a monthly penalty payment of fifty percent of all revenues collected in the previous month.[61]  The IP Agreement also provided that Edcomm had the option to pay Brody eight million dollars at a time of its choosing, after which Brody could no longer demand payment, and that Edcomm had a right of first refusal in the event that Brody decided to sell his IP.[62]  Finally, the IP Agreement provided that it would be governed by Pennsylvania law.[63]

Despite plaintiffs' requests, defendants never explained why the

---

[58]    IP Agreement.

[59]    *See id.*

[60]    *See id.*

[61]    *See id.*

[62]    *See id.*

[63]    *See id.*

Brody Agreements were not presented until five months after the closing.[64]

Plaintiffs are unsure exactly what to make of the Brody Agreements, but assert that

no matter what they are, plaintiffs are entitled to relief.[65]  One possibility that

plaintiffs suggest is that the Brody Agreements are forgeries, manufactured after

the transaction to try and extract money from Edcomm and steal its IP.[66]  Plaintiffs

believe that the documents' inauthenticity is evident from the facts that (1)

defendants waited so long to present the Brody Agreements even though they raise

the specter of a twelve million dollar liability while the entire transaction was

completed for $730,000; (2) defendants were unable to produce original copies of

the Brody Agreements upon plaintiffs' request; and (3) the IP Agreement provides

a tremendous benefit to Brody — the right to demand payment of eight million

dollars — while providing almost no benefits to Edcomm.[67]  On the assumption

that the Brody Agreements are forgeries, plaintiffs press their claims for

declaratory and injunctive relief, asking this Court to hold such agreements

unenforceable.[68]

---

[64]    *See* Compl. ¶ 94.

[65]    *See id.* ¶ 99.

[66]    *See id.* ¶¶ 92, 98.

[67]    *See id.*

[68]    *See, e.g.*, *id.* ¶¶ 102, 103, 198.

Plaintiffs advance most of their arguments, however, on the assumption that the Brody Agreements are genuine contracts that predate the transaction.[69]  Plaintiffs assert that because of the large amounts at stake in the Brody Agreements, defendants, as corporate officers, must have known about the agreements, and that if they did not, such deficient knowledge was negligent.[70] Under that scenario, plaintiffs argue that defendants engaged in securities fraud and common law fraud for their misrepresentations and failure to inform Siscom of the Brody Agreements, as well as breach of contract for providing an incomplete certification.[71]  Plaintiffs further allege that defendants omitted other significant Edcomm liabilities from the certification.[72]  Plaintiffs also request, as declaratory relief, that defendants be held liable for any of Edcomm's liabilities — most notably liabilities under the Brody agreement — that were not revealed in the certification as required by the Term Sheet.[73]  Finally, plaintiffs contend that even

---

[69]      *See, e.g.*, *id.* ¶ 100, 101, 107, 123, 137, 143.

[70]      *See id.* ¶¶ 9, 101.

[71]      *See id.* ¶¶ 11-12.

[72]      *See id.* ¶ 161; *see also* Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Dismiss the First Amended Complaint ("Pl. Mem.") at 6 (listing other liabilities missing from the certification including rent, leases and a loan to Edcomm by Deborah R. Slater in the amount of $735,000 that is the subject of a related lawsuit).

[73]      *See* Compl. ¶¶ 11-12.

16

if the Brody Agreements are genuine, they are unenforceable to the extent that their execution was part of a "sham transaction" intended to strip Edcomm of its value prior to selling the company.[74]

### F.   The Present Action

On June 20, 2011, Edcomm terminated all three defendants because of their alleged misconduct.[75]  Since that time, defendants have made plans to compete with Edcomm using Edcomm's IP.[76]  Morever, Brody's termination triggered the severance pay requirement in the Employment Agreement, and plaintiffs assert that defendants have threatened to enforce the Brody Agreements.[77]  However, defendants have not yet demanded either the severance pay mandated under the Employment Agreement or the licensing fee under the IP Agreement.[78]

Based on the allegations described above, plaintiffs seek damages as well as declarative and injunctive relief concerning the Brody Agreements.

---

[74]   *Id.* ¶ 166.

[75]   *See id.* ¶ 14.

[76]   *See id.* ¶¶ 220-221.

[77]   *See id.* ¶ 91.

[78]   *See* Memorandum of Law is Support of Defendants' Motion to Dismiss Plaintiffs' First Amended Complaint ("Def. Mem.") at 7.

Defendants now move to dismiss for the reasons already stated.

## III.   LEGAL STANDARD

### A.   Motion to Dismiss

In deciding a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), the court "accept[s] all factual allegations in the complaint as true, and draw[s] all reasonable inferences in the plaintiff's favor."[79]  The court then evaluates the sufficiency of the complaint under the "two-pronged approach" suggested by the Supreme Court in *Ashcroft v. Iqbal*.[80]  *First*, a court "'can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth.'"[81]  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" to withstand a motion to dismiss.[82]  *Second*, "[w]hen there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they

---

[79]   *Wilson v. Merrill Lynch & Co., Inc.*, — F.3d —, 2011 WL 5515958 (2d Cir. Nov. 14, 2011) (quotation marks omitted).

[80]   556 U.S. —, 129 S. Ct. 1937, 1950 (2009).

[81]   *Hayden v. Paterson*, 594 F.3d 150, 161 (2d Cir. 2010) (quoting *Iqbal*, 129 S. Ct. at 1950).  *Accord Ruston v. Town Bd. for Town of Skaneateles*, 610 F.3d 55, 59 (2d Cir. 2010), *cert. denied on other grounds*, — U.S. —, 131 S. Ct. 824 (Dec. 13, 2010).

[82]   *Iqbal*, 129 S. Ct. at 1949 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

plausibly give rise to an entitlement for relief."[83]  To survive a Rule 12(b)(6)

motion to dismiss, the allegations in the complaint must meet a standard of

"plausibility."[84]  A claim is facially plausible "when the plaintiff pleads factual

content that allows the court to draw the reasonable inference that the defendant is

liable for the misconduct alleged."[85]  Plausibility "is not akin to a probability

requirement;" rather, plausibility requires "more than a sheer possibility that a

defendant has acted unlawfully."[86]

> "In considering a motion to dismiss for failure to state a claim

pursuant to Rule 12(b)(6), a district court may consider the facts alleged in the

complaint, documents attached to the complaint as exhibits, and documents

incorporated by reference in the complaint."[87]  However, the court may also

consider a document that is not incorporated by reference, "where the complaint

'relies heavily upon its terms and effect,' thereby rendering the document 'integral'

---

[83]  *Id.* at 1950.  *Accord Kiobel v. Royal Dutch Petroleum Co.*, 621 F.3d
111, 124 (2d Cir. 2010), *cert. granted*, No. 10-1491, 565 U.S. — , 2011 WL
4905479 (Oct. 17, 2011).

[84]  *Twombly*, 550 U.S. at 564.

[85]  *Iqbal*, 129 S. Ct. at 1949 (quotation marks omitted).

[86]  *Id.* (quotation marks omitted).

[87]  *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010)
(citing *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002)).

to the complaint."[88]  A court may also take judicial notice of "the status of other lawsuits in other courts and the substance of papers filed in those actions."[89]

## B.  Pleading Requirements

### 1.  Rule 8

"Federal Rule of Civil Procedure 8(a)(2) requires . . . 'a short and plain statement of the claim showing that the pleader is entitled to relief.'"[90]  To survive a 12(b)(6) motion to dismiss, the allegations in the complaint must meet the standard of "plausibility."[91]  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[92]  Plausibility "is not akin to a probability requirement;" rather, plausibility requires "more than a sheer

---

[88]    *Id.* (quoting *Mangiafico v. Blumenthal*, 471 F.3d 391, 398 (2d Cir. 2006)).  *Accord Global Network Commc'ns, Inc. v. City of N.Y.*, 458 F.3d 150, 156 (2d Cir. 2006).

[89]    *Schenk v. Citibank/Citigroup/Citicorp*, No. 10 Civ. 5056, 2010 WL 5094360, at *2 (S.D.N.Y. Dec. 9, 2010) (citing *Anderson v. Rochester-Genesee Reg'l Transp. Auth.*, 337 F.3d 201, 205 n.4 (2d Cir. 2003)).

[90]    *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (quoting Fed. R. Civ. P. 8(a)(2)).

[91]    *See Iqbal*, 129 S. Ct. at 1949; *Twombly*, 550 U.S. at 564.

[92]    *Iqbal*, 129 S. Ct. at 1949 (quotation marks omitted).

20

possibility that a defendant has acted unlawfully."[93]  Pleading a fact that is "merely

consistent with a defendant's liability" does not satisfy the plausibility standard.[94]

### 2.      Securities Fraud

"Securities fraud claims are subject to heightened pleading

requirements that the plaintiff must meet to survive a motion to dismiss."[95]  These

heightened pleading requirements are imposed by Federal Rule of Civil Procedure

9(b) and the PSLRA.[96]

### a.      Rule 9(b)

A complaint alleging securities fraud must satisfy Rule 9(b)'s

requirement that "the circumstances constituting fraud . . . be stated with

particularity."[97]  "This pleading constraint serves to provide a defendant with fair

notice of a plaintiff's claim, safeguard his reputation from improvident charges of

wrongdoing, and protect him against strike suits."[98]  To comply with the

---

[93]     *Id.* (quotation marks omitted).

[94]     *Id.* (quotation marks omitted).

[95]     *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007).

[96]     *See* 15 U.S.C. § 78u-4(b).

[97]     Fed. R. Civ. P. 9(b).  *Accord ATSI*, 493 F.3d at 99.

[98]     *ATSI*, 493 F.3d at 99 (citing *Rombach v. Chang*, 355 F.3d 164, 171 (2d Cir. 2004)).

requirements of Rule 9(b), a plaintiff must: "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent."[99]  "Allegations that are conclusory or unsupported by factual assertions are insufficient."[100]

### b.    The PSLRA

The PSLRA requires plaintiffs to state with particularity "both the facts constituting the alleged violation, and the facts evidencing scienter, *i.e.*, the defendant's intention to deceive, manipulate, or defraud."[101]  The PSLRA specifies that the plaintiffs must "'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'"[102]  When evaluating allegations of scienter, the court must look at the complaint as a whole

---

[99]    *Rombach*, 355 F.3d at 170 (quotation marks omitted).  *Accord ATSI*, 493 F.3d at 99 (citing *Novak v. Kasaks*, 216 F.3d 300, 306 (2d Cir. 2000)).

[100]    *ATSI*, 493 F.3d at 99.

[101]    *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007) (quotation marks omitted) (citing 15 U.S.C. § 78u-4(b)(1), (2)).  *Accord ECA & Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 196 (2d Cir. 2009).

[102]    *Tellabs*, 551 U.S. at 314 (quoting 15 U.S.C. § 78u-4(b)(2)).

22

and "take into account plausible opposing inferences."[103]

"[A]n inference of scienter must be more than merely plausible or reasonable – it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent."[104]  The inference need not, however, be "irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the most plausible of competing inferences."[105]  The inquiry on a motion to dismiss is as follows:  "When the allegations are accepted as true and taken collectively, would a reasonable person deem the inference of scienter at least as strong as any opposing inference?"[106] "[I]f the plaintiff demonstrates only that an inference of scienter is at least as compelling as any nonculpable explanation for the defendant's conduct, the tie . . . goes to the plaintiff."[107]  "If the plaintiff alleges a false statement or omission, the

---

[103]   *Id.* at 323.  These plausible opposing inferences may be based only on the complaint and other public documents on which courts ordinarily rely in deciding a motion to dismiss, "while constantly assuming the plaintiff's allegations to be true."  *Id.* at 322, 326-27.

[104]   *Id.* at 314.  *Accord Slayton v. American Exp. Co.*, 604 F.3d 758, 766 (2d Cir. 2010).

[105]   *Tellabs*, 551 U.S. at 324 (citation omitted).

[106]   *Id.* at 326.  *Accord In re Bristol Myers Squibb Co. Sec. Litig.*, 586 F. Supp. 2d 148, 168 (S.D.N.Y. 2008) ("The critical inquiry is whether a reasonable person would deem the inference of scienter [to be] at least as strong as any opposing inference.").

[107]   *City of Brockton Ret. Sys. v. Shaw Group Inc.*, 540 F. Supp. 2d 464, 472 (S.D.N.Y. 2008).

PSLRA also requires that 'the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.'"[108]

## IV.   APPLICABLE LAW

### A.   Section 10(b) and Rule 10b-5

Section 10(b) of the Securities Exchange Act of 1934 makes it illegal to "use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe."[109]  Under Rule 10b-5 one may not "make any untrue statement of a material fact or [] omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading . . . in connection with the purchase or sale of any security."[110]  "To sustain a private claim for securities fraud under Section 10(b), 'a plaintiff must prove (1) a material misrepresentation or omission

---

[108]   *ATSI*, 493 F.3d at 99 (quoting 15 U.S.C. § 78u-4(b)(1)).

[109]   15 U.S.C. § 78(j)(b).

[110]   17 C.F.R. § 240.10b-5.

24

by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation.'"[111]

## 1.   Misstatements or Omissions of Material Fact

In order to satisfactorily allege misstatements or omissions of material fact, a complaint must "state with particularity the specific facts in support of [plaintiffs'] belief that [defendants'] statements were false when made."[112]  "'[A] fact is to be considered material if there is a substantial likelihood that a reasonable person would consider it important in deciding whether to buy or sell shares [of stock].'"[113]  In situations "[w]here plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information."[114]  Mere "allegations that defendants should have anticipated future events and made certain disclosures earlier than they actually did do not

---

[111]    *Ashland Inc. v. Morgan Stanley & Co., Inc.*, 652 F.3d 333, 337 (2d Cir. 2011) (quoting *Stoneridge Inv. Partners, LLC v. Scientific–Atlanta, Inc.*, 552 U.S. 148, 157 (2008)).  *Accord Erica P. John Fund, Inc. v. Halliburton Co.*, — U.S. — , 131 S. Ct. 2179, 2184 (2011).

[112]    *Rombach*, 355 F.3d at 172 (quotation marks omitted).

[113]    *Operating Local 649 Annuity Trust Fund v. Smith Barney Fund Mgmt. LLC*, 595 F.3d 86, 92-93 (2d Cir. 2010) (quoting *Azrielli v. Cohen Law Offices*, 21 F.3d 512, 518 (2d Cir. 1994)).

[114]    *Novak*, 216 F.3d at 309 (citation omitted).

25

suffice to make out a claim of securities fraud."[115]

## 2.    Scienter

A plaintiff may plead scienter by "alleging facts (1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness."[116] "Sufficient motive allegations entail concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged."[117] "Motives that are generally possessed by most corporate directors and officers do not suffice; instead, plaintiffs must assert a concrete and personal benefit to the individual defendants resulting from the fraud."[118]

"Where motive is not apparent, it is still possible to plead scienter by identifying circumstances indicating conscious behavior by the defendant, though

---

[115]     *Id.* (citation omitted).  *Accord Rothman v. Gregor*, 220 F.3d 81, 90 (2d Cir. 2000).

[116]     *ATSI*, 493 F.3d at 99 (citing *Ganino v. Citizens Util. Co.*, 228 F.3d 154, 168-69 (2d Cir. 2000)).  *Accord Dandong v. Pinnacle Performance Ltd.*, No. 10 Civ. 8086, 2011 WL 5170293, at *11 (S.D.N.Y. Oct. 31, 2011) (quoting *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 290–91 (2d Cir. 2006)).

[117]     *Kalnit v. Eichler*, 264 F.3d 131, 139 (2d Cir. 2001) (quotation marks omitted).

[118]     *Id.  Accord ECA*, 553 F.3d at 198.

the strength of the circumstantial allegations must be correspondingly greater."[119]

Under this theory of scienter, a plaintiff must show that the defendant's conduct is

"at the least, conduct which is highly unreasonable and which represents an

extreme departure from the standards of ordinary care to the extent that the danger

was either known to the defendant or so obvious that the defendant must have been

aware of it."[120]  "To state a claim based on recklessness, plaintiffs may either

specifically allege defendants' knowledge of facts or access to information

contradicting defendants' public statements, or allege that defendants failed to

check information they had a duty to monitor."[121]

### 3.    Reliance

"An investor may not justifiably rely on a misrepresentation if,

through minimal diligence, the investor should have discovered the truth."[122]

---

[119]    *Kalnit*, 264 F.3d at 142.  *Accord South Cherry St., LLC v. Hennessee Group LLC*, 573 F.3d 98, 109 (2d Cir. 2009); *In re Novagold Res. Inc. Sec. Litig.*, 629 F. Supp. 2d 272, 297 (S.D.N.Y. 2009) (quoting *ECA*, 553 F.3d at 198-99).

[120]    *South Cherry St.*, 573 F.3d at 109 (quotation marks and emphasis omitted).  *Accord ECA*, 553 F.3d at 203.

[121]    *In re Gildan Activewear, Inc.*, 636 F. Supp. 2d 261, 272 (S.D.N.Y. 2009) (quotation marks and citation omitted).

[122]    *Ashland, Inc.*, 652 F.3d at 337-38 (quotation marks omitted). Reliance is also akin to "transaction causation" which requires "an allegation that but for the claimed misrepresentations or omissions, the plaintiff would not have entered into the detrimental securities transaction."  *Lattanzio v. Deloitte & Touche*

However, "New York takes a 'contextual view' in deciding whether reliance was reasonable, looking at the parties' sophistication and the information that was available."[123]  Courts consider factors including:

> "(1) [t]he sophistication and expertise of the plaintiff in financial and securities matters; (2) the existence of longstanding business or personal relationships; (3) access to the relevant information; (4) the existence of a fiduciary relationship; (5) concealment of the fraud; (6) the opportunity to detect the fraud; (7) whether the plaintiff initiated the stock transaction or sought to expedite the transaction; and (8) the generality or specificity of the misrepresentations."[124]

### 4.     Loss Causation

"A securities fraud plaintiff is required to 'prove both transaction causation (also known as reliance) and loss causation.'"[125]  Loss causation is "the proximate causal link between the alleged misconduct and the plaintiff's economic harm."[126]  "A misrepresentation is 'the proximate cause of an investment loss if the

---

*LLP*, 476 F.3d 147, 157 n.1 (2d Cir. 2007).

[123]     *Dandong*, 2011 WL 5170293, at *14 (quoting *J.P. Morgan Chase Bank v. Winnick*, 350 F. Supp. 2d 393, 406 (S.D.N.Y. 2004)).

[124]     *Ashland, Inc.*, 652 F.3d at 338.

[125]     *Wilamowsky v. Take-Two Interactive Software, Inc.*, — F. Supp. 2d —, 2011 WL 4542754, at *5 (S.D.N.Y. Sept. 30, 2011) (quoting *ATSI*, 493 F.3d at 106).

[126]     *ATSI*, 493 F.3d at 106-07 (citing *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 346 (2005); *Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161, 172 (2d Cir. 2005).  *Accord Lattanzio*, 476 F.3d at 157; *Emergent Capital Inv. Mgmt. v.*

28

risk that caused the loss was within the zone of risk *concealed* by the misrepresentations. . . .'"[127]  "To plead loss causation," therefore, "the complaint[] must allege facts that support an inference that [defendants'] misstatements and omissions concealed the circumstances that bear upon the loss suffered such that plaintiffs would have been spared all or an ascertainable portion of that loss absent the fraud."[128]

## B.    Common Law Fraud and Negligent Misrepresentation[129]

"The elements of fraud under New York law are: '[1] a misrepresentation or a material omission of fact which was false and known to be false by defendant, [2] made for the purpose of inducing the other party to rely upon it, [3] justifiable reliance of the other party on the misrepresentation or material omission, and [4] injury.'"[130]  The elements of fraudulent inducement are

---

*Stonepath Group, LLC*, 343 F.3d 189, 197 (2d Cir. 2003).

[127]    *In re Omnicom Group, Inc. Secs. Litig.*, 597 F.3d 501, 513 (2d Cir. 2010) (quoting *Lentell*, 396 F.3d at 173) (emphasis in original).

[128]    *Lentell*, 396 F.3d at 175.

[129]    For all non-federal claims in this action, both parties' briefs assume that New York law controls, and I proceed accordingly.  *See Krumme v. WestPoint Stevens, Inc.*, 238 F.3d 133, 138 (2d Cir. 2000).

[130]    *Premium Mortgage Corp. v. Equifax, Inc.*, 583 F.3d 103, 108 (2d Cir. 2009) (quoting *Lama Holding Co. v. Smith Barney Inc.*, 88 N.Y.2d 413, 421 (1996)).

substantially the same as those for common law fraud.[131]  Because the elements of

common law fraud under New York law are "substantially identical to those

governing Section 10(b)," an "identical analysis applies."[132]

However, "[u]nder New York law, a fraud claim will not lie if it arises

out of the same facts as plaintiff's breach of contract claim."[133]  Thus, "parallel

fraud and contract claims may be brought if the plaintiff (1) demonstrates a legal

duty separate from the duty to perform under the contract; (2) points to a

fraudulent misrepresentation that is collateral or extraneous to the contract; or (3)

seeks special damages that are unrecoverable as contract damages."[134]

### C.    The Martin Act

---

[131]    *See Braddock v. Braddock*, 871 N.Y.S.2d 68, 70 (1st Dep't 2009)
("To plead a claim for common-law fraudulent inducement, a plaintiff must assert
the misrepresentation of a material fact, which was known by the defendant to be
false and intended to be relied on when made, and that there was justifiable
reliance and resulting injury.").

[132]    *AIG Global Sec. Lending Corp. v. Banc of Am. Sec., LLC*, No. 01 Civ
11448, 2005 WL 2385854, at *16 (S.D.N.Y. Sept. 25, 2005) (citation and
quotation marks omitted).  *Accord Morse v. Weingarten*, 777 F. Supp. 312, 319
(S.D.N.Y. 1991).

[133]    *See IMG Fragrance Brands, LLC v. Houbigant, Inc.*, 759 F. Supp. 2d
363, 382 (S.D.N.Y. 2010) (quotation marks omitted).

[134]    *Merrill Lynch & Co. Inc. v. Allegheny Energy, Inc.*, 500 F.3d 171, 183
(2d Cir. 2007) (citing *Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc.*,
98 F.3d 13, 20 (2d Cir. 1996)).

New York's Martin Act makes it unlawful to, among other things, use or employ "any fraud, deception, concealment, suppression, false pretense or fictitious or pretended purchase or sale . . . where engaged in to induce or promote the issuance, distribution, exchange, sale, negotiation or purchase within or from this state of any securities . . . ."[135]  In 1987, the New York Court of Appeals established that "there is no implied private cause of action for violations of the antifraud provisions of the Martin Act."[136]  At that time, the Court explained that "the specific purpose of the statute was to create a statutory mechanism in which the Attorney-General would have broad regulatory and remedial powers to prevent fraudulent securities practices."[137]  Subsequently, New York courts — though never the Court of Appeals — held that the New York Attorney General possesses the exclusive power to regulate the sale of securities and that the Martin Act bars both private claims brought directly under the statute and "common-law claims based on facts that provide the Attorney General grounds for instituting an action

---

[135]    N.Y. Gen. Bus. Law § 352-c(1).  *Accord Kerusa Co. LLC v. W10Z/515 Real Estate Ltd. P'ship*, 12 N.Y.3d 236, 243 (2009) (holding that the Martin Act "authorizes the Attorney General to investigate and enjoin fraudulent practices in the marketing of stocks, bonds and other securities within or from New York State").

[136]    *CPC Int'l, Inc. v. McKesson Corp.*, 70 N.Y.2d 268, 275 (1987).

[137]    *Id.* at 277.

under the Act."[138]   Thus in 2001, the Second Circuit relied on *Eagle Tenants Corp.*

*v. Fishbein* and *Horn v. 440 East 57th Co.* in holding that non-fraud common law

claims — in that case, breach of fiduciary duty — were preempted by the Martin

Act.[139]   Since that time, the Martin Act has been held to preempt, at least, the

following non-fraud common law claims when they are predicated on the purchase

or sale of securities within or from New York:  negligence;[140] breach of fiduciary

duty;[141] negligent misrepresentation;[142] unjust enrichment;[143] and aiding and

abetting any of these claims.[144]

---

[138]     *Lehman Bros. Commercial Corp. v. Minmetals Int'l Non-Ferrous Metals Trading Co.*, 179 F. Supp. 2d 159, 162 (S.D.N.Y. 2001).  *Accord Eagle Tenants Corp. v. Fishbein*, 582 N.Y.S.2d 218, 219 (2d Dep't 1992); *Horn v. 440 E. 57th Co.*, 547 N.Y.S.2d 1, 5 (1st Dep't 1989).

[139]     *See Castellano v. Young & Rubicam, Inc.*, 257 F.3d 171, 190 (2d Cir. 2001) (relying on *Eagle Tenants Corp.*, 582 N.Y.S.2d at 219, and *Horn*, 547 N.Y.S.2d at 5).

[140]     *See Lehman Bros. Commercial Corp.*, 179 F. Supp. 2d at 162.

[141]     *See id.*

[142]     *See id.*

[143]     *See Pro Bono Inv., Inc. v. Gerry*, No. 03 Civ. 4347, 2005 WL 2429787, at *16 (S.D.N.Y. Sept. 30, 2005).

[144]     *See, e.g.*, *Jana Master Fund, Ltd. v. JPMorgan Chase & Co.*, 859 N.Y.S.2d 903 (Table), 2008 WL 746540, at *5 (Sup. Ct. N.Y. Co. Mar. 12, 2008) (dismissing claim for aiding and abetting breach of fiduciary duty because claims for "breach of fiduciary duty in connection with the purchase and sale of securities have been found to be barred by the Martin Act").

Recently, however, the state of the law concerning Martin Act preemption of non-fraud common law claims has entered a "state of flux."[145] Judge Victor Marrero's opinion in *Anwar v. Fairfield Greenwich Limited* extensively reviewed the state of the law surrounding Martin Act preemption and concluded that if the Court of Appeals were to take up the question today, it "would hold that the Martin Act does not preclude state common law causes of action that do not derive from or rely upon the Martin Act to establish a required element of the claim."[146]  Judge Marrero supported his analysis with persuasive arguments recently advanced by the First Department of the Appellate Division concluding that "there is nothing in the plain language of the Martin Act, its legislative history or appellate level decisions in this State that supports defendant's argument that the [Martin] act preempts otherwise validly pleaded common-law causes of action"[147] and Judge Marrero presciently foresaw that New York courts would soon adopt a position "against total preemption."[148]  Indeed,

---

[145]     *Dandong*, 2011 WL 5170293, at *14.

[146]     728 F. Supp. 2d 354, 357-72 (S.D.N.Y. 2010).

[147]     *Assured Guar. (UK) Ltd. v. J.P. Morgan Inv. Mgmt. Inc.*,  915 N.Y.S.2d 7, 15 (1st Dep't 2010) (holding that gross negligence and breach of fiduciary duty are not preempted by the Martin Act).

[148]     *Anwar*, 728 F. Supp. 2d at 357-58.

recently both the First and Second Departments have held that the Martin Act does

not preempt properly pled causes of action unless the private action is "drafted in

such a way as to cast what is clearly an obligation under the Martin Act as a

common-law cause of action."[149]  These more recent cases have been understood to

abrogate the broad holdings of *Eagle Tenants* and *Horn*[150] and instead apply the

well-established rule "that when the common law gives a remedy, and another

remedy is provided by statute, the latter is cumulative, unless made exclusive by

---

[149]    *Assured Guar. (UK) Ltd.*, 915 N.Y.S.2d at 13.  *Accord Bhandari v. Ismael Leyva Architects, P.C.*, 923 N.Y.S.2d 484, 484-85 (1st Dep't 2011); *Ambac Assurance UK Ltd. v. J.P. Morgan Inv. Mgmt., Inc.*, 928 N.Y.S.2d 253, 256 n.4 (1st Dep't 2011) (holding that tort claims were not preempted);  *CMMF, LLC v. J.P. Morgan Inv. Mgmt. Inc.*, 915 N.Y.S.2d 2, 5-6 (1st Dep't 2010) (holding that negligence, negligent misrepresentation and breach of fiduciary duty were not preempted); *Board of Managers of Marke Gardens Condominium v. 240/242 Franklin Ave. LLC*, 898 N.Y.S.2d 564, 565 (2d Dep't 2010) (holding that fraud and fraud in the inducement claims were not preempted); *Caboara v. Babylon Cove Dev., LLC*, 862 N.Y.S.2d 535, 537-39 (2d Dep't 2008) (holding that fraud and breach of contract claims are not preempted).  The Third and Fourth Departments have also held that common law claims are not always preempted by the Martin Act, *see Rasmussen v. A.C.T. Envtl. Servs.*, 739 N.Y.S.2d 220, (3d Dep't 2002) (rejecting Martin Act preemption defense without discussion); *Scalp & Blade v. Advest, Inc.*, 722 N.Y.S.2d 639, 640  (4th Dep't. 2001) (refusing to dismiss claims of breach of fiduciary duty and negligent misrepresentation based on Martin Act preemption).  I also take judicial notice that *Assured Guar. (UK) Ltd. v. J.P. Morgan Inv. Mgmt. Inc.* was argued before the New York Court of Appeals on November 15, 2011 and the argument addressed Martin Act preemption, *see* http://www.courts.state.ny.us/CTAPPS/summaries/Daily/Nov%2015.pdf.  The decision of the Court of Appeals will be the binding authority on this question.

[150]    *Schwarz v. ThinkStrategy Capital Mgmt. LLC*, — F. Supp. 2d —, 2011 WL 2732218, at *4 (S.D.N.Y. July 14, 2011).

the statute."[151]

Although the tide has turned in the state courts, the issue is not

completely resolved among the federal courts, and, in fact, most continue to apply

rigorous Martin Act preemption.[152]  There can be no question, however, that when

applying state law, this Court must "predict how the New York Court of Appeals

---

[151]     *Caboara*, 862 N.Y.S.2d at 539.

[152]     *Contrast Dandong*, 2011 WL 5170293, at *14 (Sand, J.) (denying preemption); *Schwarz*, 2011 WL 2732218, at *4 (Kaplan, J.) (same); *Waverly Props., LLC v. KMG Waverly, LLC*, — F. Supp. 2d —, 2011 WL 4472284, at *17 (S.D.N.Y. Sept. 27, 2011) (Marrero, J.) (same); *Anwar*, 728 F. Supp. 2d at 357 (Marrero, J.) (same) *with In re Herald, Primeo, & Thema Secs. Litig.*, No. 09 Civ. 289, 2011 WL 5928952, at *9 (S.D.N.Y. Nov. 29, 2011) (Berman, J.) (granting preemption); *Wilamowsky*, 2011 WL 4542754, at *14-15 (Sullivan, J.) ("[U] unless and until the New York Court of Appeals adopts such a rule, this Court is bound to apply the result in the only Second Circuit case to address the subject of Martin Act preemption, *Castellano*."); *In re Merkin*, — F. Supp. 2d —, 2011 WL 4435873 (S.D.N.Y. Sept. 23, 2011) (Batts, J.) (same); *In re Wachovia Equity Secs. Litig.*, 753 F. Supp. 2d 326, 380-81 (S.D.N.Y. 2011) (Sullivan, J.) (same); *In re Kingate Mgmt. Ltd. Litig.*, No. 09 Civ. 5386, 2011 WL 1362106, at *10-11 (S.D.N.Y. Mar. 30, 2011) (Batts, J.) (same) (collecting cases); *Iroquois Master Fund, Ltd. v. CEL-SCI Corp.*, No. 09 Civ. 8912, 2011 WL 1216688, at *2-3 (S.D.N.Y. Mar. 28, 2011) (Baer, J.) (same); *Jain v. T & C Holding Inc.*, No. 10 Civ. 1006, 2011 WL 814659, at *6 (S.D.N.Y. Mar. 3, 2011) (Berman, J.) (same);  *In re Merrill Lynch Auction Rate Secs. Litig.*, No. 09 Civ. 9888, 2011 WL 536437 (S.D.N.Y., Feb. 9, 2011) (Preska, C.J.) (same);  *In re J.P. Jeanneret Assocs., Inc.*, 769 F. Supp. 2d 340, 378 (S.D.N.Y. 2011) (McMahon, J.) (same); *In re Beacon Assocs. Litig.*, No. 09 Civ. 777, 2010 WL 3895582, at *37 (S.D.N.Y. Oct. 5, 2010) (Sand, J.) (same). Indeed, many of the cited cases enforcing preemption rely on *In re Beacon*, despite the fact that Judge Sand has more recently acknowledged the growing trend away from Martin Act preemption.

would" — or in this case will — "resolve the state law question."[153]   Moreover,

inasmuch as the cases relied upon by *Castellano v. Young & Rubicam, Inc.* have

been eroded, this Court must view *Castellano* in the context of the current state of

New York law.[154]

### D.    Breach of Contract

To make out a breach of contract claim under New York law, a

plaintiff must show "(1) the existence of a contract between itself and th[e]

defendant; (2) performance of the plaintiff's obligations under the contract; (3)

breach of the contract by th[e] defendant; and (4) damages to the plaintiff caused

by th[e] defendant's breach."[155]   Moreover, an "implied covenant" of good faith "is

---

[153]     *Tom Rice Buick-Pontiac v. General Motors Corp.*, 551 F.3d 149, 154 (2d Cir. 2008).

[154]     *See, e.g.*, 8/13/10 Amicus Brief on behalf of Attorney General of the State of New York filed in the appeal of *Barron v. Igolnikov*, No. 09 Civ. 4471, 2010 WL 882890 (S.D.N.Y. Mar. 10, 2010) (Griesa, J.) (granted preemption) as Dkt. No. 57 in *Barron v. Igolnikov*, No. 10 Civ. 1387, at 2 (asking the Second Circuit to "reconsider *Castellano* in light of intervening state appellate decisions" and because cases granting preemption "reflect a mistaken understanding of the Martin Act.").

[155]     *Diesel Props S.r.l. v. Greystone Bus. Credit II LLC*, 631 F.3d 42, 52 (2d Cir. 2011) (citing *Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.*, 375 F.3d 168, 177 (2d Cir. 2004) and *Harsco Corp. v. Segui*, 91 F.3d 337, 348 (2d Cir. 1996)).   *Accord Mandarin Trading Ltd. v. Wildenstein*, 16 N.Y.3d 173, 182 (2011).

read into every contract under New York law."[156]  However, "[a] claim for breach of the implied covenant can be maintained in conjunction with a breach of contract claim only if the damages sought by the plaintiff[s] for breach of the implied covenant are not intrinsically tied to the damages allegedly resulting from breach of contract."[157]

It is well-known that "[p]arties to proposed commercial transactions often enter into preliminary agreements, which may provide for the execution of more formal agreements."[158]  Thus, "New York law recognizes two types of preliminary agreement: under the first, sometimes called a binding preliminary commitment, the parties are bound only to make a good faith effort to negotiate and agree upon the open terms and a final agreement, with no further obligation; the second . . . is a fully binding preliminary agreement, which is preliminary only in form, and binds both sides to their ultimate contractual objective."[159]  In

---

[156]     *Excelsior Fund, Inc. v. JP Morgan Chase Bank, N.A.*, No. 06 Civ. 5246, 2007 WL 950134, at *6 (S.D.N.Y. Mar. 28, 2007).

[157]     *Ellington Credit Fund, Ltd. v. Select Portfolio Servicing, Inc.*, No. 08 Civ. 2437, 2011 WL 6034310, at *29 (S.D.N.Y. Dec. 5, 2011) (quotation marks omitted).

[158]     *Adjustrite Sys., Inc. v. GAB Bus. Servs., Inc.*, 145 F.3d 543, 547 (2d Cir. 1998).

[159]     *Rubinstein v. Clark & Green, Inc.*, 395 Fed. App'x 786, 789 (2d Cir. 2010).  *Accord L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 430 (2d Cir.

37

deciding whether an agreement is a preliminary fulling binding agreement courts

consider the following four factors:

> (1) whether there has been an express reservation of the right not
> to be bound in the absence of a writing; (2) whether there has been
> partial performance of the contract; (3) whether all of the terms of
> the alleged contract have been agreed upon; and (4) whether the
> agreement at issue is the type of contract that is usually committed
> to writing.[160]

In determining when an agreement is instead merely a non-binding preliminary

commitment courts consider:

> (i) "whether the intent to be bound is revealed by the language of
> the agreement"; (ii) "the context of the negotiations"; (iii) "the
> existence of open terms"; (iv) "partial performance"; and (v) "the
> necessity of putting the agreement in final form, as indicated by
> the customary form of such transactions."[161]

In making its determination, a court must balance the need to avoid "trapping

---

2011) (dealing with a commitment that simply "create[d] an obligation to negotiate the open issues in good faith") (quotation marks omitted); *Learning Annex Holdings, LLC v. Whitney Educ. Group, Inc.*, 765 F. Supp. 2d 403, 410-11 (S.D.N.Y. 2011).

[160]     *Powell v. Omnicom*, 497 F.3d 124, 129 (2d Cir. 2007). *Accord Adjustrite Sys., Inc.*, 145 F.3d at 549; *Ciaramella v. Reader's Digest Ass'n, Inc.*, 131 F.3d 320, 323 (2d Cir. 1997); *Madu, Edozie & Madu, P.C. v. SocketWorks Ltd. Nigeria*, 265 F.R.D. 106, 126 (S.D.N.Y. 2010).

[161]     *Vacold LLC v. Cerami*, 545 F.3d 114, 125 n.2 (2d Cir. 2008) (quoting *Brown v. Cara*, 420 F.3d 148, 154 (2d Cir. 2005)). *Accord Arcadian Phosphates, Inc. v. Arcadian Corp.*, 884 F.2d 69, 72 (2d Cir. 1989); *Madu, Edozie & Madu, P.C.*, 265 F.R.D. at 126.

parties in surprise contractual obligations that they never intended to undertake"

and the duty to "enforce and preserve agreements that were intended [to be]

binding, despite a need for further documentation."[162]

## V.   DISCUSSION

### A.   Plaintiffs' Securities Fraud Claims

Defendants argue that plaintiffs have failed to allege the necessary

elements of federal securities fraud as well as common law fraud.  However,

plaintiffs' allegations of fraud are sufficiently specific and plausible to survive a

motion to dismiss under the heightened pleading standard imposed by the PSLRA

and Rule 9.

### 1.   Plaintiffs Have Alleged Material Misrepresentations

Plaintiffs base their claims of fraud on (1) defendants' failure to

disclose the liabilities resulting from the Brody Agreements and (2) defendants'

affirmative misrepresentations suggesting that Edcomm owned all of its IP.[163]

Defendants do not deny that they had a duty to disclose important company

information, but argue that no representations by defendants were fraudulent or

misleading because Eagle's e-mails stated that Edcomm's IP was "owned by us" or

---

[162]    *Adjustrite Sys., Inc.*, 145 F.3d at 548 (citations and quotation marks
omitted).

[163]    *See* Compl. ¶¶ 107, 128, 129.

"100% ours," and that language was "intended to clarify that no *third parties* . . . owned the intellectual property," and referred to "Edcomm, Linda Eagle, Cliff Brody and David Shapp."[164]  Thus, defendants assert that they did not misrepresent the value or the status of Edcomm's IP.  This argument fails to negate the element of material misrepresentation or omission, however, for at least two reasons.  *First*, even assuming, arguendo, that Eagle's e-mails referred to both Edcomm and the defendants, defendants have still not shown why their failure to disclose the Brody Agreements was not a material omission.[165]  Moreover, even if Eagle's e-mails could be understood to refer to Brody, the terms of the Brody Agreements — agreements that potentially subject Edcomm to substantial liability — would still need to be disclosed in order to clarify Eagle's e-mails.  It is undisputed that the liabilities contained in the Brody Agreements greatly exceeded the price at which Siscom purchased all of Edcomm's outstanding shares.  Surely, a prospective buyer of a company for approximately $730,00 would want to know about the ownership of the company's most valuable asset as well as potential liabilities totaling up to twelve million dollars.  In other words, "an omission is actionable

---

[164]    Def. Mem. at 14 (emphasis added).

[165]    *See Wright v. Ernst & Young LLP*, 152 F.3d 169, 177 (2d Cir. 1998) ("Silence where there is a duty to disclose can constitute a false or misleading statement within the meaning of § 10(b) and Rule 10b-5.").

when the failure to disclose renders a statement misleading."[166]  Thus, even if

Eagle's e-mails did not specify the precise ownership of the IP, failure to disclose

the IP Agreement ensured that no one could accurately understand who owned the

IP and what liabilities were associated with it.  *Second*, the question of whether

"us" and "ours" in Eagle's e-mails referred to Edcomm or to the defendants is

incapable of resolution on a motion to dismiss.  Such ambiguities in e-mails

depend heavily on the factual contexts in which they are sent and viewed, and

cannot be resolved at this early stage.[167]  Thus, because plaintiffs allege — under

an eminently plausible reading of the e-mails — that they understood the e-mails

as assurances that Edcomm, and not its individual officers, owned the IP,

plaintiffs' claims may proceed.

       Likewise, defendants' argument that the certifications were not

material misrepresentations because they only concerned accounts payable and

accounts receivable is irrelevant to plaintiffs' claims of securities fraud.  Even if

---

[166]     *In re Alstom SA*, 406 F. Supp. 2d 433, 453 (S.D.N.Y. 2005) (finding a company's failure to disclose the fact that it was the guarantor of loans to be a material misrepresentation).  *Accord S.E.C. v. Gabelli*, 653 F.3d 49, 57 (2d Cir. 2011) ("[S]o-called 'half-truths' — literally true statements that create a materially misleading impression — will support claims for securities fraud.").

[167]     *Cf. Maniolos v. United States*, 741 F. Supp. 2d 555, 567 (S.D.N.Y. 2010) ("[W]hen the language of a contract is ambiguous, its construction presents a question of fact, which of course precludes summary dismissal on a Rule 12(b)(6) motion.") (quotation marks omitted).

the certification was never supposed to be a device for revealing contingent liabilities, defendants fail to explain their misleading e-mails suggesting that Edcomm owned all of its IP, and their simultaneous failure to disclose the existence of the Brody Agreements — agreements of which the shareholders of a small closely-held company would be expected to know.  In sum, plaintiffs have sufficiently alleged that at least some portion of the e-mails, the Shapp certification or defendants' inaction constituted a specific act of material misrepresentation or omission.  To the extent that defendants also believe that this argument is a valid defense to breach of contract, I consider it below.

### 2.    Plaintiffs Have Properly Alleged Scienter Under *Tellabs*

Plaintiffs have alleged a theory of scienter that is at least as compelling as any other explanation of defendants' actions (*i.e.*, more than merely plausible).  Plaintiffs argue both that defendants had a motive and an opportunity to commit fraud, and that in any case, failure to disclose the Brody Agreements was reckless.  Defendants' motive to defraud arose because, as plaintiffs allege, Edcomm had financial troubles in September 2010, and defendants were in danger of being held personally liable for Edcomm's debts of over $700,000.[168] Defendants also had an opportunity to defraud Siscom inasmuch as they were the

---

[168]    *See* Compl. ¶ 119.

sole owners of Edcomm, had a long history of involvement in Edcomm's business and internal affairs, and would have been able to prevent the disclosure of the Brody Agreements.[169]  Moreover, defendants had an incentive to lie in order to finalize the transaction because they realized that no reasonable potential investor "would proceed with a transaction knowing that Edcomm had no assets capable of generating a return on investment and millions of dollars in liabilities."[170] Defendants' only response to this is that the entire transaction — as alleged by plaintiffs — is implausible, that defendants had better alternatives to deal with Edcomm's debt, and that the transaction was only intended as a temporary loan of Edcomm's stock.[171]  However, both the Term Sheet as well as plaintiffs' pleadings state that the transaction was intended as an acquisition, not a loan.  To the extent that defendants contest this characterization of the transaction, a motion to dismiss is not the proper place to do so.[172]  While all of defendants' proposed alternative transactions might have made sense for defendants and Edcomm to have pursued — such as letting Edcomm be taken over, or renegotiating Edcomm's line of credit

---

[169]   *See id.* ¶ 127.

[170]   *Id.* ¶ 120.

[171]   *See* Def. Mem. at 16.

[172]   *See* Pl. Mem. at 17 n.6.

— I cannot say that the allegations of defendants' fraudulent activity are less compelling.

Plaintiffs also assert that even if defendants had no motive or opportunity to commit fraud, it was reckless under the circumstances to fail to disclose the Brody Agreements.[173]  This is supported by the facts that the Brody Agreements were made by and concerned the defendants, and that the ownership and value of Edcomm's IP was clearly central to the transaction.  Plaintiffs also assert that defendants were in a rush to finalize the transaction in order to avoid losing Edcomm to SmartPros and to avoid personal liability.[174]  Moreover, defendants have failed to explain why the Brody Agreements were only brought to plaintiffs' attention in March 2011.  Under these circumstances, plaintiffs have adequately pled that defendants' conduct was a gross deviation from what is normally expected of corporate officers.  Plaintiffs have thus alleged facts giving rise to a strong inference of scienter under the PSLRA.

### 3.   Plaintiffs Have Properly Pled Reasonable Reliance

Defendants further argue that even if plaintiffs relied on statements or

---

[173]   *See* Compl. ¶ 134.

[174]   *See* Pl. Mem. at 17.

omissions by defendants, they could not reasonably have done so.[175]  Defendants

explain that reliance would have been inappropriate because plaintiffs were buying

an entire company, the Term Sheet did not warranty that Edcomm's IP was owned

by Edcomm, and by requiring Shapp to certify future liabilities, the parties

intended to discount any prior representations.  However, none of these points

undermines reasonable reliance.  While defendants are certainly correct that

reasonable reliance can depend on the sophistication of the parties, the nature of

the transaction and a party's failure to make use of means of verification available

to it, the resolution of a dispute concerning such issues is rarely appropriate for a

motion to dismiss.  Also, plaintiffs argue that their multiple requests to verify

information about Edcomm's IP — in e-mails as well as in the certification clause

of the Term Sheet — show that they did as much as they could to ascertain the

truth regarding Edcomm's IP.[176]  Plaintiffs point out that given the speed of the

transaction, defendants were clearly on notice that plaintiffs would be relying on

the information they provided.  Plaintiffs have also pled that despite the fact that

both parties are business entities, defendants were in a unique position to know

---

[175]    *See* Def. Mem. at 15.

[176]    *See* Pl. Mem. at 14.

about — and disclose — Edcomm's outstanding agreements.[177]  In sum, because

"reasonable reliance is always nettlesome because it is so fact-intensive" plaintiffs'

motion to dismiss based on unreasonable reliance is denied.[178]

### 4.    Plaintiffs Do Not Need to Allege Damages with Specificity

Although defendants argue that plaintiffs have failed to allege

damages, "[r]ule 9(b) does not require that claimants plead injury with particularity

in fraud claims."[179]  In fact, plaintiffs have alleged all that is required of them in

this case — that they have suffered compensable damages in an amount to be

proven at trial.[180]  While defendants strongly assert that Brody has never requested

the amounts he is owed under the Brody Agreements and thus such liabilities are

not compensable injury, it cannot be overlooked that such liabilities affect the

---

[177]    *See Crigger v. Fahnestock & Co., Inc.*, 443 F.3d 230, 234 (2d Cir. 2006) ("Only [w]hen matters are held to be peculiarly within defendant's knowledge[ ] [is it] said that plaintiff may rely without prosecuting an investigation, as he ha[d] no independent means of ascertaining the truth.").

[178]    *Schlaifer Nance & Co. v. Estate of Warhol*, 119 F.3d 91, 98 (2d Cir. 1997).  *Accord Doehla v. Wathne Ltd., Inc.*, No. 98 Civ. 6087, 1999 WL 566311, at *10 (S.D.N.Y. Aug. 3, 1999) ("Whether or not reliance on alleged misrepresentations is reasonable in the context of a particular case is intensely fact-specific and generally considered inappropriate for determination on a motion to dismiss.").

[179]    *Xcellence, Inc. v. Arkin Kaplan Rice LLP*, No. 10 Civ. 3304, 2011 WL 1002419, at *5 (S.D.N.Y. Mar. 15, 2011).

[180]    *See id.*

46

value of the company and may be enforced by Brody whenever he wishes.

Therefore, just as plaintiffs have alleged a specific factual basis for fraud, their

representation that such fraud has caused injury is sufficient to surmount the low

damages threshold imposed on a motion to dismiss.

### 5.    Plaintiffs Have Adequately Alleged Causation

Defendants argue that because all of the alleged misrepresentations

took place after the execution of the Term Sheet, plaintiffs have failed to plead

transaction and loss causation.  In other words, because the plaintiffs went ahead

with the transaction before any of defendants' misrepresentations, such

misrepresentations could not have induced plaintiffs to do so.[181]  However, to

allege transaction causation, plaintiffs only need to show that "but for the claimed

misrepresentations or omissions, the plaintiff would not have entered into the

detrimental securities transaction."[182]  Similarly, loss causation only requires that

plaintiffs allege a "causal link between the alleged misconduct and the economic

harm ultimately suffered by the plaintiff."[183]  Plaintiffs satisfy this burden by

---

[181]    *See* Def. Mem. at 11.

[182]    *Lentell*, 396 F.3d at 172 (quotation marks omitted).

[183]    *Id.* (quotation marks omitted).  *Accord City of Roseville Employees'
Ret. Sys. v. EnergySolutions, Inc.*, — F. Supp. 2d —, 2011 WL 4527328, at *22
(S.D.N.Y. Sept. 30, 2011).

alleging multiple examples of material representations made *before* the closing that could have — and allegedly did — cause plaintiffs to enter into the transaction. *First*, plaintiffs allege that on October 1 — before the Term Sheet or the transaction — Shapp represented to Siscom that Edcomm's IP was worth twenty million dollars, without mentioning that all such IP actually belonged to Brody.[184] Likewise, plaintiffs allege that Eagle's October 1 e-mail represented that Edcomm's IP was of great value, and "100% owned by us."[185]  *Second*, Eagle's October 2 e-mail — also before both the Term Sheet and the transaction — allegedly stated that Edcomm's IP was "owned by us."[186]  *Third*, on October 8 — between the execution of the Term Sheet and the transaction — plaintiffs allege that Shapp provided them with the certification which did not include any liabilities connected to the Brody Agreements.[187]  *Fourth*, in Eagle's October 8 e-mail — also before the transaction was closed — Eagle represented to Siscom that "Edcomm has never sold its content."[188]  All of these communications can be read as misleading information or material omissions concerning the true ownership,

---

[184]   *See* Compl. ¶ 64.

[185]   *Id.* ¶ 67.

[186]   *Id.* ¶ 70.

[187]   *See id.* ¶¶ 75-77.

[188]   *Id.* ¶ 80.

and hence the true value to Edcomm, of Edcomm's IP.  Finally, plaintiffs explicitly state that "[n]either SISCOM nor any reasonable potential purchaser of Defendants' stock would proceed with a transaction knowing that Edcomm had no assets capable of generating a return on investment and millions of dollars in liabilities to Defendant Brody."[189]  In other words, plaintiffs assert that they would not have entered into the transaction knowing about the approximately twelve million dollars in liabilities based on the Brody Agreements.  Because these representations occurred before the closing, and some even before the Term Sheet, defendants cannot negate the element of causation as a matter of law.  Accordingly, plaintiffs' federal security fraud claims are not subject to dismissal on this ground.

### B.   Plaintiffs' Fiduciary Duty and Negligent Misrepresentation Counts Are Not Preempted by the Martin Act

Plaintiffs acknowledge the uncertain state of New York law regarding Martin Act preemption, but urge this Court to reject "blanket Martin Act preemption for non-fraud common law claims."[190]  I accept this invitation based on my conclusion that the law in New York — as established by all four appellate divisions — weighs against Martin Act preemption here.  Plaintiffs' claims for breach of fiduciary duty as well as negligent misrepresentation may, therefore,

---

[189]   *Id.* ¶ 120.

[190]   Pl. Mem. at 18.

proceed inasmuch as they are well-pled non-fraud common law claims, and are not based on rights or duties arising solely under the Martin Act or regulations thereunder.  Since I last considered Martin Act preemption in *Abu Dhabi Commercial Bank v. Morgan Stanley & Co. Inc.*,[191] the First Department has retracted its approval of blanket Martin Act preemption, and I must now rule in accordance with my prediction of the way in which the New York Court of Appeals will resolve this issue.[192]  I now predict, in fact, that the New York Court of Appeals will not find blanket preemption under the Martin Act for non-fraud claims.

### C.    Plaintiffs' Breach of Contract Claims

#### 1.    The Term Sheet Was a Binding Preliminary Agreement

Defendants argue that the Term Sheet was merely a preliminary commitment that only imposed an obligation to negotiate further and that even if the agreement was binding, it was never breached.  However, the application of the Second Circuit's multi-factor test inescapably leads to the opposite conclusion —

---

[191]    651 F. Supp. 2d 155, 181-82 (S.D.N.Y. 2009) (dismissing tort claims based on Martin Act preemption).

[192]    I also note that because most of the other counts are not being dismissed, if the New York Court of Appeals reverses the First Department in the pending appeal of *Assured Guar. (UK) Ltd.* and holds in favor of broad Martin Act preemption, these three counts can be dismissed later while the remaining counts proceed.

that the Term Sheet was intended as a binding and comprehensive agreement. *First*, there was nothing in the writing even approximating a reservation of the right not to be bound in the absence of a more formal contract.  Indeed, nothing in the language of the Term Sheet other than the final line calling for a "formal contract" suggests that the parties did not intend to be bound.[193]  However, it is well-settled that "'the mere fact that the parties contemplate memorializing their agreement in a more formal document does not prevent their informal agreement from taking effect prior to that event.'"[194]  The plain language of the Term Sheet as well as the parties' signatures evidence the parties' mutual intent to commit to its terms.  The Term Sheet also explicitly refers to Siscom's offer to purchase Edcomm as well as the defendants' acceptance of this offer.  *Second*, and perhaps most importantly here, plaintiffs pled that the parties orally affirmed the binding nature of the Term Sheet and carried out the transaction under its terms.[195]  In fact, defendants do not appear to dispute that the transaction closed on October 11, and that Siscom is now the sole owner of Edcomm.  The parties' subsequent course of

---

[193]     Term Sheet.

[194]     *Bear Stearns Inv. Prods., Inc. v. Hitachi Automotive Prods. (USA), Inc.*, 401 B.R. 598, 618 (S.D.N.Y. 2009) (quoting *V'Soske v. Barwick*, 404 F.2d 495, 499 (2d Cir. 1968)).

[195]     *See* Compl. ¶ 49.

action thus strongly supports the conclusion that the Term Sheet was intended to be a binding and enforceable agreement.[196]   *Third*, the Term Sheet is very specific about the requirements for the transaction.  While the date of the closing, the terms of the non-compete agreements and certain other terms were not finalized in the Term Sheet, the central terms for the transaction were agreed upon — an exact purchase price ($727,985) and a simultaneous transfer of all of Edcomm's outstanding stock.  Furthermore, defendants' assertion that the reorganization period specified in the Term Sheet was really an opportunity for further negotiation does not square with either the plain language of the Term Sheet or the parties' subsequent behavior in finalizing the transaction on October 11.[197]   To the extent that defendants expect to introduce proof that the reorganization period was intended to further negotiate the terms of the transaction, such an argument, at best, requires further factual development.  *Fourth*, while defendants argue that "surely the acquisition of a global financial services training firm with 1400 courses and a significant client base in the banking industry" would require a more formal agreement, plaintiffs' allegations adequately state that the Term Sheet covered all

---

[196]   *See R.G. Group, Inc. v. Horn & Hardart Co.*, 751 F.2d 69, 75-76 (2d Cir. 1984) ("[P]artial performance is an unmistakable signal that one party believes there is a contract; and the party who accepts performance signals, by that act, that it also understands a contract to be in effect.").

[197]   *See* Def. Mem. at 5 n.1.

the relevant elements of the transaction.  In any event, it is nearly impossible to determine at the motion to dismiss stage whether a more formal contract would normally be expected under prevailing industry conditions.[198]

### 2. Plaintiffs Have Properly Pled Defendants' Breach of the Term Sheet

Defendants argue that even if the Term Sheet was binding, they did not breach it because the liabilities alleged to have been missing from the certification — those arising from the Brody agreement — were mere contingencies and were thus unlikely to arise within six months of the transaction.[199]  However, the Term Sheet called for the disclosure not just of liabilities that would probably occur withing six month; rather, it required Shapp to "forecast any liabilities that *might reasonably occur* within six (6) months."[200]  By their terms, both of the Brody Agreements could have reasonably come due within six months.  The IP Agreement easily could have come due — for eight million dollars — within six months inasmuch as Brody was entitled to demand such

---

[198]     *See FCOF UB Secs. LLC v. MorEquity, Inc.*, 663 F. Supp. 2d 224, 231 (S.D.N.Y. 2009) ("[T]he question of whether it is customary to accord binding force to a certain type of preliminary agreement is a question of fact to be determined, in significant part, based on industry custom.").

[199]     *See* Def. Mem. at 21.

[200]     Term Sheet ¶ 10 (emphasis added).

payment at any time.[201]  Likewise the Employment Agreement was set to become

due whenever Brody ceased working for Edcomm for any reason other than his

voluntary departure.[202]  While the Term Sheet provided that Edcomm could not fire

Brody for "ninety (90) to one hundred twenty (120) days" following the closing,[203]

that did not preclude Edcomm from firing him within the following sixty to ninety

days, thus triggering Brody's severance pay within six months of the closing.  At

the very least, the question defendants raise concerning whether the liabilities

arising under the Brody Agreements were sufficiently "contingent" such that they

would not have been required to appear on the certification requires further factual

development and thus cannot be resolved on a motion to dismiss.

        Defendants' further argument that they did not breach the Term Sheet

because the certification was only intended to disclose accounts payable and

accounts receivable is likewise misguided.[204]  The plain language of the Term

Sheet requires that the certification include any liabilities and not just a subset of

accounts payable and accounts receivable.  And again, to the extent that defendants

---

[201]     *See* IP Agreement.

[202]     *See* Employment Agreement.

[203]     Term Sheet ¶ 5(b).

[204]     *See* Def. Mem. at 12.

expect to submit additional facts to show that the parties only intended to share information about accounts payable and accounts receivable, factual disputes cannot be resolved on a motion to dismiss.

> 3.    **Plaintiffs' Allegations Concerning the Covenant of Good Faith Are Duplicative of the Breach of Contract Claims**

While plaintiffs have alleged sufficient facts to make out a claim for breach of contract (count five), they have not shown that defendants breached the covenant of good faith (count six) in any way other than the principal breach.[205] The principal breach of contract claim is premised on defendants' failure to provide a proper certification of liabilities to Siscom pursuant to the Term Sheet. Likewise, plaintiffs' claim for breach of the covenant of good faith is based on defendants having "conceal[ed] the asserted liabilities due to Brody under the Alleged IP and Employment Agreements."[206]  Because this allegation is merely duplicative of plaintiffs' claims concerning breach of contract, it must be dismissed.

> D.    **Plaintiffs' Fraud Counts Are Not Identical to Their Breach of Contract Counts**

---

[205]    *See FCOF UB Secs. LLC*, 663 F. Supp. 2d at 231 ("New York law requires dismissal of an implied covenant claim where the claim derives from the same set of facts as a breach of contract claim.").

[206]    Compl. ¶ 154.

Plaintiffs' counts of fraud are not duplicative of the breach of contract claims.  While both the fraud and the breach of contract arise out of a common transaction, plaintiffs properly pled fraud allegations that are "collateral or extraneous" to the contract.[207]  Plaintiffs' breach of contract claims arise out of defendants' alleged failure to include the Brody agreement in the certification of Edcomm's liabilities — an obligation that only exists by virtue of the Term Sheet. The fraud allegations, however, are not mere restatements of such breach of contract claims.  Plaintiffs allege that defendants engaged in fraud by concealing the liabilities arising under the Brody Agreements — and other liabilities — throughout the transaction through misrepresentation and omission.  The requirement not to misrepresent material information in a securities transaction arises independently of the Term Sheet and its attendant obligations, as long as defendants had a duty to disclose.  Whether or not a contract exists to compel certification of liabilities, a seller — particularly one with unique knowledge of a company's liabilities — cannot misrepresent or fail to disclose liabilities that the reasonable investor would want to know.  Thus, because plaintiffs have properly pled the elements of fraud, those allegation may be pursued in parallel with plaintiffs' contractual claims.

---

[207]    *Bridgestone/Firestone, Inc.*, 98 F.3d at 20.

### E.    Defendants Have Alleged Sufficient Damages

Defendants argue that plaintiffs' claim of breach of fiduciary duty (count thirteen) must be dismissed because plaintiffs have not suffered any damages as a result of such alleged breach.[208]  Count thirteen is pled based on the assumption that the Brody Agreements are inauthentic and that they constitute an attempt by defendants "to extort additional funds from SISCOM in connection with the Stock Purchase Transaction."[209]  Under Count thirteen, plaintiffs argue that defendants had a fiduciary duty to Edcomm as their employer which they breached by producing false documents of Edcomm's liabilities.  While plaintiffs do not plead their damages from such action with any particularity, they do claim to have been injured by such behavior.[210]  As already explained, moreover, there is no question that plaintiffs do not need to plead damages with specificity, even in the context of the heightened pleading standard applicable to fraud.[211]  In fact, it is generally sufficient for plaintiffs to rely on an assertion that they were "damaged in an amount to be determined at trial" based on their costs incurred.[212]  Also,

---

[208]    *See* Def. Mem. at 22.

[209]    Compl. ¶ 198.

[210]    *See id.* ¶ 204.

[211]    *See, e.g., Xcellence, Inc.*, 2011 WL 1002419, at *5.

[212]    *Id.*

contrary to defendants' assertion, plaintiffs allege that they have incurred costs in connection with defendants' breach of fiduciary duty in addition to their demand for attorney's fees.[213]   Therefore, plaintiffs' claim of breach of fiduciary duty cannot be disposed of on a motion to dismiss.

### F.    Supplemental Jurisdiction

Because the federal securities fraud claims asserted here (counts one and two) are not subject to dismissal, there are no grounds for dismissing the state law claims.   Although there are significant state law claims presented here, there are no exceptional circumstances here that would prevent this Court from exercising supplemental jurisdiction over them.[214]   Accordingly, both the state and federal claims may proceed in federal court.

## IV.   CONCLUSION

For the foregoing reasons, defendants' motion to dismiss is denied in part and granted in part.   The Clerk of the Court is directed to close this motion

---

[213]    *See* Compl. ¶ 204.

[214]    *See Metro Foundation Contractors, Inc. v. Arch Ins. Co.*, No. 09 Civ. 6796, 2011 WL 2150466, at *5 (S.D.N.Y. May 31, 2011) ("The Court of Appeals for the Second Circuit has held that a district court's exercise of supplemental jurisdiction is mandatory over any claim that satisfies the elements of 28 U.S.C. § 1367(a) unless the claim also falls within one of the exceptions enumerated in § 1367( c).") (citing *Itar–Tass Russ. News Agency v. Russ. Kurier, Inc.*, 140 F.3d 442, 447 (2d Cir. 1998)).

[Docket No. 35]. A conference is scheduled for Friday, January 6 at 4:30 p.m.

The parties are instructed to bring a proposed scheduling order to the conference in

accordance with the Court's individual rules.


SO ORDERED:

_____
Shira A. Scheindlin
U.S.D.J.


Dated:      New York, New York
            December 15, 2011

**- Appearances -**

**For Plaintiffs:**

Philip L. Hirschhorn, Esq.
Tanya D. Bosi, Esq.
Lauren A. Isaacoff, Esq.
Leslie J. Harris, Esq.
Buchanan Ingersoll & Rooney PC
1290 Avenue of the Americas, 30th Floor
New York, NY 10104
(212) 440-4400

**For Defendants:**

Justin M. Sher, Esq.
Sher Tremonte LLP
41 Madison Avenue, 41st Floor
New York, NY 10010
(212) 202-2600