UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------X

SAWABEH INFORMATION SERVICES
COMPANY and EDCOMM, INC.,

                    Plaintiffs,

    - against -

CLIFFORD BRODY, LINDA EAGLE and
DAVID SHAPP,

                    Defendants.

------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:  1/6/14

**OPINION AND ORDER**

**11 Civ. 4164 (SAS)**

SHIRA A. SCHEINDLIN, U.S.D.J.:

I.    INTRODUCTION

        Sawabeh Information Services Company ("SISCOM") and its wholly

owned subsidiary Edcomm, Inc. ("Edcomm") bring this action against former

Edcomm officers and shareholders, Clifford Brody, Linda Eagle and David Shapp,

arising out of an alleged agreement to sell all outstanding shares of Edcomm from

defendants to SISCOM pursuant to a Term Sheet signed by all parties and dated

October 7, 2010.[1]  Plaintiffs allege that defendants intentionally misrepresented or

concealed information about Edcomm's financial status prior to the execution of

---

[1]        *See* First Amended Complaint.

1

the Term Sheet.  Defendants deny that they intentionally misrepresented or concealed any information and allege that SISCOM intentionally misled defendants as to the purpose of the transaction.

Plaintiffs originally brought sixteen claims for relief.  The following claims remain: (1) securities fraud under Section 10(b) of the Securities Exchange Act of 1934; (2) common law fraud; (3) fraudulent inducement; (4) breach of contract; and (5) breach of fiduciary duty.  Plaintiffs also seek the following declaratory and injunctive relief: a declaratory judgment stating (1) that defendants should indemnify plaintiffs as to any undisclosed liabilities and (2) that all of Edcomm's intellectual property belongs to Edcomm, as well as an order prohibiting defendants from competing with Edcomm.  Defendants' remaining counterclaims are as follows: (1) common law fraud; (2) fraudulent inducement; (3) breach of contract; (4) breach of implied employment contract; (5) violation of Pennsylvania Wage Payment and Collection Law; (6) conversion; (7) replevin; and (8) indemnification.

I held a bench trial from November 12 to November 18, 2013.  The parties made post-trial submissions on December 9, 2013.  Pursuant to Rule 52(a) of the Federal Rules of Civil Procedure, I make the following findings of fact and conclusions of law.  In reaching these findings and conclusions, I heard the

testimony, examined the documentary evidence, observed the demeanor of the witnesses, and considered the arguments and submissions of counsel.

## II.    FINDINGS OF FACT

### A.    The Parties

SISCOM is a Saudi Arabian company and a regional technology services firm that defines, designs and delivers information technology-enabled business solutions to clients.[2]  Edcomm is a New York corporation that specializes in providing consulting and training to the banking industry.[3]  Edcomm was founded in 1987 by defendants Brody and Eagle.[4]  Defendant Shapp joined Edcomm in 1995.[5]

Brody is a citizen and resident of Pennsylvania.  Brody was the Chief Executive Officer and a shareholder of Edcomm.[6]  Eagle is a citizen and resident of New York.  Eagle was the president and a shareholder of Edcomm.[7]  Shapp is a citizen and resident of Pennsylvania.  Shapp was the Chief Financial Officer and

---

[2]    *See* Joint Pretrial Order ("JPTO"), at 9.

[3]    *See id.*

[4]    *See* Trial Transcript ("Trial Tr.") at 432 (Brody).

[5]    *See id.* at 149 (Shapp).

[6]    *See* JPTO at 9.

[7]    *See id.*

shareholder of Edcomm.[8]  Prior to approximately October 2010, Brody, Eagle and

Shapp were Edcomm's only shareholders and directors.[9]

### B.    Deferred Salaries and Shareholder Loans

Defendants decided to defer their salaries in July 2007 and continued

to do so through October 2010.[10]  Brody and Eagle also made several shareholder

loans to Edcomm between July 2007 and April 2010.[11]  Defendants tracked the

deferred salaries and shareholder loans on a spreadsheet entitled "Partner Loan

Analysis."[12]  According to defendants' records, Brody deferred salary over 134

weeks between July 2007 and October 2010 in the amount of $1,190,146.11, Eagle

deferred salary over 134 weeks between July 2007 and October 2010 in the amount

of $518,269.29, and Shapp deferred salary over 134 weeks between July 2007 and

October 2010 in the amount of  $452,169.29.[13] According to defendants' records,

the total amount of unpaid principal on Brody's shareholder loans is $1,024,982.00

---

[8]       *See id.*

[9]       *See* Plaintiffs' Exhibit ("Pl. Ex.") 16 (Collected Minutes of
Shareholders and Board of Directors Meetings from 1995-2009).

[10]      *See* Trial Tr. at 509-510 (Brody), 711 (Shapp), 794-795 (Eagle).

[11]      *See id.* at 509 (Brody) and 599 (Eagle).

[12]      *See* Defendants' Exhibit ("Def. Ex.") T8.

[13]      *See id.*

4

and the total amount of unpaid principal on Eagle's loans is $60,352.31.[14]

### C.   Summa/SmartPros Line of Credit

On May 9, 2002, defendants entered into a financing agreement with Summa Capital Corporation ("Summa") in connection with a line of credit Summa made available to Edcomm.[15]   The line of credit was increased from time to time and the financing agreement was correspondingly amended.[16]   The line of credit was secured by "all of [Edcomm's] receivables . . . includ[ing] accounts, contract rights, instruments, documents, chattel paper, general intangibles and all forms of obligations owing to [Edcomm]" and the financing agreement included personal guarantees from all three shareholders.[17]

On June 10, 2010, SmartPros, Ltd. ("SmartPros") assumed Summa's obligations pursuant to the financing agreement and increased the line of credit to $900,000, from which an outstanding balance totaling $540,781.66 was paid directly to Summa.[18]   The agreement between Edcomm and SmartPros required

---

[14]     *See id.*

[15]     *See* Pl. Ex. 29 (collected versions of Financing and Security Agreements between Summa and Edcomm).

[16]     *See id.*

[17]     *Id*.

[18]     *See* Pl. Ex. 30 (Line of Credit Agreement between SmartPros and Edcomm).

full payment of the loan "on or before October 11, 2010."[19]  The agreement also required Edcomm to maintain "a minimum of $300,000 in domestic Receivables . . . not aged more than 90 days"[20] and gave SmartPros a right of first refusal "[d]uring the term of said line of credit and extending for a period of ten years thereafter . . . in the event that [Edcomm] receives a bona fide offer from a third party to purchase the assets of [Edcomm]."[21]  The agreement stated that "all of the terms and conditions" in the previous Summa agreements, including "personal guarantees" continue to be "in full force and effect."[22]

In August 2010, Allen Greene, Chairman and CEO of SmartPros notified Edcomm that its receivables were "not in compliance with [its] loan agreement . . . and asked them to pay down the loan to bring the loan in compliance."[23]  Greene "didn't get a response and [] didn't get any money, [s]o, two days later, [he] told them that [SmartPros is] putting [the] accounts on notice [] to have all payments directed to [SmartPros] and that any payments [Edcomm]

---

[19]     *Id.* ¶ 2.

[20]     *Id.* ¶ 5.

[21]     *Id.* ¶ 4.

[22]     *Id.* ¶ 6.

[23]     Trial Tr. at 729 (Greene).

6

received should be turned over."[24]   Shapp agreed to send letters to clients at the end of August and "any checks that [Edcomm] received, [were] brought to [SmartPros]."[25]   SmartPros received approximately $180,000 in receivables and also gave Edcomm a credit of approximately $66,000, leaving a balance of approximately $740,000 on the loan by September 2010.[26]

### D.    The Slater Loans

Debra Slater is a long-time friend of Eagle.[27]   In June 2008, Eagle approached Slater to ask for a loan to Edcomm.[28]   Slater made a loan of $20,000 at a 20% interest rate on June 26, 2008.[29]   On September 4, 2008, Slater made an additional loan of $100,000 at a 20% interest rate.[30]   On September 17, 2008, Slater made an additional loan of $100,000 at a 15% interest rate.[31]   On December 10,

---

[24]    *Id*.

[25]    *Id*. at 730.

[26]    *See id*. at 731-732.

[27]    *See id*. at 465 (Slater) (stating that she has known Eagle for over 35 years).

[28]    *See id.* at 467.

[29]    *See* Pl. Ex. 76 (7/9/09 letter from Eagle, Brody and Shapp to Slater summarizing history of loans).

[30]    *See id.*

[31]    *See id.*

2008, Slater made an additional loan of $100,000 at a 15% interest rate.[32]  On

December 23, 2008, Slater made an additional loan of $105,000 at a 15% interest

rate.[33]  On July 9, 2009, Slater made an additional loan of $100,000.[34] On

September 17, 2009, Slater made an additional loan of $210,000 at a 25% interest

rate.[35]  Edcomm made no payments on the interest or principal of any of these

loans until "early 2010" and in total, paid approximately $37,000 to Slater.[36]  The

Slater loans were recorded in Edcomm's financial records as shareholder loans

from Eagle,[37] although they were also tracked as loans from Slater in a separate

spreadsheet.[38]  The shareholder loans were converted to paid-in capital, or equity,

in 2009.[39]

---

[32]     See id.

[33]     See id.

[34]     See Pl. Ex. 77 (7/9/09 letter from Eagle and Brody to Slater
confirming the loan and pledging that Edcomm will "pay back an additional
$1,000 which is the equivalent of more than a 50% interest rate").

[35]     See Pl. Ex. 64 (9/17/09 e-mail from Eagle to Slater).

[36]     Trial Tr. at 480 (Slater).

[37]     See id. at 191 (Shapp).

[38]     See Def. Ex. T6 ("Slater Loan Spreadsheet").

[39]     See Pl. Ex. 54 (Edcomm Financial Statement for the Years Ending
December 31, 2008 and December 31, 2009).  See also Trial Tr. at 503 (Brody)
(stating that the decision to convert shareholder loans to paid-in capital, or equity,

E.      **The Transaction and Term Sheet**

1.      **Lack of Documentary Evidence**

I note at the outset of this section that I previously ruled that plaintiffs

were "at least grossly negligent in the preservation and production of

E[lectronically] S[tored] I[nformation]" and granted defendants' motion for

sanctions in the form of an adverse inference. [40]   Testimony during this trial

overwhelmingly confirmed that plaintiffs failed to search for, and produce, relevant

documents.  Plaintiffs' witnesses repeatedly testified about records, documents and

communications that were never produced in discovery.[41]  Defendants continue to

claim that plaintiffs affirmatively withheld text messages, e-mails and other

relevant documents.[42]  From the evidence defendants *were* able to obtain from their

---

was made by Stanley Nasberg, Edcomm's accountant).

[40]      Transcript ("Tr.") of 8/28/13 Conference, at 5.

[41]      *See, e.g.,* Trial Tr. at 62 (Waleed Abalkhail, president of SISCOM) (testifying about receiving reports from employees about subsidiary companies); *id.* at 93 (Abalkhail) (testifying about versions of certified liabilities worksheet prepared by Shapp); *id.* at 118-119 (Abdulrahman Abdalla, financial analyst for SISCOM) (testifying about reports prepared for, and sent to, Abalkhail, pertaining to Abdalla's work on Edcomm); *id.* at 215 (Omar Saeed, SISCOM's internal accountant) (testifying about reviewing alternate versions of accounts receivable aging report).

[42]      *See* Eagle, Brody and Shapp's Proposed Findings of Fact and Conclusions of Law ("Def. Facts and Concl."), at 2-3.

own records and from a data dump, it is clear that plaintiffs used e-mail, web mail and text messages throughout the period leading to the October 7, 2010 signing of the Term Sheet, as well as the period subsequent to the signing and leading to defendants' termination on June 20, 2011. A tremendous amount of relevant evidence has not been produced and is unavailable to the Court. "When evidence has not been produced because of gross negligence, prejudice to the innocent party may be presumed because that party is deprived of what the Court can assume would have been evidence relevant to the innocent party's claim or defense."[43] Plaintiffs have not rebutted the presumption of prejudice. As a result, I will infer that missing evidence would have been favorable to defendants.

Although it is still impossible to determine whether plaintiffs knowingly withheld documents, the woeful discovery in this case renders the record partial and incomplete. This is especially troubling because the limited documentary evidence that is available shows that the oral testimony by key witnesses on both sides was riddled with self-serving statements, inconsistencies and credibility issues. Without documents evidencing contemporaneous discussions, it is very difficult to make many findings of fact regarding the time period from September 2010 to June 2011.

---

[43]     Tr. of 8/28/13 Conference at 15 (citing *Southern New England Tel. Co. v. Global Naps Inc.*, 624 F.3d 123, 148 (2d Cir. 2010)).

## 2.    The Negotiations

The balance of the SmartPros loan was due on October 11, 2010.[44]

Under the terms of the financing agreement, the loan was secured by Edcomm's

assets, including intellectual property.[45]  In late September 2010, Eagle approached

Waleed Abalkhail, president of SISCOM, to discuss a potential loan or

investment.[46]  Between approximately September 28 and October 7, 2010, the

parties engaged in negotiations regarding the terms of this transaction.  Haitham

Saead, the Vice President of SISCOM, e-mailed Eagle on September 28, 2010 to

request "audited financial statements for the last 3 years and the latest 2010

unaudited f[inancial] s[tatements]."[47]  Eagle responded, attaching the requested

financial statements and other documents to give Saead "a high level picture of our

business," but clarified that "[t]he financials are prepared by a Certified Public

Accounting firm but are unaudited as [Edcomm is] privately held."[48]  Saead

---

[44]    *See* Pl. Ex. 30 and Trial Tr. at 751 (Greene).

[45]    *See* Pl. Ex. 30 ¶ 6.

[46]    *See* Trial Tr. at 23-24 (Abalkhail) and 558 (Eagle).

[47]    Def. Ex. I (9/28/10 e-mail from Eagle to Saead).

[48]    Def. Ex. H (9/29/10 e-mail from Eagle to Saead).

responded to ask why "Edcomm does not have any audited financial statements."[49]

Eagle replied that "[a]s a privately held company, there has been no need for

audited financials [because] [w]e have not had external financing other than simple

lines of credit secured by our receivables, and have not given equity in our

company to anyone, so we have not been asked for them."[50]  The unaudited

financial statements showed that Edcomm's net revenue for 2008 and 2009 was

$6,565,399 and $8,936,604, respectively, and that Edcomm's net *income* for 2008

and 2009 was $145,003 and $197,994, respectively.[51]  Over the next few days,

Shapp and Eagle continued to provide financial records as requested, including

office leases, and continued to correspond with SISCOM's team regarding

Edcomm's business model and finances.[52]  Eagle noted that Edcomm's IP

"represents great value" and "is 100% owned by us."[53]

---

[49]     Def. Ex. I (9/29/10 e-mail from Saead to Abalkhail and Richard Yahya, consultant for SISCOM).

[50]     *Id*. (10/29/10 e-mail from Eagle to Saead, Abalkhail, Yahya and Shapp).

[51]     *See* Pl. Ex. 54, at 3.

[52]     *See, e.g.*, Def. Ex. L (9/29/10 e-mail from Shapp to Yahya, Saead, Abalkhail and Eagle), Def. Ex. O (10/1/10 e-mail from Shapp to Yahya, Abalkhail, Saead, Abdalla and Eagle), Def. Ex. YY (10/1/10 e-mail from Eagle to Shapp, Yahya, Abalkhail, Abdalla and Saead).

[53]     Def. Ex. YY.

On October 3, SISCOM's attorney, Jared Silverman, expressed concern to Eagle that the "SmartPros agreement may be an impediment to an agreement with SISCOM" because Edcomm's "assets cannot be put up as collateral for the SISCOM loan because of SmartPros' UCC-1, which gives it the superior lien."[54]  Eagle reassured Silverman that SmartPros would assign the UCC-1 to SISCOM.[55]  Eagle also identified Bryan Lavine of Troutman Sanders as "[o]ur attorney" and indicated that she would authorize Lavine to "fully disclose to [Silverman] any facts or thoughts about the Edcomm/Smartpros relationship."[56]

On October 5, Silverman e-mailed Eagle to request Edcomm's Accounts Receivable and Accounts Payable worksheets, "certified by Edcomm's CPA," and an estimate of the working capital required by Edcomm for the next twelve months.[57]  Eagle provided Silverman with contact information for Stanley Nasberg, Edcomm's CPA, who informed Silverman that he could not certify the

---

[54]     Def. Ex. S3 (10/3/10 e-mail from Silverman to Eagle, Yahya, Abalkhail, Saead and Abdalla).

[55]     *See id.* (10/3/10 e-mail from Eagle to Silverman, Yahya, Abalkhail, Saead and Abdalla).

[56]     *Id.* (10/4/10 e-mail from Eagle to Silverman, Yahya, Abalkhail, Saead and Abdalla).

[57]     Def. Ex. X (10/5/10 e-mail from Silverman to Eagle, Lavine, Matthew Roberts, associate at Troutman Sanders, Yahya, Abalkhail, Saead and Abdalla).

figures because that would require "an audit which would take weeks and would not be available in the time period needed."[58]  Shapp responded to Silverman that "[i]f an audit were performed on [the Accounts Receivable and the Accounts Payable aging reports], all items would be confirmed" and that he "certif[ied] their accuracy."[59]  On October 7, Shapp sent Silverman a list of all bank accounts and corporate credit cards, as well as bank statements and credit card statements for the past three months, and indicated that the current cash position on hand and on deposit was $18,794.34.[60]

### 3.    The Term Sheet

On October 7, Abalkhail, Eagle, Brody and Shapp signed a three page document entitled "Sawabeh Information Services Company Acquisition of All Issued and Outstanding Common Shares of Edcomm, Inc.," subtitled "Term Sheet."[61]  Paragraph 2 of the Term Sheet states:

Simultaneous with the payment of Edcomm's debt to SmartPros,

---

[58]    *Id*. (10/5/10 e-mail from Silverman to Shapp, Eagle, Yahya, Abalkhail, Saead, Abdalla, Lavine and Roberts).

[59]    *Id*. (10/5/10 e-mail from Shapp to Silverman, Eagle, Yahya, Abalkhail, Saead, Abdalla, Lavine and Roberts).

[60]    *See* Def. Ex. S (10/7/10 e-mail from Shapp to Silverman, Eagle, Yahya, Abalkhail, Saead, Abdalla, Lavine and Roberts).

[61]    Pl. Ex. 1.

14

ownership of the current issued and outstanding shares shall pass to SISCOM.  All outstanding stock certificates of the Company shall be deemed cancelled and SISCOM shall be entered on the Company's stock ledger as the owner of all outstanding shares. The date of the payment to SmartPros and the transfer of the outstanding common stock and control of the Company to SISCOM shall be deemed the "Closing Date" and the time of transfer shall be deemed the "Closing."

Paragraphs 3 and 4 of the Term Sheet require Edcomm to identify all bank and investment accounts and corporate credit card accounts prior to the Closing Date.  Paragraph 5 of the Term Sheet states: "A period of ninety (90) to one hundred twenty (120) days of reorganization ("Reorganization Period") shall follow the Closing Date" during which time "[t]he current officers and directors will remain in the employ of [Edcomm] and cooperate with SISCOM in transitioning the management of [Edcomm]." Paragraph 8 states that "[a]t the conclusion of the Reorganization period, [Edcomm] will set aside a specific number of shares from the then authorized common shares of [Edcomm] for distribution to designated [Edcomm] managers and employees within the discretion of [Edcomm's] board of directors."  Paragraph 9 states, in relevant part, that "[s]hares allocated to [Edcomm] employees, pursuant to Paragraph 8 . . . will be conditioned upon the employee entering into an employment agreement."

Paragraph 7 of the Term Sheet states: "All current directors and officers of [Edcomm]. . . shall sign a non-compete agreement with [Edcomm] for a

15

term of three (3) years.[sic] effective upon leaving [Edcomm's] employ."

Paragraph 10 of the Term Sheet states:

> The current [Edcomm] CFO, David Shapp, shall certify [Edcomm's] outstanding liabilities and forecast any liabilities that might reasonably occur within six (6) months of the stock acquisition by SISCOM.  If the actual or forecasted liabilities are exceeded, the current directors and officers shall be personallly liable, jointly and severally, for the amount the actual liabilities exceed those in the Shapp certification.  Additionally, Shapp shall prepare a declaration of all Company assets sold within a 90 day period prior to the Closing Date.

Paragraph 11 of the Term Sheet states: "This term sheet shall be replaced by a formal contract."

### 4.    Post-Term Sheet Signing

On October 11, 2010, Silverman wrote to Lavine to propose "restructuring the deal in order to bolster the protection against SmartPros claims while offering security to SISCOM."[62]  Silverman suggested structuring the deal as a "stock purchase and loan" where "[t]he funds for the SnartPros [sic] payoff would be considered a loan while the stock could be purchased for a nominal amount. . . . The loan can be secured, and separate consideration for the stock could strengthen the argument that this is a pure stock deal."[63]  On October 12,

---

[62]    Def. Ex. B (10/11/10 e-mail from Silverman to Lavine and Roberts).

[63]    *Id.*

2010, Lavine e-mailed Jack Van Horne, counsel for SmartPros, to inform him that Edcomm will pay the outstanding balance in full by October 13, 2010.[64]  Lavine stated that "Edcomm disagrees with [SmartPros] that the sale of stock equates to a sale of assets" which would trigger SmartPros right of first refusal.[65]  SISCOM's wire transfer entered Edcomm's bank account on October 13, 2010 and the SmartPros loan was paid in full on the same day.[66]  On October 13, 2010, Eagle, Brody and Shapp signed a document entitled "Acknowledgment of Term Sheet" ("Acknowledgment").[67]  The document stated that the undersigned "acknowledge that the Term Sheet is in full effect and is binding upon the parties until replaced by a formal contract between the parties."[68]

SISCOM requested that defendants sign stock certificates in blank, leaving the transferee name blank.[69]  On October 14, 2010, defendants sent signed (but blank) stock certificates and the signed Acknowledgment to Lavine "to be

---

[64]    See Def. Ex. X4 (10/12/10 e-mail from Lavine to Van Horne).

[65]    Id.

[66]    See id. (10/13/10 e-mail from Saead to Eagle).

[67]    See Pl. Ex. 2.

[68]    Id.

[69]    See Trial Tr. at 411 (stipulation by plaintiffs' counsel).

17

placed in escrow."[70]  On November 19, 2010, Silverman e-mailed Lavine to

"acknowledge receipt of the escrowed materials."[71]  No completed stock

certificates (*i.e.* transferring stock to any specific recipient) have ever been

produced in this litigation and none were introduced into evidence at trial.

### F.   Post-October 13 Period

#### 1.   Due Diligence Period

Numerous witnesses testified as to what took place over the next

several months, including Abalkhail, Abdalla, SISCOM's financial analyst, Saeed,

SISCOM's internal auditor, Yahya, a former SISCOM consultant, and the

defendants.  Plaintiffs' witnesses characterized this period as a reorganization

period during which there would be a transition of management.  Defendants'

witnesses characterized the period as due diligence, during which SISCOM's team

would fully examine Edcomm's finances in anticipation of restructuring the

transaction.  Based on the available documents and the testimony, I find that

---

[70]     Def. Ex. F (10/14/10 e-mail from Eagle to Silverman, Lavine,
Roberts, Yahya, Abalkhail, Saead and Abdalla).  Silverman had earlier asked
Lavine to place "a few other items" in escrow, including "the Edcomm corporate
minute book, the stock ledger, all unissued stock certificates and the corporate
seal."  *Id.* (10/13/10 e-mail from Silverman to Lavine, Roberts, Eagle, Yahya,
Abalkhail, Saead and Abdalla).

[71]     Def. Ex. D (11/19/10 e-mail from Silverman to Lavine, Abalkhail and
Yahya).

SISCOM's team was both conducting due diligence in order to better understand Edcomm's financials *and* working on implementing new accounting systems and controls.

On October 20, 2010, Eagle e-mailed Abalkhail, Saead, Yahya, Abdalla, Silverman, Lavine, Brody and Shapp, stating: "In the whirlwind of getting the deal done there were many things that we ran through quickly, agreeing tacitly to trust each other and finalize following the payoff of the loan."[72]  Eagle's e-mail proposed an extensive strategy "to allow us to move forward smoothly for the 90-120 day Transition Period."[73]  Among the proposed steps was that Yahya would "come to the Edcomm office and work with [Shapp] to put into place procedures, tracking and reporting that will meet operational and informational needs of all."[74]  Eagle also suggested that "SISCOM should continue to provide written and oral approval for expenditures, with the addition of a 'petty cash' fund for small expenditures."[75]

Over the next few months, Yahya, Abdalla, Saeed and Shapp carried

---

[72]     Def. Ex. E5.

[73]     *Id*.

[74]     *Id.*

[75]     *Id*.

out a review of Edcomm's financial records.[76]  Based on their findings, Abdalla

and Yahya wrote a report for Abalkhail sometime in February 2011 titled

"Investment You Can Grow & Enjoy."[77]  The report characterizes itself as a "due

diligence" report.  It includes income projections and valuations.  Abdalla testified

that he and Yahya did not make valuations "based on the financial standards and

the accounting standards," but rather "took the numbers from what the

management team told us."[78]  Yahya stated that the "reason for due diligence [was]

to determine whether SISCOM wants to take [an] equity position in this particular

company."[79]  Although Abalkhail denies that due diligence was taking place, he

himself referred to the undertaking as "due diligence" on April 7, 2011.[80]  Shapp

and Yahya both credibly testified that they were working on the certification of

---

[76]     *See, e.g.*, Def. Ex. F5 (10/25/10 e-mail from Shapp to Yahya), G5
(11/15/10 e-mail from Shapp to Yahya, Eagle and Abdalla); H6 (2/5/11 e-mail
from Shapp to Saeed); II, JJ, KK and LL (3/18/11 e-mails from Shapp to
Silverman).

[77]     *See* Def. Ex. FF.  *See also* Trial Tr. 124 (Abdalla) and Trial Tr. at 633
(Yahya).

[78]     Trial Tr. at 124 (Abdalla).

[79]     *Id.* at 635 (Yahya).

[80]     *See* Def. Ex. BB (4/7/11 e-mail from Abalkhail to Eagle, Brody,
Shapp, Saead, Silverman and Lavine).

liabilities required by Paragraph 10 of the Term Sheet during this time period.[81]

### 2.    Proposed Formal Contract

On March 4, 2011, Silverman sent Lavine "the draft of the formal contract between SISCOM and Edcomm."[82]  Lavine replied to Eagle that the contract is "nothing more than boiler plate . . . and does not even fit the transaction."[83]  The draft contract is largely blank.[84]  No other drafts were circulated to the parties.[85]

### 3.    Discovery of Additional Liabilities

As part of SISCOM's due diligence, Saeed reviewed Edcomm's unaudited financial statements, the accounts receivable and accounts payable, consolidated and subsidiary ledgers, and disbursement statements. [86] Abdalla reviewed "the aging accounts receivables, the aging accounts payables, and some of the contracts [Edcomm] ha[d] with [] clients."[87] Qamar Zaman, an outside

---

[81]    *See* Trial Tr. at 613 and 632 (Yahya) and 704-708 (Shapp).

[82]    Def. Ex. K6 (3/4/11 e-mail from Silverman to Lavine and Abalkhail).

[83]    *Id*. (3/6/11 e-mail from Lavine to Eagle).

[84]    *See* Def. Ex. I7.

[85]    *See* Trial Tr. at 84 (Abalkhail).

[86]    *See id.* at 201 (Saeed).

[87]    *Id.* at 122 (Abdalla).

SISCOM consultant, testified that he was retained in March 2011 to review

Edcomm's financial statements and the accounts payable and receivable

paperwork.[88]  Saeed, Abdalla and Zaman testified that they discovered numerous

liabilities that had not been disclosed prior to October 7, 2010.

However, Abdalla did not identify any particular undisclosed

liabilities.  He merely stated that "there was [sic] a lot of credit lines [that] were not

accurate [a]nd they were not exactly the same, like – the sheets that they sent us

before the acquisition."[89]  Plaintiffs' counsel stated that he would introduce records

showing these accounting discrepancies during Omar Saeed's testimony.[90]  Yet

during Saeed's lengthy testimony in which he identified "$14.5 million [of

liabilities that were] not disclosed," plaintiffs did not introduce a single

substantiating record showing the alleged accounting failures.[91]  Plaintiffs also

failed to introduce evidence that these potential liabilities ever materialized – for

example, the $14.5 million figure includes an estimated $12.1 million in liabilities

stemming from two agreements which, as I will discuss below, were never

---

[88]     *See id.* at 615 (Zaman).

[89]     *Id.* at 123 (Abdalla).

[90]     *See id.* ("BERWISH: "We will have [those records] with Mr. Saeed
tomorrow, your Honor.").

[91]     *Id.* at 228 (Saeed).

22

enforced.

Second, the only financial records introduced during Zaman's testimony were Edcomm's tax returns which showed that the shareholder loans – which incorrectly included the Slater loans – were converted to paid in capital in 2009.[92]  I find that plaintiffs have only proven one undisclosed liability by a preponderance of the evidence – the Slater loans in the amount of $735,000 plus interest.  I understand that on some issues oral testimony is the only evidence available, but where plaintiffs are in full control and custody of the complete financial records and present witnesses who testify that they reviewed those records and identified undisclosed credit lines and liabilities, failure to present documentary evidence of either accounting irregularities or of damages caused by those irregularities is a failure of proof.

### 4.    Disclosure of Brody Agreements

On March 28, 2011, Silverman wrote to Lavine and Abalkhail stating that "[a]s part of the ongoing due diligence review of Edcomm, [he] was provided with . . . a September 17, 2008 agreement between Edcomm and Clifford Brody under which all rights to Edcomm intellectual property ("IP") were given to Brody for his being compensated below 'fair market value.'  Additionally, Brody was

---

[92]    See id. at 626-627 (Zaman, discussing Pl. Ex. 54).

23

given an $8 million demand claim against Edcomm."[93]  At or around the same time

that this agreement was disclosed to SISCOM, defendants disclosed another

agreement between Brody and Edcomm, signed and dated August 2, 1995, stating

that Brody would be entitled to a severance package of: (1) untaken vacation time,

accrued at four weeks per year of service calculated at an annual salary of

$400,000 from February 14, 1988, (2) two months' salary per year of service

calculated at an annual salary of $400,000 from February 14, 1988, and (3) two

years' salary calculated at an annual salary of $400,000, as well as a $1,000,000

bonus unless the severance package exceeds $5 million.[94]  Abalkhail understood

the 1995 agreement to represent a $5 million liability.[95] These two agreements are

collectively referred to as "the Brody agreements."

On April 7, 2011, Abalkhail demanded that defendants send the

"original contracts to . . . Silverman for forensic examination to authenticate if

these contracts are bona fide."[96]  Defendants stipulated at trial that they have never

---

[93]     Def. Ex. A (3/28/11 e-mail from Silverman to Lavine and Abalkhail).

[94]     *See* Pl. Ex. 12 (8/2/95 and 9/17/08 agreements between Brody and
Edcomm, collectively entitled "the Brody agreements").

[95]     *See* Trial Tr. at 48 (Abalkhail).  A rough calculation of the severance
package based on Brody's termination date of June 20, 2011 shows that, if
enforced, the 1995 employment agreement would be a $4.1 million liability.

[96]     Def. Ex. BB.

produced the original agreements and that "those specific documents were created in 2011 . . . [n]ot the agreements, but those documents."[97]  Though at one point, defendants sought to enforce the Brody agreements, Brody is no longer doing so.[98]  I find that the defendants fabricated and backdated the Brody agreements in late March 2011, probably as a result of frustration with the draft contract sent by Silverman to Eagle, which did not include an employment agreement or proposed division of shares.  However, because Brody no longer seeks to enforce the agreements and the approximately $12.1 million dollars of liability never materialized, it would be incorrect to characterize the Brody agreements as an undisclosed liability.  I do note that defendants' actions in fabricating these documents reflects poorly on their good faith and credibility.

### G.    Defendants' Termination

Defendants were terminated on June 20, 2011.[99]  Over the next sixteen months, Eagle and Brody attempted to retrieve certain personal items and documents from Edcomm's offices.  On June 29, 2011, Kathy Gioia, Edcomm's

---

[97]    Trial Tr. at 48 (Shapp).

[98]    *See id*. at 866 (Shapp: "Mr. Brody is determined that he will not seek to enforce those agreements.").

[99]    *See* Pl. Ex. 49 (6/20/11 letters of termination from Philip L. Hirschorn, Counsel for SISCOM, to Eagle, Brody and Shapp).

director of administration, e-mailed Eagle to tell her that she will "get [her] personals sorted and packed up for [] pickup next week."[100]  On August 16, 2012, Gioia e-mailed Eagle to say that "Edcomm is prepared to inventory and deliver . . . the personal items (specifically: clothes, shoes, bedding, artwork) currently housed in our offices."[101]  Eagle forwarded the e-mail to plaintiffs' then-counsel, Philip Hirschorn and Lauren Isaacoff, stating that "[t]his does not address my personal notes and papers and medical and tax records, nor does it address books, binders and work samples of mine from prior to Edcomm – nor does it address Cliff's items at all."[102]  Isaacoff responded that Eagle is not permitted onto Edcomm premises but "Edcomm is willing to return to you your clothes and personal items to the extent they do not belong to the business . . . and [] consent[s] to having a third party come to Edcomm to pick up [Eagle's] belongings" or to have "someone that you trust still at Edcomm . . . to . . . assist in some way."[103]  Isaacoff also noted that "Brody's documents and belongings were packed by an Edcomm employee

---

[100]   Def. Ex. V9 (6/29/11 e-mail from Gioia to Eagle and Zaman).

[101]   Def. Ex. H10 (8/16/12 e-mail from Gioia to Eagle).

[102]   *Id*. (8/20/12 e-mail from Eagle to Hirschorn and Isaacoff).

[103]   *Id*. (8/20/12 e-mail from Isaacoff to Eagle, Brody, Shapp and Hirschorn)

and picked up by Brody personally after his termination."[104]   After additional back
and forth, Eagle and plaintiffs' counsel were unable to come to an agreement about
how to retrieve the property.  On October 12, 2012, Hirschorn e-mailed Eagle with
a two page inventory list documenting personal property that Edcomm was
preparing to return to Eagle.[105]

On January 30, 2013, Gioia e-mailed Eagle to state that she would
ship the personal items on February 6, 2013.[106]  Eagle testified that the items were
never received.[107]  Eagle admitted that she never accepted Hirschorn's offer to
"have someone go there and pick up what was available."[108]  Brody testified that he
did pick up some items from Edcomm, but that he has never received other
personal items including "one-of-a-kind work products that predate Edcomm."[109]

---

[104]    *Id.*

[105]    *See* Def. Exs. J10 and I10 (e-mail from Hirschorn to Eagle, Brody,
Shapp and Isaacoff).

[106]    *See* Def. Ex. D10 (1/30/13 e-mail from Gioia to Eagle).

[107]    *See* Trial Tr. at 798 (Eagle).

[108]    *Id.* at 803 (Eagle).

[109]    *Id.* at 833-834 (Brody).

## III.   APPLICABLE LAW[110]

### A.   Section 10(b) of the Securities Exchange Act and Rule 10b-5

Section 10(b) of the Securities Exchange Act makes it illegal to "use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe . . . ."[111]  Under Rule 10b-5, one may not "make any untrue statement of a material fact or [] omit to state a material fact necessary in order to make the statements made . . . not misleading . . . in connection with the purchase or sale of any security."[112]  "Section 10(b) does not punish deceptive conduct, but only deceptive conduct 'in connection with the purchase or sale of any security registered on a national securities exchange or any

---

[110]   The Court has subject matter jurisdiction over this case under 28 U.S.C. § 1331 as to those causes of action arising under the laws of the United States.  The Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over the related state law claims. Venue is proper pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to the claims occurred in this district. *See* JPTO ¶ 2

[111]   15 U.S.C. § 78j(b).

[112]   17 C.F.R. § 240.10b-5.  Courts have long recognized an implied private right of action under Section 10(b) and Rule 10b-5.  *See Superintendent of Ins. v. Bankers Life & Cas. Co.*, 404 U.S. 6, 13 n.9 (1971) (noting that "[i]t is now established that a private right of action is implied under [Section] 10(b)").

28

security not so registered.'"[113]  "To sustain a private claim for securities fraud

under Section 10(b), 'a plaintiff must prove (1) a material misrepresentation or

omission by the defendant; (2) scienter; (3) a connection between the

misrepresentation or omission and the purchase or sale of a security; (4) reliance

upon the misrepresentation or omission; (5) economic loss; and (6) loss

causation.'"[114]

     "An investor may not justifiably rely on a misrepresentation if,

through minimal diligence, the investor should have discovered the truth."[115]

Courts consider numerous factors in deciding whether reliance was reasonable

based on the parties' sophistication and the available information, including:

> (1) [t]he sophistication and expertise of the plaintiff in financial
> and securities matters; (2) the existence of longstanding business
> or personal relationships; (3) access to the relevant information;
> (4) the existence of a fiduciary relationship; (5) concealment of
> the fraud; (6) the opportunity to detect the fraud; (7) whether the
> plaintiff initiated the stock transaction or sought to expedite the
> transaction;  and  (8)  the  generality  or  specificity  of  the

---

[113]    *Morrison v National Australia Bank Ltd.*, 130 S.Ct. 2869, 2884 (2010)
(quoting 15 U.S.C. § 78j(b)).

[114]    *Ashland Inc. v. Morgan Stanley & Co., Inc.*, 652 F.3d 333, 337 (2d
Cir. 2011) (quoting *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 552
U.S. 148, 157 (2008)).  *Accord Erica P. John Fund, Inc. v. Halliburton Co.*, —
U.S. — , 131 S. Ct. 2179, 2184 (2011).

[115]    *Ashland*, 652 F.3d at 337-38 (quotation marks omitted).

misrepresentations.[116]

## B.    Common Law Fraud and Fraudulent Inducement

"The elements of fraud under New York law are: '[1] a misrepresentation or a material omission of fact which was false and known to be false by defendant, [2] made for the purpose of inducing the other party to rely upon it, [3] justifiable reliance of the other party on the misrepresentation or material omission, and [4] injury.'"[117] "The elements of fraudulent inducement are substantially the same as those for common law fraud."[118]

Under New York law, a plaintiff may only justifiably rely on misrepresentations or omissions without conducting an independent investigation if they pertain to information "peculiarly within defendant's knowledge . . . and the

---

[116]    *Id.* at 338.

[117]    *Premium Mortgage Corp. v. Equifax, Inc.*, 583 F.3d 103, 108 (2d Cir. 2009) (quoting *Lama Holding Co. v. Smith Barney Inc.*, 88 N.Y.2d 413, 421 (1996)).

[118]    *SISCOM v. Brody,* 832 F. Supp. 2d 280, 297-98 (S.D.N.Y. 2012) (citing *Braddock v. Braddock*, 871 N.Y.S.2d 68, 70 (1st Dep't 2009) ("To plead a claim for common-law fraudulent inducement, a plaintiff must assert the misrepresentation of a material fact, which was known by the defendant to be false and intended to be relied on when made, and that there was justifiable reliance and resulting injury.")).

[plaintiff] had no independent means of ascertaining the truth.'"[119] The Second

Circuit has explained that "the greater the sophistication of the investor, the more

inquiry [into reasonable reliance] that is required. 'Where sophisticated

businessmen engaged in major transactions enjoy access to critical information but

fail to take advantage of that access, New York courts are particularly disinclined

to entertain claims of justifiable reliance.'"[120] A plaintiff must also prove *actual*

reliance – that is, that she in fact relied on the misrepresentations or omissions

when making the investment decision.[121]

### C.    Breach of Contract

The elements of breach of contract under New York law are as

follows: "(1) the existence of a contract between [the plaintiff] and th[e] defendant;

(2) performance of the plaintiff's obligations under the contract; (3) breach of the

contract by th[e] defendant; and (4) damages to the plaintiff caused by th[e]

---

[119]    *Abu Dhabi Commercial Bank v. Morgan Stanley & Co. Inc.*, No. 08 Civ. 7508, 2012 WL 3584278, at *4 (S.D.N.Y. Aug. 17, 2012) (quoting *Crigger v. Fahnestock & Co., Inc.*, 443 F.3d 230, 234 (2d Cir. 2006)).

[120]    *Crigger*, 443 F.3d at 235 (quoting *Grumman Allied Indus., Inc. v. Rohr Indus., Inc.*, 748 F.2d 729, 737 (2d Cir. 1984)).

[121]    *See Abu Dhabi Commercial Bank v. Morgan Stanley & Co.*, 269 F.R.D. 252, 263 (S.D.N.Y. 2010).

defendant's breach."[122]

### 1.    Existence of a Contract

It is well-known that '[p]arties to proposed commercial transactions often enter into preliminary agreements, which may provide for the execution of more formal agreements.'"[123] "Under New York Law, two types of preliminary agreements create binding obligations."[124]  "A [Type I] preliminary agreement binds both sides to their ultimate contractual objective in recognition that, 'despite the anticipation of further formalities,' a contract has been reached."[125]  A Type II preliminary agreement, is binding only to the extent that the parties are committed to "negotiate the open issues in good faith" to reach their ultimate contractual objective.[126]  Because a Type II preliminary agreement "does not commit the parties to their ultimate contractual objective," a party to a Type II preliminary

---

[122]    *Diesel Props S.r.l. v. Greystone Bus. Credit II LLC*, 631 F.3d 42, 52 (2d Cir. 2011) (citing *Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.*, 375 F.3d 168, 177 (2d Cir. 2004) and *Harsco Corp. v. Segui*, 91 F.3d 337, 348 (2d Cir. 1996)).  *Accord Mandarin Trading Ltd. v. Wildenstein*, 16 N.Y.3d 173, 182 (2011).

[123]    *SISCOM*, 832 F. Supp. 2d at 301.

[124]    *Learning Annex Holdings LLC v. Whitney Educ. Grp. Inc.*, 765 F. Supp. 2d 403, 410 (S.D.N.Y. 2011) (citing *Adjustire Sys., Inc. v. GAB Business Servs., Inc.*, 145 F.3d 543, 547-48 (2d Cir. 1998)).

[125]    *Id.* (quoting *Adjustire Sys.*, 145 F.3d at 548).

[126]    *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 431 (2d Cir. 2011).

agreement has no right to demand performance of the transaction.[127]

"To determine whether the parties have reached a Type I preliminary agreement, courts weigh four factors:

> (1) whether there has been an express reservation of the right not to be bound in the absence of writing; (2) whether there has been partial performance of the contract; (3) whether all of the terms of the alleged contract have been agreed upon; and (4) whether the agreement at issue is the type of contract that is usually committed to writing.[128]

"[T]o determine whether the parties have reached a Type II preliminary agreement, courts weigh five factors: '(1) the language of the agreement; (2) the context of the negotiations; (3) the existence of open terms; (4) partial performance; and (5) the necessity of putting the agreement in final form, as indicated by the customary form of such transactions.'"[129]

### 2.    Parol Evidence Rule

The parol evidence rule "generally prohibits the admission of extrinsic evidence of prior or contemporaneous oral agreements to explain the meaning of a

---

[127]    *Adjustrite Sys.*, 145 F.3d at 548 (citation omitted).

[128]    *Learning Annex*, 765 F. Supp. 2d at 411 (quoting *Adjustrite Sys.* at 549).

[129]    *Id.* (quoting *Arcadian Phosphates, Inc. v. Azuelos*, 884 F.2d 69, 72 (2d Cir. 1989)).

contract that the parties have reduced to an unambiguous integrated writing."[130]  A contract does not need to have an integration clause to be considered fully integrated.  "If the written document appears to contain the engagements of the parties, and to define the object and measure the extent of such engagement then it constitutes the contract between them, and is presumed to contain the whole of that contract."[131]  "Absent a merger clause or language that explicitly states that the written agreement is integrated, the issue of whether the writing is an integrated agreement is determined 'by reading the writing in the light of surrounding circumstances, and by determining whether or not the agreement was one which the parties would ordinarily be expected to embody in the writing.'"[132]

Even where a written agreement is not fully integrated, New York law does not permit parol evidence to "contradict or vary the writing, but [only] to 'complete the entire agreement of which the writing was only a part'" or to resolve

---

[130]    *Gualandi v. Adams*, 385 F.3d 236, 242 (2d Cir. 2004).

[131]    *Morgan Stanley High Yield Sec., Inc. v. Seven Circle Gaming Corp.*, 269 F. Supp. 2d 206, 214 (S.D.N.Y. 2003).

[132]    *Myskina v. Conde Nast Publ'n Inc.*, 386 F. Supp. 2d 409, 415 (S.D.N.Y. 2005) (quoting *Wilson-Gray v. Jay Feinberg Ltd.*, No. 90 Civ. 0001, 1990 WL 209635, at *2 (S.D.N.Y. Dec. 17, 1990)).

some ambiguity therein.[133]  Thus, the party seeking to introduce parol evidence

may not use it to vary or contradict the terms included in the contract, but may

offer such evidence regarding terms that are *not* included in the agreement, or to

challenge the validity of the contract's formation,[134] or to show that it was

fraudulently induced.[135]

### D.    Breach of Fiduciary Duty

"'To establish a claim for breach of fiduciary duty, a plaintiff must

prove (1) the existence of a fiduciary relationship; (2) misconduct by defendant

constituting a breach of its fiduciary duty to plaintiff; and (3) damages to plaintiff

directly caused by defendant's misconduct.'"[136] "Whether one party is a fiduciary

of another depends on the relationship between the parties."[137]  "A fiduciary

---

[133]    *Laskey v. Rubel Corp.*, 303 N.Y. 69, 71 (1951) (quoting *Thomas v. Scutt*, 127 N.Y. 133, 138 (1891)).

[134]    *See Genger v. Sharon*, 910 F. Supp. 2d 656, 669 (S.D.N.Y. 2012) ("Parol evidence is admissible to establish that an instrument never became a binding agreement.").

[135]    *See Camofi Master LDC v. College P'ship., Inc.*, 452 F. Supp. 2d 462, 475 (S.D.N.Y. 2006) ("The parol evidence rule does not bar consideration of such extrinsic evidence of fraudulent inducement, provided that the contract does not contain a disclaimer of the specific misrepresentations at issue.").

[136]    *Soley v. Wasserman*, 823 F. Supp. 2d 221, 232 (S.D.N.Y. 2011) (quoting *Sokol Holdings, Inc. v. BMB Munai, Inc.*, 726 F. Supp. 2d 291, 305-06 (S.D.N.Y. 2010)).

[137]    *Id.*

relationship exists under New York law 'when one [person] is under a duty to act for or to give advice for the benefit of another upon matters within the scope of relation.'"[138] "Rather than determining the existence of a fiduciary relationship 'by recourse to rigid formulas, New York courts typically focus on whether one person has reposed trust or confidence in another who thereby gains a resulting superiority or influence over the first.'"[139] "The calculation of damages in breach of fiduciary duty cases is predicated upon the type of misconduct in which the fiduciary engaged."[140] "When the plaintiff seeks money damages, she must establish that the alleged breach of fiduciary duty was both a 'but for' and proximate cause of [her] damages."[141]

### E.   Breach of Implied Employment Contract

"It is well settled under New York law that, even if there is no written contract between two parties, 'a contract may be implied where inferences may be

---

[138]   *Berman v. Sugo LLC*, 580 F. Supp. 2d 191, 204 (S.D.N.Y. 2008) (quoting *Flickinger v. Harold C. Brown & Co.*, 947 F.2d 595, 599 (2d Cir. 1991)).

[139]   *Id.* (quoting *Litton Indus., Inc. v. Lehman Bros. Kuhn Loeb Inc.*, 767 F. Supp. 1220, 1231 (S.D.N.Y. 1991), *rev'd on other grounds*, 967 F.2d 742 (2d Cir. 1992)).

[140]   *Negrin v. Kalina*, No. 09 Civ. 6234, 2013 WL 6671688, at *4 (S.D.N.Y. Dec. 17, 2013) (citing *Estate of Janes,* 90 N.Y.2d 41, 55, 659 N.Y.S.2d 165, 172 (1997)).

[141]   *Soley*, 823 F. Supp. 2d at 232 (citations and quotation marks omitted).

drawn from the facts and circumstances of the case and the intention of the parties as indicated by their conduct.'"[142] "There is a distinction between a contract implied in fact and one implied in law. An implied-in-fact contract is 'just as binding as an express contract arising from declared intention, since in the law there is no distinction between agreements made by words and those made by conduct.'"[143] If there is no valid contract in fact, a party may recover for an implied contract in law, or in quantum meruit.  "In order to recover in quantum meruit, plaintiffs must establish "(1) the performance of services in good faith[;] (2) the acceptance of the services by the person to whom they are rendered[;] (3) an expectation of compensation therefore[;] and (4) the reasonable value of the services."[144]

### F.    Pennsylvania Wage Payment and Collection Law

The Pennsylvania Wage Payment and Collection Law ("WPCL")[145]

---

[142]    *Missigman v. USI Northeast, Inc.*, 131 F. Supp. 2d 495, 512 (S.D.N.Y. 2001) (quoting *Ellis v. Provident Life & Accident Ins. Co.*, 3 F. Supp. 2d 399, 409 (S.D.N.Y. 1998)).

[143]    *Id.* (quoting *Ellis*, 3 F. Supp. 2d at 409).

[144]    *Learning Annex,* 765 F. Supp. 2d at 413 (quoting *Mid-Hudson Catskill Rural Migrant Ministry, Inc. v. Fine Host Corp.*, 418 F.3d 168, 175 (2d Cir. 2005)).

[145]    43 P.S. §§ 260.1–260.12.

"imposes a statutory duty on every employer to pay all wages due to employees."[146] Employees may bring a civil action to recover unpaid wages, liquidated damages and attorneys' fees.[147] However, the WPCL "does not create an employee's substantive right to compensation; rather, it only establishes an employee's right to enforce payment of wages and compensation to which an employee is otherwise entitled by the terms of an agreement."[148] Thus, a "WPCL claim cannot survive without an independent valid breach of contract claim."[149]

## G.   Conversion and Replevin

Under New York law, seeking damages from allegations of "'unauthorized assumption and exercise of the right of ownership over goods belonging to another to the exclusion of the owner's rights' sounds in conversion,"

---

[146]   *Murin v. Bray*, No. 13 Civ. 1017, 2013 WL 6145590, at *5 (W.D. Pa. Nov. 21, 2013) (quotations omitted)).

[147]   *See* 43 P.S. §§260.09 and 260.10.  Employees may recover liquidated damages of 25% of the total amount of wages due or $500, whichever is greater.

[148]   *Banks Eng'g Co., Inc. v. Polons*, 697 A.2d 1020, 1024 (Pa. Super. Ct. 1997), *appeal granted*, 550 Pa. 715 (1998).  *Accord De Ascencio v. Tyson Foods, Inc.,* 342 F.3d 301, 309 (3d Cir. 2003) ("[T]he WPCL does not create a right to compensation. . . . Rather, it provides a statutory remedy when the employer breaches a contractual obligation to pay earned wages. The contract between the parties governs in determining whether specific wages are earned.") (citations omitted)).

[149]   *Wieczorek v. Dempsey Partners, LLC*, No. 12 Civ. 4170, 2013 WL 6578788, at * (E.D. Pa. Dec. 16, 2013).

38

not replevin.[150] A party seeking monetary damages for conversion must prove by a preponderance of the evidence that "'(1) the party charged has acted without authorization, and (2) exercised dominion or a right of ownership over property belonging to another [,] (3) the rightful owner makes a demand for the property, and (4) the demand for the return is refused.'"[151]

"The law of replevin governs actions for the recovery of stolen or wrongfully detained property. A cause of action in replevin 'must establish that the defendant is in possession of certain property of which the plaintiff claims to have a superior right.'"[152] "'Demand upon, and refusal of, the person in possession of the chattel to return it [are] essential elements of a cause of action in replevin.'"[153]

### H.  Indemnification

Section 722(c) of New York's Business Corporations Law authorizes, but does not require, corporations to indemnify directors and officers in suits

---

[150]    *Dore v. Wormley*, 690 F. Supp. 2d 176, 182 (S.D.N.Y. 2010) (quoting *Vigilant Ins. Co. of Am. v. Housing Auth. of City of El Paso, Tex.*, 87 N.Y. 2d 36, 44 (1995)).

[151]    *Goodman v. Port Auth. of N.Y. and N.J.*, 850 F. Supp. 2d 363, 376 (S.D.N.Y. 2012) (quoting *Seanto Exps. v. United Arab Agencies*, 137 F. Supp. 2d 445, 451 (S.D.N.Y. 2001)).

[152]    *Wormley*, 690 F. Supp. 2d at 183 (quoting *Batsidis v. Batsidis*, 778 N.Y.S.2d 913, 913 (2004)).

[153]    *Id*. (quoting *In re Peters*, 821 N.Y.S.2d 61, 65 (2006)).

brought "by or in the right of the corporation to procure a judgment in its favor . . .

against amounts paid in settlement and reasonable expenses, including attorneys'

fees, actually and necessarily incurred . . . in connection with the defense or

settlement of such action . . . if such director or officer acted, in good faith, for a

purpose which he reasonably believed to be in . . . the best interests of the

corporation."[154] Indemnification in suits brought by or in the right of the

corporation to procure a judgment it its favor is not permissible as to

> any claim, issue or matter as to which such person shall have been
> adjudged to be liable to the corporation, unless and only to the
> extent that the court in which the action was brought . . .
> determines upon application that, in view of all the circumstances
> of the case, the person is fairly and reasonably entitled to
> indemnity for such portion of the settlement amount and expenses
> as the court deems proper.[155]

> "Notwithstanding the failure of a corporation to provide

indemnification . . . indemnification shall be awarded by a court to the extent

authorized under section 722"[156] and "subject to the same standards and

qualifications where applicable as in the case of voluntary corporate

---

[154]    McKinney's Bus. Corp. L. § 722(c) (2013).

[155]    *Id.*

[156]    *Id.* § 724(a) (2013).

40

indemnification."[157]

## I.   Declaratory and Injunctive Relief

The Declaratory Judgment Act[158] "gives a district court the discretion to 'declare the legal rights and other legal relations of any interested party seeking such declaration.'"[159]

> The Declaratory Judgment Act by its express terms vests a district court with discretion to determine whether it will exert jurisdiction over a proposed declaratory action or not. . . .Courts have consistently interpreted this permissive language as a broad grant of discretion to district courts to refuse to exercise jurisdiction over a declaratory action that they would otherwise be empowered to hear.[160]

The Second Circuit has held that the following factors are relevant in determining whether declaratory relief is appropriate:

> (1) whether the judgment will serve a useful purpose in clarifying or settling the legal issues involved; and (2) whether a judgment would finalize the controversy and offer relief from uncertainty . . . (3) whether the proposed remedy is being used merely for 'procedural fencing' or a 'race to res judicata'; (4) whether the use of a declaratory judgment would increase friction between

---

[157]   McKinney's Bus. Corp. L. § 724, Comment (2013).

[158]   28 U.S.C. §§ 2201–2202.

[159]   *Chevron Corp. v. Naranjo*, 667 F.3d 232, 244 (2d Cir. 2012) (quoting 28 U.S.C. § 2201(a)).

[160]   *Dow Jones & Co., Inc. v. Harrods Ltd.*, 346 F.3d 357, 359 (2d Cir. 2003).

sovereign legal systems or improperly encroach on the domain of
a state or foreign court; and (5) whether there is a better or more
effective remedy.[161]

## IV.   CONCLUSIONS OF LAW

### A.   Plaintiffs' Claims

#### 1.   Plaintiffs Failed to Prove Reasonable Reliance, a Required Element of the Securities Fraud, Common Law Fraud and Fraudulent Inducement Claims

"The elements of fraudulent inducement are substantially the same as those for common law fraud [and] the elements of common law fraud under New York law are 'substantially identical to those governing Section 10(b).'"[162] Plaintiffs argue that "[d]efendants failed to disclose or made material misrepresentations regarding the liabilities of Edcomm, including but not limited to failing to disclose or properly identify the Slater loans on the Edcomm financial statements, failing to disclose the [Brody agreements], and failing to disclose the insolvency of Edcomm."[163]  I conclude that plaintiffs failed to prove reasonable reliance on these alleged misrepresentations, a required element of all three

---

[161]   *Chevron*, 667 F.3d at 245 (citing *Dow Jones*, 346 F.3d at 359-60) (quotations omitted).

[162]   *SISCOM,* 832 F. Supp. 2d at 298 (quoting *AIG Global Sec. Lending Corp. v. Banc of Am. Sec., LLC*, No. 01 Civ. 11448, 2005 WL 2385854, at *16 (S.D.N.Y. Sept. 25, 2005)).

[163]   Plaintiffs' Proposed Conclusions of Law, at 4.

claims.[164]

It would be obvious to anyone, and especially to a sophisticated investor like SISCOM, that Edcomm was a company in financial distress based merely on the circumstances of the transaction and the financial statements and other documents Edcomm provided to SISCOM prior to October 7, 2010. Its net income for the prior two years was meager. On the day the Term Sheet was signed, Edcomm had little more than $18,000 in available funds. Eagle approached Abalkhail in the first place because Edcomm had no conceivable way to pay the outstanding balance on the SmartPros loan. Silverman recognized that Edcomm could not sell any of its assets without triggering SmartPros's right of first refusal and that no company would give it another line of credit given SmartPros's superior lien. Edcomm did not misrepresent its solvency – it was apparent on the face of the available records that Edcomm could not pay its bills as they came due.

Furthermore, SISCOM knew that it received unaudited financial statements from a small corporation whose only three shareholders were also its

---

[164]   Because I conclude that plaintiffs failed to prove reasonable reliance, I will not address the other elements of the claims, except to note that plaintiffs also failed to prove damages. The only evidence offered as to damages, beyond the initial $727,000 investment, was conclusory testimony unsupported by documents as to allegedly uncovered liabilities and $6 million of expenditures made by SISCOM since acquiring Edcomm.

only three directors.   The testimony and the documents in evidence make clear that defendants did not maintain records in accordance with generally accepted accounting principles.  They relied on multiple spreadsheets stored in various locations to keep track of different receivables, contracts and liabilities.  However, these loose accounting standards were obviously disclosed to SISCOM as it was receiving these documents over the nine days between September 28 and October 7.

        "Sophisticated investors must show they used due diligence and took affirmative steps to protect themselves from misrepresentations by employing what means of verification were available at the time."[165]  Although the New York Court of Appeals has held that reliance may be justifiable "where plaintiffs made a significant effort to protect themselves against the possibility of false financial statements [by] obtain[ing] representations and warranties to the effect that nothing in the financials was materially misleading,"[166] SISCOM's minimal efforts to do so in this instance are not sufficient to overcome the glaring red flags that jump out from even a summary review of Edcomm's financial records.  "[W]hen plaintiff has the means of knowing, by the exercise of ordinary intelligence, the truth, or the

---

[165]    *VisionChina Media Inc. v Shareholder Representative Serv., LLC*, 109 A.D. 3d 49, 57 (1st Dep't 2013).

[166]    *DDJ Mgmt., LLC v. Rhone Group LLC*, 15 N.Y.3d 147, 156 (2010).

real quality of the subject of the representation, he must make use of those means. While the law does not require that a defrauded party go to the ends of the earth to discover the falsity of a statement, patent foolishness is not excused."[167]

SISCOM obtained a representation from Shapp that the accounts payable and accounts receivable aging reports were accurate.  Yet SISCOM understood that the accounts payable and accounts receivable aging reports were not a complete picture of Edcomm's liabilities and receivables.  Thus SISCOM could not justifiably rely on Shapp's warranty as a warranty of anything more than the accuracy of the statements contained in those two reports.[168]  Second, SISCOM included a provision in the Term Sheet stating "[i]f the actual or forecasted liabilities are exceeded, the current directors and officers shall be personally liable, jointly and severally, for the amount the actual liabilities exceed those in the Shapp certification."[169]  As I discuss below, the parties did not contemplate that Shapp would complete the certification before the Term Sheet was signed.

Thus, SISCOM knowingly invested prior to receiving a definite

---

[167]    *In re Eugenia VI Venture Holdings, Ltd. Litig.*, 649 F. Supp. 2d 105, 118 (S.D.N.Y. 2008), *aff'd sub nom.*, *Eugenia VI Venture Holdings, Ltd. v Glaser*, 370 Fed. App'x 197 (2d Cir. 2010) (quotations omitted).

[168]    *See* Trial Tr. at 69 (Abalkhail) ("[The] aging report is different than the certified liabilities . . . I'm not saying it is not accurate.  Maybe it is accurate.").

[169]    Pl. Ex. 1 ¶ 10.

representation from defendants as to Edcomm's liabilities.  SISCOM cannot

justifiably rely on the provision in Paragraph 10 of the Term Sheet because it failed

to prove that defendants provided either "actual or forecasted" liabilities prior to

the investment.

### 2.    Plaintiffs Failed to Prove Breach of Contract

At the outset, I conclude that the Term Sheet is a Type I preliminary

agreement and is enforceable as to the terms contained within it.  This contract was

not merely an agreement to agree, but included real preliminary obligations in

anticipation of a future final contract.

However, the Term Sheet is not fully integrated and parol evidence

was properly heard.  Neither the Term Sheet nor the Acknowledgment include an

integration clause.  The Term Sheet states: "This term sheet shall be replaced by a

formal contract."[170]  The Acknowledgment states: "The undersigned hereby

acknowledge that the Term Sheet is in full effect and is binding upon the parties

*until* replaced by a formal contract between the parties."[171] Although plaintiffs

argue that this phrase is an integration clause,[172] I disagree.  The cases plaintiffs

---

[170]    Pl. Ex. 1 ¶ 11.

[171]    Pl. Ex. 2 (emphasis added).

[172]    *See* 12/2/13 Plaintiffs' Reply to Defendants' Opposition to Plaintiffs'
Memorandum in Support of the "Acknowledgment" Acting as an Integration

cite in support of this notion only state that phrases similar to the Acknowledgment can be evidence that the court considers *in the absence of an integration clause* as to whether an agreement is integrated "in light of the surrounding circumstances."[173]

The surrounding circumstances in this case indicate that the parties intended to amend the agreement in a future formal contract, and may even have intended to amend the structure of the transaction, based on the legal positions taken by SmartPros. In fact, the evidence reveals that this transaction was structured as a stock deal primarily because it could not be structured as a loan, given SmartPros's superior lien. Through creative lawyering, the parties concluded that a stock deal was not a sale of assets that would trigger SmartPros's right of first refusal and would be the most likely way to be rid of future litigation threats from SmartPros.

Plaintiffs claim that defendants breached the Term Sheet by failing to sign a non-compete agreement, in violation of Paragraph 7, and that Shapp breached the Term Sheet by failing to certify Edcomm's outstanding liabilities in

_____

Clause, at 5 (citing *Adler & Shaykin v. Wachner*, 721 F. Supp. 472 (S.D.N.Y. 1988), *Braten v. Bankers Trust Co.*, 60 N.Y.2d 155 (1983), *Lee v. Joseph E. Seagram & Son*, 413 F. Supp. 693 (S.D.N.Y. 1976)).

[173]    *See Adler,* 721 F. Supp. at 476; *Braten*, 60 N.Y.2d at 162; *Lee*, 413 F. Supp. at 701.

violation of Paragraph 10.  I conclude that plaintiffs failed to prove that a breach occurred.

Paragraph 7 requires that the "current directors and officers of [Edcomm] . . . shall sign a non-compete agreement . . . effective upon leaving [Edcomm's] employ."[174]  Defendants were never given a non-compete agreement to sign.  Paragraph 7 does not require that defendants draft the non-compete agreement themselves.

Paragraph 10 does not specify when Shapp was required to provide a certification of liabilities.  Unlike Paragraphs 3 and 4, which state that certain information must be disclosed "[p]rior to the Closing Date," Paragraph 10 imposes no deadline on the certification.  As a general matter, an ambiguous term will be construed against the contract's drafter as the drafter is responsible for any ambiguity.[175] Because Abalkhail agreed that he knew the certification of liabilities was not provided prior to the signing of the Term Sheet, because Shapp and Yahya credibly testified that they were working on the certification during the due

---

[174]   Pl. Ex. ¶ 7.

[175]   *See M. Fortunoff of Westbury Corp. v. Peerless Ins. Co.*, 432 F.3d 127, 142 (2d Cir. 2005) (citing *Andy Warhol Found. for Visual Arts, Inc. v. Federal Ins. Co.*, 189 F.3d 208, 215 (2d Cir. 1999)).  Plaintiffs' counsel agrees that Silverman drafted the Term Sheet on behalf of SISCOM.  *See* Trial Tr. at 865 ("BERWISH: [Silverman] drafted it and negotiated it.").

diligence period with the knowledge of SISCOM's management, and because

Shapp was terminated in June 2011, plaintiffs failed to prove that Shapp breached

Paragraph 10 of the Term Sheet.

### 3. Defendants Breached Their Fiduciary Duty to SISCOM By Failing to Disclose the Slater Loans

A claim for breach of fiduciary duty requires "a breach by a fiduciary

of obligations *to another*."[176]  Prior to this transaction, Eagle, Shapp and Brody

were the only shareholders of Edcomm.  A person cannot have a fiduciary

relationship to him or herself.[177]  However, defendants had a fiduciary relationship

to SISCOM because they remained directors of Edcomm after SISCOM became

Edcomm's sole shareholder.  Assuming that SISCOM became a shareholder on

October 13, 2010, the same day that the SmartPros loan was repaid, defendants

would have had a fiduciary duty to SISCOM from that date until their termination

on June 20, 2011.

During this period, defendants breached their fiduciary duty to

---

[176]    *Kaufman v. Cohen*, 307 A.D. 2d 113, 125 (1st Dep't 2003) (emphasis added).

[177]    *See EBC I, Inc. v. Goldman, Sachs & Co.*, 5 N.Y.3d 11, 19 (2005) ("A fiduciary relationship 'exists between *two persons* when one of them is under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relation.'") (quoting Restatement (Second) of Torts § 874, Comment A) (emphasis added)).

SISCOM by failing to disclose the Slater loans to SISCOM and failing to disclose

that those loans had been inappropriately converted to paid-in capital. SISCOM

and Edcomm have not yet suffered damages as a result of this breach.  However,

Slater has brought an action against Edcomm in New York state court.[178]  I take no

position on the dispute between Slater and Edcomm.  However, should Edcomm be

found liable as a result of that litigation, defendants have a duty to indemnify

plaintiffs because such a judgment would arise as a direct result of defendants'

breach of their fiduciary duty to SISCOM.[179]

### 4.   Plaintiffs Are Entitled to a Declaratory Judgment Stating that Edcomm's Intellectual Property Belongs to Edcomm

Plaintiffs seek a declaratory judgment stating (1) that defendants

should indemnify plaintiffs as to any undisclosed liabilities and (2) that all of

Edcomm's intellectual property belongs to Edcomm.  Plaintiffs also seek an order

prohibiting defendants from competing with Edcomm.  Plaintiffs' request for

declaratory and injunctive relief is granted in part.

The provision under which defendants are personally liable for

---

[178]    *See* Trial Tr. at 468 (Slater).

[179]    The fabrication of the Brody agreements in March 2011 could also conceivably be a breach of fiduciary duty; however, because defendants no longer seek to enforce those agreements, plaintiffs cannot prove that they were damaged by the breach.

undisclosed liabilities is only triggered by Shapp completing a certification of liabilities.[180]  As discussed earlier, because Shapp never finalized a certification of liabilities, the personal liability provision cannot be triggered.  However, I have already found that defendants must indemnify plaintiffs if they are found liable to Slater as her loans to Edcomm were an undisclosed liability.

An order compelling defendants to sign a non-compete agreement as required by Paragraph 7 of the Term Sheet would not be equitable.   Paragraph 7 required defendants to sign a non-compete agreement "for a term of three years effective upon leaving [Edcomm's] employ."[181]  That term will expire on June 20, 2014.  It would be unreasonable to force parties to spend additional time and money to negotiate a reasonable non-compete agreement to cover a period of only a few months.

However, plaintiffs' request for a declaratory judgment stating that Edcomm's intellectual property belongs to Edcomm is granted.

### B.    Defendants' Claims

#### 1.    Defendants Failed to Prove Actual Reliance, a Required Element of the Common Law Fraud and Fraudulent Inducement Claims

---

[180]     *See* Pl. Ex. 1 ¶ 10.

[181]     *Id.* ¶ 7.

51

Defendants argue that SISCOM misled them as to its intentions when negotiating the Term Sheet.  Defendants argue that

> SISCOM, Yahya, Silverman and Abalkhail all represented to Eagle and Brody that they understood that the Term Sheet reflected a means by which SISCOM could provide a loan to Edcomm secured by its common stock which would be held in escrow by the attorneys, and which left open the possibility that following due diligence, SISCOM would either take an equity stake, or . . . the SISCOM loan would be repaid without interest.[182]

As I discuss above, the contemporaneous e-mail communications indicate that the transaction was first contemplated as a loan, but was ultimately structured as a stock deal in order to avoid triggering SmartPros's superior lien.

Defendants failed to prove that they were were misled into signing a contract for a sale of stock.  Defendants were represented by sophisticated counsel at Troutman Sanders[183] and signed a Term Sheet that unambiguously describes a stock sale without reference to loans or escrow.  Defendants signed the Term

---

[182]    Def. Facts and Concl. at 48.

[183]    Defendants repeatedly argued that Lavine represented Edcomm in its corporate capacity, but that they were not represented by Lavine as individuals. This argument is unconvincing.  Edcomm was a small company, completely owned and run by the three defendants.  Defendants, on numerous occasions, stated that there was no difference between "us" and "Edcomm" *see, e.g.* Trial Tr. 461 (Brody) ("THE COURT: The three of you were Edcomm.  There is nobody else.  You were the three principals, you, the three owners, you were Edcomm." BRODY: Exactly right, Your Honor."), and Eagle referred to Lavine as "our attorney" in e-mails to SISCOM.  *See* Def. Ex. S3 (10/4/10 e-mail from Eagle to Silverman, Yahya, Abalkhail, Saead and Abdalla).

Sheet, with full knowledge that the transaction was structured as a stock deal, because they knew it was the best opportunity to be rid of the SmartPros threat.

### 2.   Defendants Failed to Prove Plaintiffs' Breach of Contract

Defendants argue that plaintiffs breached the Term Sheet by (1) failing to make any good faith effort to negotiate a final contract in violation of Paragraph 11; (2) refusing to set aside common shares of Edcomm to return to defendants in violation of Paragraph 8; and (3) refusing to provide employment agreements to defendants in violation of Paragraph 9.

Paragraph 8 states that "[a]t the conclusion of the Reorganization period, [Edcomm] will set aside a specific number of shares from the then authorized common shares of [Edcomm] for distribution to designated [Edcomm] managers and employees within the discretion of [Edcomm's] board of directors."[184]  Paragraph 9 states, in relevant part, that "[s]hares allocated to [Edcomm] employees, pursuant to Paragraph 8 . . . will be conditioned upon the employee entering into an employment agreement."[185]  Paragraph 11 of the Term Sheet states: "This term sheet shall be replaced by a formal contract."[186] Because

---

[184]   Pl. Ex. 1 ¶ 8.

[185]   *Id.* ¶ 9.

[186]   *Id.* ¶ 11.

Paragraphs 8, 9 and 11 do not establish affirmative obligations to set aside common shares, provide employment agreements or negotiate a final contract, defendants failed to prove plaintiffs' breach.

### 3. Defendants Are Not Entitled to Deferred Salaries or Repayment of Shareholder Loans

To recover in quantum meruit, defendants must establish "(1) the performance of services in good faith[;] (2) the acceptance of the services by the person to whom they are rendered[;] (3) an expectation of compensation therefore[;] and (4) the reasonable value of the services."[187] Defendants argue that "[i]n approximately 2007, Eagle, Brody, and Shapp on one hand and Edcomm on the other agreed that they would delay the payment of some of their earned salaries to help the company use its cash flow to pay other liabilities."[188] Defendants – the sole owners and shareholders of Edcomm at the time of this alleged agreement – cannot argue in good faith that they were on "one hand" of the implied agreement and that Edcomm was "on the other."  The court cannot equitably enforce an implied employment contract between the defendants and themselves.

Furthermore, defendants could not have reasonably expected to be repaid given Edcomm's distressed finances and persistent cash flow problems.  In

---

[187] *Longo v. Shore & Reich, Ltd.*, 25 F.3d 94, 98 (2d Cir. 1994).

[188] Def. Facts and Concl. at 53.

fact, Eagle admitted that the three partners made the conscious business decision to forgo their salaries because it would have been difficult to pay other bills.[189] Defendants took the risk that if the company failed to make any money, they would lose both the deferred salaries and shareholder loans.  These business decisions do not constitute an implied employment contract.[190]

### 4.    Conversion and Replevin

Eagle waived her claims as to conversion and replevin by failing to accept plaintiffs' offer to return her personal items on numerous occasions. Eagle's argument that plaintiffs' only proposed to return some of her items is unavailing.  Eagle had multiple opportunities to retrieve the items plaintiffs were willing to return and then make a demand for the return of any additional items she believed were unlawfully possessed.  She chose not to do so and has thus waived her conversion and replevin claims entirely.

Brody retrieved those items that plaintiffs were willing to return. Brody's conversion and replevin claims fail because he did not prove that he made a demand for the return of any other *specific* items and he did not assert a claim for

---

[189]    *See* Trial Tr. at 593 (Eagle).

[190]    Because defendants have no valid claim for breach of contract, their Pennsylvania Wage Payment Collection Law claim must also be dismissed.  *See De Ascencio*, 342 F.3d at 309.

damages, merely stating in a conclusory fashion that "[t]he monetary value of the items . . . would be impossible to judge."[191]

### 5. Indemnification

Section 724 of New York's Business Corporations Law authorizes the court to award indemnification "to the extent authorized under section 722"[192] and "subject to the same standards and qualifications where applicable as in the case of voluntary corporate indemnification."[193]  While section 722(c) permits corporations to indemnify directors and officers in suits brought "by or in the right of the corporation to procure a judgment in its favor," indemnification is not appropriate if the director or officer did not act "in good faith, for a purpose which he reasonably believed to be in . . . the best interests of the corporation."[194]

I find that indemnification is not warranted in this case because defendants failed to act in good faith or in the best interests of the corporation by failing to maintain appropriate accounting records, by inappropriately treating the Slater loans as shareholder loans and by fabricating the Brody agreements.  This is

---

[191]   Trial Tr. at 833-834 (Brody).

[192]   McKinney's Bus. Corp. L. § 724(a) (2013).

[193]   *Id.* § 724, Comment (2013).

[194]   *Id.* § 722(c) (2013).

a case where both parties acted poorly and neither party should benefit from its own wrongdoings.

## V.    CONCLUSION

For the foregoing reasons, plaintiffs' claims are dismissed with prejudice, except that (1) defendants shall indemnify plaintiffs for any judgment awarded in the ongoing New York state court litigation between Slater and Edcomm, and (2) plaintiffs' request for a declaratory judgment stating that Edcomm's intellectual property belongs to Edcomm is granted.  Defendants' counterclaims are dismissed with prejudice.  Plaintiffs are ordered to pay $7,870 to Vandenberg & Feliu LLP in attorneys' fees pertaining to defendants' spoliation motion, which I granted by a separate order on August 28, 2013.[195]  The Clerk of the Court is directed to close this case.

---

[195]    Defendants submitted a request for $11,695 in attorneys' fees in connection with the spoliation motion.  I reviewed the letter from Jeffrey Gross, Esq., and the pertinent legal bills included in defendants' submission dated September 20, 2013, and slightly reduced the award because I was unable to determine what, if any, work pertaining to the spoliation issue was performed on February 14 and February 15, 2012.

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:        New York, New York
              January 6, 2014

**- Appearances -**

For Plaintiffs:

Philip R. Berwish, Esq.
Berwish Law
228 Park Avenue South
New York, NY 10003
(800) 547-8717

Defendants (Pro Se):

Clifford Brody
840 Merrill Road
Ambler, PA 19002
(215) 540-8530

David Shapp
P.O.  Box 542
Buckingham, PA 18912
(267) 251-0224

Linda Eagle
225 West 71st Street, Apt. 83
New York, NY 10023
(917) 318-6650